# NO. 23-3030

In The

# 𝔘𝔫𝔦𝔱𝔢𝔡 𝔖𝔱𝔞𝔱𝔢𝔰 ℭ𝔬𝔲𝔯𝔱 𝔒𝔣 𝔄𝔭𝔭𝔢𝔞𝔩𝔰
## 𝔉𝔬𝔯 𝔗𝔥𝔢 𝔗𝔥𝔦𝔯𝔡 ℭ𝔦𝔯𝔠𝔲𝔦𝔱

**LIBBY HILSENRATH,**
on behalf of her minor child, C.H.,

*Appellant,*

v.

**SCHOOL DISTRICT OF THE CHATHAMS;
BOARD OF EDUCATION OF THE SCHOOL DISTRICT OF THE CHATHAMS;
MICHAEL LASUSA, In his official capacity as the Superintendent of the
School District of Chathams; KAREN CHASE, In her official capacity as the
Assistant Superintendent of Curriculum and Instruction at the
School District of the Chathams; JILL GIHORSKI, In her official capacity as the
Principal of Chatham Middle School; STEVEN MAHER, In his official capacity
as the Supervisor of Social Studies for the School District of the Chathams;
MEGAN KEOWN, In her official capacity as a Social Studies teacher for
Chatham Middle School; CHRISTINE JAKOWSKI, In her official capacity as a
Social Studies teacher for Chatham Middle School.**

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

_____

**BRIEF OF APPELLANT**

_____

Richard Thompson
THOMAS MORE LAW CENTER
24 Frank Lloyd Wright Drive
P.O. Box 393
Ann Arbor, MI 48106
(734) 827-2001
rthompson@thomasmore.org

Michael P. Hrycak
ATTORNEY AT LAW
316 Lenox Avenue
Westfield, NJ 07090
(908) 789-1870
michaelhrycak@yahoo.com

*Counsel for Appellant*

*Counsel for Appellant*

## United States Court of Appeals for the Third Circuit

### Corporate Disclosure Statement and
### Statement of Financial Interest

No. 23-3030
_____

LIBBY HILSENRATH, on behalf of her minor child, C.H.

v.

BOARD OF EDUCATION OF THE SCHOOL DISTRICT OF
THE CHATHAMS

Instructions

Pursuant to Rule 26.1, Federal Rules of Appellate Procedure any nongovernmental corporate party to a proceeding before this Court must file a statement identifying all of its parent corporations and listing any publicly held company that owns 10% or more of the party's stock.

Third Circuit LAR 26.1(b) requires that every party to an appeal must identify on the Corporate Disclosure Statement required by Rule 26.1, Federal Rules of Appellate Procedure, every publicly owned corporation not a party to the appeal, if any, that has a financial interest in the outcome of the litigation and the nature of that interest. This information need be provided only if a party has something to report under that section of the LAR.

In all bankruptcy appeals counsel for the debtor or trustee of the bankruptcy estate shall provide a list identifying: 1) the debtor if not named in the caption; 2) the members of the creditors' committee or the top 20 unsecured creditors; and, 3) any entity not named in the caption which is an active participant in the bankruptcy proceedings. If the debtor or the bankruptcy estate is not a party to the proceedings before this Court, the appellant must file this list. LAR 26.1(c).

The purpose of collecting the information in the Corporate Disclosure and Financial Interest Statements is to provide the judges with information about any conflicts of interest which would prevent them from hearing the case.

The completed Corporate Disclosure Statement and Statement of Financial Interest Form must, if required, must be filed upon the filing of a motion, response, petition or answer in this Court, or upon the filing of the party's principal brief, whichever occurs first. A copy of the statement must also be included in the party's principal brief before the table of contents regardless of whether the statement has previously been filed. Rule 26.1(b) and (c), Federal Rules of Appellate Procedure.

If additional space is needed, please attach a new page.

(Page 1 of 2)

Pursuant to Rule 26.1 and Third Circuit LAR 26.1, makes the following disclosure:

Libby Hilsenrath, o/b/o her minor child, C.H.
_____
(Name of Party)

      1) For non-governmental corporate parties please list all parent corporations: Not applicable.

      2) For non-governmental corporate parties please list all publicly held companies that hold 10% or more of the party's stock:

Not applicable.

      3) If there is a publicly held corporation which is not a party to the proceeding before this Court but which has as a financial interest in the outcome of the proceeding, please identify all such parties and specify the nature of the financial interest or interests:

None known.

      4) In all bankruptcy appeals counsel for the debtor or trustee of the bankruptcy estate must list: 1) the debtor, if not identified in the case caption; 2) the members of the creditors' committee or the top 20 unsecured creditors; and, 3) any entity not named in the caption which is active participant in the bankruptcy proceeding. If the debtor or trustee is not participating in the appeal, this information must be provided by appellant.

Not applicable.

/s/ Richard Thompson
_____
(Signature of Counsel or Party)

Dated: 11/28/2023
_____

rev: 09/2014                    (Page 2 of 2)

# TABLE OF CONTENTS

**Page**

DISCLOSURE STATEMENT

TABLE OF AUTHORITIES ....................................................................... iii

STATEMENT OF JURISDICTION ...........................................................1

STATEMENT OF ISSUES FOR REVIEW ................................................2

STATEMENT OF RELATED CASES AND PROCEEDINGS ..................2

STATEMENT OF THE CASE ....................................................................3

SUMMARY OF THE ARGUMENT ........................................................18

STANDARD OF REVIEW .......................................................................21

ARGUMENT .............................................................................................22

I.    KENNEDY DID NOT GRANT PERMISSION TO PUBLIC SCHOOLS TO ENGAGE IN RELIGIOUS INSTRUCTION AND PROSELYTIZATION ......................................................................23

    A.    THE DIFFERENCES BETWEEN *KENNEDY V. BREMERTON* AND HILSENRATH'S CASE ILLUMINATE THAT THE CHATHAM SCHOOL BOARD'S VIOLATION OF THE ESTABLISHMENT CLAUSE WAS EGREGIOUS AND AVOIDABLE ......................................................................24

        1.    UNLIKE IN *KENNEDY*, THE SPEECH AT ISSUE IN HILSENRATH'S CASE IS INDISPUTABLY GOVERNMENT SPEECH ..........................................................25

2. UNLIKE IN *KENNEDY*, THE RELIGIOUS SPEECH AT ISSUE IN HILSENRATH'S CASE WAS DELIVERED TO A CAPTIVE AUDIENCE OF SEVENTH GRADE STUDENTS WHO WERE DIRECTED TO WATCH THE VIDEOS AS PART OF A REQUIRED COURSE AND UNDER THREAT OF LOWER GRADES ...................................27

B. THE DISTRICT COURT ERRED IN ITS INTERPRETATION OF WHAT IT DESCRIBES AS A "CIPHER" IN FOOTNOTE FIVE OF THE *KENNEDY* OPINION AS THE ENTIRETY OF THE CITED MATERIAL SUPPORTS HILSENRATH'S CLAIMS ............................................................................28

II. HISTORICAL PRACTICES AND UNDERSTANDINGS DO NOT PERMIT A SCHOOL BOARD TO FAVOR ONE RELIGION BY INCLUDING PROSELYTIZING VIDEOS IN ITS CURRICULUM FOR A REQUIRED SEVENTH GRADE COURSE THAT DESCRIBE ISLAM AS THE "TRUE FAITH" AND ENCOURAGE ISLAMIC PRAYER AND CONVERSION.....................................................36

A. THE DISTRICT COURT APPLIED A HIGHER BURDEN OF PROOF THAN JUSTIFIED BY ANY PRECEDENT, WRONGLY REQUIRING HILSENRATH TO PRODUCE EVIDENCE OF "SIGNIFICANT COERCION." ..............................41

1. Hilsenrath Pled Facts Showing Coercion And the District Court Committed Clear Error By Ignoring or Disregarding Them...............................................................................46

III. HISTORICAL PRACTICES AND UNDERSTANDINGS FORBID THE GOVERNMENT FROM FAVORING ONE RELIGION OVER ALL OTHERS ...............................................................................49

CONCLUSION.........................................................................53

COMBINED CERTIFICATIONS ...........................................55

JOINT APPENDIX VOLUME I

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Am. Legion v. Am. Humanist Ass'n*,
139 S. Ct. 2067 (2019)................................................22, 34, 49, 50

*Anderson v. Liberty Lobby, Inc.*,
477 U.S. 242 (1986)....................................................................21

*Bd. of Educ. v. Mergens*,
496 U.S. 226 (1990)................................................................26, 45

*Borden v. Sch. Dist. of Twp. of E. Brunswick*,
523 F.3d 153 (3d Cir. 2008) ............................................16, 43, 44

*Brown v. Board of Education*,
347 U.S. 483 (1954)....................................................................38

*C.N. v. Ridgewood Bd. Of Educ.*,
430 F.3d at 187 ..........................................................................16

*Capitol Square Review & Advisory Bd. v. Pinette*,
515 U.S. 753 (1995)....................................................................26

*Carson v. Makin*,
142 S. Ct. 1987 (2022)................................................................34

*Cnty. of Allegheny v. ACLU*,
492 U.S. 573 (1989)................................................................41, 45

*Doe v. Luzerne Cnty.*,
660 F.3d 169 (3d Cir. 2011) ......................................................21

*Edwards v. Aguillard*,
482 U.S. 578 (1987)............................................................31, 38, 46

*Engel v. Vitale*,
370 U.S. 421 (1962)..............................................................*passim*

*Epperson v. Arkansas*,
    393 U.S. 97 (1968)..................................................................................19, 49

*Everson v. Bd. of Educ.*,
    330 U.S. 1 (1947)....................................................................................*passim*

*Garcetti v. Ceballos*,
    547 U.S. 410 (2006)...............................................................................25, 26

*Kennedy v. Bremerton Sch. Dist.*,
    142 S. Ct. 2407 (2022).............................................................................*passim*

*Larson v. Valente*,
    456 U.S. 228 (1982)................................................................................*passim*

*Lee v. Weisman*,
    505 U.S. 577 (1992)................................................................................*passim*

*Lemon v. Kurtzman*,
    403 U.S. 602 (1971)................................................................................*passim*

*Marsh v. Chambers*,
    463 U.S. 783 (1983)........................................................................37, 38, 50

*Modrovich v. Allegheny County*,
    385 F.3d 397 (3d Cir. 2004) .........................................................................43

*Monell v. Department of Social Services*,
    436 U.S. 658 (1978)....................................................................................9, 10

*Nathanson v. Med. Coll. of Pa.*,
    926 F.2d 1368 (3d Cir. 1991) .......................................................................21

*Pichler v. Unite*,
    542 F.3d 380 (3d Cir. 2008) ...................................................................21, 46

*Ramara, Inc. v. Westfield Ins. Co.*,
    814 F.3d 660 (3d Cir. 2016) .........................................................................21

*Range v. AG United States*,
    69 F. 4th 96 (3d Cir. 2023) ...........................................................................33

*Santa Fe Indep. Sch. Dist. v. Doe,*
    530 U.S. 290 (2000)................................................................44, 45, 50

*Sch. Dist. of Abington Twp. v. Schemmp,*
    374 U.S. 203 (1963).......................................................................*passim*

*Shurtleff v. City of Boston, Massachusetts,*
    596 U.S. 243 (2022).......................................................................*passim*

*Torcaso v. Watkins,*
    367 U.S. 488 (1961).............................................................................19

*Town of Greece v. Galloway,*
    572 U.S. 565 (2014)................................................................22, 46, 50

*United States v. One Toshiba Color Television,*
    213 F.3d 147 (3d Cir. 2000) ...............................................................22

*United States v. Scarfo,*
    263 F.3d 80 (3d Cir. 2001) .................................................................22

*Wallace v. Jaffree,*
    472 U.S. 38 (1985)................................................................37, 38, 45

*Walz v. Egg Harbor Twp. Bd. of Educ.,*
    342 F.3d 271 (3d Cir. 2003) ...............................................................41

*West Virginia Bd. of Ed. v. Barnette,*
    319 U.S. 624 (1943).............................................................................32

*Zorach v. Clauson,*
    343 U.S. 306 (1952)................................................................19, 27, 28, 50

**Statutes**

28 U.S.C. § 1291 ......................................................................................1

28 U.S.C. § 1331 ......................................................................................1

28 U.S.C. § 1343(a)(3)..............................................................................1

28 U.S.C. § 1343(a)(4)..............................................................................1

28 U.S.C. § 2201 ...........................................................................................1

28 U.S.C. § 2202 ...........................................................................................1

42 U.S.C. § 1983 .......................................................................................1, 8

**Constitutional Provisions**

U.S. Const. amend. I .............................................................................*passim*

U.S. Const. amend. XIV .................................................................1, 37, 38, 49

**Rules**

Fed. R. Civ. P. 56(a).....................................................................................21

**Other Authorities**

1 Annals of Cong. 730-731 (1789) ...............................................................35

M. McConnell, *Establishment and Disestablishment at the Founding,*
*Part I: Establishment of Religion,*
        44 Wm. & Mary L. Rev. 2105 (2003)...............................35, 36, 37

M. McConnell, *Religion and Its Relation to Limited Government,*
        33 Harv. J. L. & Pub. Pol'y 943 (2010) .......................................40

## STATEMENT OF JURISDICTION

This case arises under the First and Fourteenth Amendments to the United States Constitution and 42 U.S.C. § 1983. The district court possessed jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1343(a)(3) & (4). *See* A40 (Pl.'s Compl.) The district court had jurisdiction over Hilsenrath's request for declaratory and injunctive relief pursuant to 28 U.S.C. §§ 2201 and 2202.

The district court first entered summary judgment in favor of the Defendants on November 12, 2020, and Hilsenrath timely appealed. This Court possessed jurisdiction pursuant to 28 U.S.C. § 1291. While the appeal was pending, the Supreme Court decided *Kennedy v. Bremerton Sch. Dist.,* 142 S. Ct. 2407 (2022). This Court then vacated the decision of the district court without reaching the merits and remanded the case to the district court for further proceedings consistent with *Kennedy*. A634. The district court ordered additional briefing from the parties and again entered judgment for the Defendants on October 16, 2023. A1 (Supp. Op. on Remand); A22 (Order). Hilsenrath filed a timely notice of appeal on November 13, 2023, and now seeks review of the final judgment of the district court which disposed of all parties' claims. A24 (Notice of Appeal). Accordingly, this Court possesses subject-matter jurisdiction pursuant to 28 U.S.C. § 1291.

## STATEMENT OF ISSUES FOR REVIEW

1.      Does a public school violate the Establishment Clause when, as part of a required course, it treats one religion more favorably than all others, calling it the "true faith", and requires seventh grade students, under threat of lower grades, to view videos posted to the school's Google Classroom that present religious opinion as fact, that encourage Islamic prayer, and that include an explicit call for conversion, or does the history and tradition of the United States support such conduct in public schools? *See* A42, 50-66 (Pl. Compl.); A498-503 (Pl. Resp. in Opp. to Defs.' Summ. J.); A565-574 (Pl. Brief on Remand); A1 (Opinion on Remand).

2.      Did the Supreme Court in *Kennedy v. Bremerton Sch. Dist.*, 142 S. Ct. 2407 (2022), without ever expressly saying so and based on a "cipher" contained in a footnote, create a new standard requiring public school students to prove they suffered "significant coercion" and that their school coerced them to "participat[e] in or adher[e] to a religious belief or practice" in order to demonstrate a violation of the Establishment Clause? A13-18 (Opinion on Remand).

## STATEMENT OF RELATED CASES AND PROCEEDINGS

This case was previously before the Third Circuit Court of Appeals. Hilsenrath's initial notice of appeal was filed on December 7, 2020, and the case was assigned number 20-3474. A575 (Docket Entries). The parties completed briefing and the Court heard oral argument on September 23, 2021. A582 (Oral Arg. Tr.).

Before a decision was rendered, the Supreme Court decided *Kennedy v. Bremerton Sch. Dist.,* 142 S. Ct. 2407. Consequently, on July 20, 2022, the Third Circuit entered an order vacating the district court's judgment entered November 12, 2020, and remanding the case to the district court for further consideration in light of the Supreme Court's *Kennedy* opinion. A634. The mandate issued on August 11, 2022. A638.

### STATEMENT OF THE CASE

This case began during the 2016-2017, school year when Libby Hilsenrath's son, C.H. was a seventh grade student at Chatham Middle School and was enrolled in the mandatory World Cultures and Geography ("WCG") class. A326 (LaSusa Dep. 42:5-11). The WCG class contained a unit dedicated to the Middle East and North Africa ("MENA") region. A326-327 (LaSusa Dep. 42:24-43:5). This class utilized Google Classroom, an internet forum for schools to remotely present information to students including documents, videos, and hyperlinks. A319 (LaSusa Dep. 27:1-25). The material that was presented via Google Classroom was considered equivalent to in-class instruction. A322 (LaSusa Dep. 30:14-20). The syllabus for the seventh grade WCG course instructed that homework and classwork comprise 10% of a student's grade and that "completion of all assignments is essential and expected in order to be successful in this course." A440-441 (WCG Syllabus). The syllabus also instructed "Google Classroom websites will contain

important information including class calendars, handouts, assignment and project directions, and grading guidelines. Students and parents are advised to use this resource as the primary source of information about coursework." A441. Additionally, the study guide for the MENA unit test directed students to "Use slides on Google Classroom to ensure you have all important information in your notes or on the handouts!" A424 (MENA study guide).

In January 2017, Hilsenrath asked C.H. if he had any homework and he replied that he "had to watch a video and then take notes or do a worksheet." A310 (C.H. Dep. 36:1-4). Hilsenrath viewed the material posted on Google Classroom for C.H.'s class. A288 (Hilsenrath Dep. 17:17-23). The WCG Google Classroom contained an assignment directing C.H. to watch a video called Intro to Islam. A310 (C.H. Dep. 36:1-9); A416 (Generalizations Presentation). The written directions on Google Classroom required students to watch the Intro to Islam video and "[a]s you're watching this video clip, write down words that describe Islam as presented by this video." A416 (Generalizations Presentation); A332-333 (LaSusa Dep. 48:21-49:10). The Intro to Islam video is nearly five-minutes long and is filled with Islamic religious tenets presented as statements of fact, including: "Allah is the one God;" "[Allah] has no equal and is all powerful;" "Muhammad (peace be upon him) is the last & final Messenger of God;" "God gave [Muhammad] the Noble Quran;" "[The Quran is] [d]ivine revelation;" "[The Quran is a] Perfect guide for Humanity;" "The

Noble Quran [is] Guidance, Mercy and Blessing for all mankind;" "The Noble Quran[:] Guidance for the wise & sensible;" "Muslims created a tradition of unsurpassable splendor;" and "Islam [is] [a] shining beacon against the darkness of repression, segregation, intolerance and racism." A335-339 (LaSusa Dep. 51:24—55:8); A435 (Intro to Islam Video link); A521 (Pl. Statement of Material Fact "SOMF" 53). The video also contains an excerpt from the Quran, the Islamic holy book, stating that Islam is the perfected religion and the only religion for mankind. A435 (Intro to Islam Video); A522 (Pl. SOMF 54). It concludes with a prayer for its viewers to become members of the Islamic religion, stating "May God help us all find the true faith, Islam, Ameen." A435 (Intro to Islam Video); A299 (Hilsenrath Dep., 130:5-7). Superintendent LaSusa testified that a school accomplishes its educational mission by teaching factual information, and admitted that none of the proselytizing statements in the Intro to Islam video are factual. A368-369, 335-339 (LaSusa Dep. 97:15-98:3; 51:10-55:8). Additionally, the video is set to an Arabic-language musical version of the Islamic poem Qaseedah Burdah and includes a link for students to download it. A435 (Intro to Islam Video); A33 (Pl. SOMF 56). Although, C.H. does not speak Arabic and therefore did not realize the verses described non-Muslims as "infidels" and praised Muhammad for slaughtering them, he did recognize the sound of the music as "prayer music." A55-56 (Compl. ¶ 62); A314 (C.H. Dep. 61:6-25).

5

Google Classroom also contained an assignment directing C.H. to watch a cartoon video about the five pillars of Islam ("Five Pillars video"). A524-525 (Statement of Fact 58); A308-310 (C.H. Dep. 34:7-35:1-36:9); A437 (Five Pillars Video Link); A395, 397 (Five Pillars slides). The Five Pillars video depicts a conversation between two children, Alex (a non-Muslim) and Yusef (a Muslim), in which Yusef explains Islamic tenets, beliefs, and practices to Alex. A437 (Five Pillars Video). Yusef states "Allah created everything" and instructs Alex in the shahada, the Islamic conversion creed and prayer stating "[t]here is no God except Allah and Prophet Muhammed is his messenger." *Id*. Yusef explains the five pillars of Islam to Alex, including the second pillar which requires Muslims to pray five times a day. When Alex asks if it is hard to pray that often, Yusef responds, "No, Not at all! We are praying to god. And when I remember that it is god that keeps me healthy and keeps my heart beating it makes me want to pray." *Id*. The video shows Yusef's heart beating. Alex looks down and sees his heart beating as well, and smiles. *Id*. Yusef leaves to pray midday prayers and Alex looks sad until Yusef returns and invites Alex to come with him. *Id*. Alex happily accepts. The end of the video provides viewers with information and points of contact to schedule a mosque tour. *Id*. Both videos were included in the WCG online classroom as student assignments, but neither contained any form of disclaimer indicating that these videos did not represent the views or opinions of

Chatham School District, its teachers or board. *Id*.; A435 (Intro to Islam Video); A373 (LaSusa Dep. 102:5-10).

The WCG class also assigned students to complete a worksheet that required C.H. to engage in a fill-in-the-blank written profession of the shahada ("shahada worksheet") the Islamic conversion creed and prayer, which stated: "There is no god but [Allah] and [Muhammad] is his messenger." A294-295 (Hilsenrath Dep. 76:12-77:4); A418-420 (Intro to Islam Worksheet). This worksheet contained a hyperlink directing C.H. to a website that recited the shahada and informed visitors that in order to convert to Islam and become a Muslim all that is required is to recite the shahada three times before a witness. A298-299 (Hilsenrath Dep. 129:17-130:4); A526-528 (Pl. SOMF 67, 68). The WCG course did not address other religions in a similar manner. It did not provide instructions on how to become a member of or convert to any world religions except Islam, nor did the course describe any other religion as the "true faith." *See* A501-502 (Pl. Resp. in Opp'n).

After seeing the proselytizing nature of the assignments that were given to her seventh grader, Hilsenrath sought to have the videos removed by bringing her concerns to the attention of the Social Studies Content Supervisor for the School District, the Assistant Superintendent of Curriculum, the Superintendent, and the Board of Education of the School District. Her request was denied. The School Board confirmed their approval of the WCG course material at a public Board

meeting and declined to vote to change the curriculum. A115 (Dep of Board Rep. 28:6-22). Thereafter, Hilsenrath filed her federal complaint on behalf of her minor son C.H. on January 23, 2018, in the United States District Court for the District of New Jersey. A40 (Compl.).

### District Court Proceedings

Hilsenrath's Complaint asserted one claim under 42 U.S.C. § 1983 against the Chatham School District, School Board, Superintendent and other teachers and administrators responsible for the WCG curriculum in their official capacities. A40, 63-67 (Compl.). Hilsenrath alleged that Defendants' curriculum, in particular the Intro to Islam and Five Pillars videos and shahada worksheet violate the Establishment Clause of the First Amendment. *Id*. The Complaint sought a declaratory judgment, permanent injunction prohibiting the Defendants from "funding and implementing religious instruction that endorses Islam or that favors Islam over other religions or non-religion" including the Intro to Islam and Five Pillars videos, and nominal damages and attorneys' fees. A67-68. After completing discovery, each party moved for summary judgment.

The district court first entered judgment in favor of Defendants on November 12, 2020, after granting Defendants' motion for summary judgment and denying Hilsenrath's cross-motion. A535 (2020 Opinion). In doing so, the district court credited the testimony of the seventh grade teacher, Ms. Jakowski, to find that neither

8

the Intro to Islam video nor the Five Pillars video was played in class or assigned as homework. A537-538, 540. This finding ignored Hilsenrath's summary judgment arguments and evidence to the contrary including the plain language of the slides on Google Classroom, the deposition testimony of C.H., the language of the course syllabus, the MENA study guide, and the testimony of multiple school officials that material posted to Google Classroom was treated the same as in class work. A498-503 (Pl Resp. in Opp'n); A440-441 (Syllabus); A424 (MENA test guide); A322 (LaSusa Dep. 30:14-24); A171-172 (Maher Dep. 30:12-22, 34:5-18) ("there is not any difference between what a teacher distributes in a classroom and what a teacher says in a classroom and what a teacher would post or write in Google Classroom in the online environment").

The district court dismissed the claims against the individual defendants and the School District finding that the School Board is the proper defendant and that "Superintendent LaSusa's involvement in the curricular decisions is a policy sufficient to confer potential liability under *Monell v. Department of Social Services*, 436 U.S. 658 (1978)." A543 (2020 Opinion). In particular, the district court held that "[f]ollowing Hilsenrath's complaints, [LaSusa] along with others, reviewed the materials and determined that they comported with the religious neutrality policy and did not require removal; that determination represents the policy of the Board." A553. Hilsenrath does not challenge this portion of the district court's opinion.

The district court did not address Hilsenrath's claims regarding the School Board's failure to train its officials and employees related to the First Amendment or the school's religion policy after finding that Hilsenrath "has one clearly viable *Monell* theory." *Id*. at n. 11. The district court held that Hilsenrath had standing to pursue a claim for nominal damages but lacked standing to pursue injunctive and declaratory relief. A543.

Finally, applying the three-part test found in *Lemon v. Kurtzman*, 403 U.S. 602 (1971) the district court held that "the seventh grade World Cultures curriculum and materials do not violate the Establishment Clause." A544.   In particular, the district court held that the curriculum treated "Islam equally with other religions" because "[i]t is not a standalone course of study, but is part of a larger survey of world regions and religions, so there is no impermissible favoritism." A558. The district court did not address Hilsenrath's arguments and evidence that contradict such a finding including that the WCG class did not provide excerpts from any sacred text except the Islamic Quran and did not provide detailed instruction on the historical origins, tenets, or beliefs of any world religion except Islam. A501-502 (Pl. Resp. in Opp'n). Additionally, the lower court found that "[a]lthough the video-creator can be perceived as believing those tenets [of Islam], neither the lesson, Ms. Jakowski, nor even the video-creator invites or encourages the students to adopt those views." A559. This finding again fails to address Hilsenrath's arguments and evidence

establishing the contrary is true including the explicit language that concludes the Intro to Islam video "May God help us all find the true faith, Islam. Ameen." A498-503 (Pl. Resp. in Opp'n).

### **Hilsenrath's First Appeal**

Hilsenrath appealed the district court's November 12, 2020 decision, timely filing notice of appeal on December 7, 2020. *See* A575. The parties completed briefing and oral argument was held before a panel of the Third Circuit on September 23, 2021. A582 (Oral Arg. Tr.). Hilsenrath continued to argue that the religious proselytizing videos at issue are not constitutionally appropriate material for a public school to assign as part of a required seventh grade course. At oral argument, a judge on the panel stated during questioning "the first video is a proselytizing video. We can go through what it says . . . may God help us all find the true faith, Islam, on and on. There are a multitude of these proselytizing statements in the first video." A596 (Oral Arg. Tr. 15:14-19). Another panel judge dismissed the School Board's counsel's contention that it was not unconstitutional to show these videos because the content was not created by a Chathams teacher noting that "in Lee v. Weisman, the teachers didn't create anything . . . [here] we have something that's curriculum that's proselytizing." A597 (Oral Arg. Tr.16:5-11). Additionally, the School Board's counsel suggested during oral argument that "It wasn't the teachers who were proselytizing. The teachers were utilizing those statements of a third-party creator to

teach a lesson about generalizations and to imbue critical thinking skills." A602 (Oral Arg. Tr. 21:10-14). The appellate judge responded that this was a "thin reed to be relying upon, that somebody else said it" and suggested that under this rubric, a teacher could bring in a rabbi or a minster or priest as an expert to teach a lesson. *Id*. (Oral Arg. Tr. 21:15-23).

The appellate court was also unconvinced by counsel's claim that C.H. was not required to watch the videos, even though the PowerPoint slide specifically directs students to watch the Intro to Islam video, stating, "it just feels like that's a bit of a stretch, counsel." A608 (Oral Arg. Tr. 27:2-21). Additionally, the panel recognized the significance of other religions not receiving equal treatment in the WCG course questioning, "So, Judaism didn't get equal time, neither did Wicca or Christianity or any other religion that might have at some point touched on the Middle East?" A598 (Oral Arg. Tr. 17:10-13).

After oral argument, but before the panel issued its decision, the Supreme Court issued its opinion in *Kennedy v. Bremerton Sch. Dist.,* 142 S. Ct. 2407 (2022), abandoning the three-part test of *Lemon v. Kurtzman*, 403 U.S. 602, that had guided the parties' and the lower court's legal analysis. Consequently, the Third Circuit issued an order to show cause why the case should not be remanded. A619. Hilsenrath responded and requested the Court proceed to an opinion on the merits. A620. Instead, the Court vacated the district court's November 2020 decision and

remanded the case for further consideration in light of *Kennedy*. A634. After the mandate issued, the district court directed additional briefing and each party submitted a supplemental brief in support of their respective summary judgment motions.

### District Court Proceedings on Remand

On remand, Hilsenrath argued that looking to history and tradition as *Kennedy* instructs confirms that Chathams School Board violated the Establishment Clause when it presented non-factual and non-objective proselytizing videos as part of its curriculum for a required seventh grade course, which promoted the religion of Islam over all other religions. A570-571 (Pl. Supp. Br.). Hilsenrath argued that "*Kennedy* underscored the fundamental demand of the Establishment Clause that the government may not prefer one religion over another and may not present information that encourages impressionable school children to convert to a particular religion." A572 (citing *Kennedy*, 142 S. Ct. at 2422). Hilsenrath argued the instant case is unlike *Kennedy*, where the Supreme Court found there was no coercion from Mr. Kennedy's private prayer because he "did not direct prayers to students or require anyone else to participate" rather he wanted to "wait to pray until athletes were occupied." A574. Conversely, Hilsenrath argued, the instant case involved a captive audience of school children where "proselytizing videos were posted to Google Classroom specifically so that

students would watch them" and "[t]heir religious content was directed at seventh grade public school students, who are legally required to attend school, and the students were coerced to view these videos under threat of lower grades." A574 (citing *Lee v. Weisman*, 505 U.S. 577, 605, n. 6 (1992)) (Blackmun, J., concurring) (observing that "[a]s a practical matter . . . anytime the government endorses a religious belief there will almost always be some pressure to conform"). Hilsenrath argued "[t]he only reason C.H. watched the Intro to Islam or Five Pillars videos is because the School directed him to watch them on Google Classroom for one of his required classes and he reasonably believed he was required to watch them for homework." A569 (citing C.H. Dep. 35:20—36:4). Hilsenrath also analyzed Supreme Court cases addressing history and tradition regarding the Court's interpretation of the Establishment Clause and argued that historical practices and traditions do not permit a public school to use proselytizing material that favors any one faith. *See* A570.

On October 16, 2023, the district court entered a supplemental opinion on remand and directed it "should be read, *mutatis mutandis*, against the backdrop of the full discussion in [the district court's] earlier decision." A2 (Supp. Op.)  The district court again denied Hilsenrath's motion for summary judgment and granted Defendants' cross-motion. The district court repeated its factual finding that the seventh grade teacher did not play either video in class and the students were not

required to watch them for homework, again ignoring Hilsenrath's evidence and arguments to the contrary. A4-5,7 (Supp. Op.); A566-570 (Pl. Supp. Br.).

Relying on footnote 5 of the *Kennedy* opinion, the district court looked to Justice Gorsuch's concurrence in *Shurtleff v. City of Boston, Massachusetts*, 596 U.S. 243, 285 (2022) (Gorsuch, J., concurring) which discussed "telling traits" of "founding-era religious establishments." A13-14 (Supp. Op.) (citing *Shurtleff*, 596 U.S. at 285). From this, the district court concluded that *Kennedy*, "recognized coercion to be 'among the foremost hallmarks of religious establishments the framers sought to prohibit when they adopted the First Amendment.'" A17 (quoting *Kennedy*, 142 S. Ct. at 2429).

The district court then determined that it would enter summary judgment for Defendants because the record did not contain evidence of "significant coercion." *Id*. In so finding, the district court focused on C.H.'s deposition testimony wherein the district court found C.H. did not feel coerced. *Id.* (citing C.H. Dep. 24:18-25:1, 40:8-24, 41:22-25). In the cited testimony, C.H. never discussed his feelings regarding the videos. *See* A108-109, 305. The court ignored that C.H.'s deposition was taken years after he viewed the videos for class. *See* A103 (C.H. Dep. 2) (reflecting C.H.'s deposition was taken in 2019). Additionally, C.H.'s former teachers, who were named defendants, were in the room sitting next to defense counsel as C.H. was being questioned about their teaching. *See* A304-305, A107

(C.H. Dep. 23:23—25:13). Nevertheless, the district court found "direct, subjective evidence of coercion is lacking." A17 (Supp. Op.). Further, the lower court stated: "Unless and until the Third Circuit holds to the contrary, I continue to be guided by its mandate, which I take to be consistent with *Kennedy*, that the reviewing court 'look[] at whether the government is coerc[ing] anyone to support or participate in religion or its exercise.'" *Id*. at n. 16 (quoting *Borden v. Sch. Dist. of Twp. of E. Brunswick*, 523 F.3d 153, 175 n.18 (3d Cir. 2008)) (alterations in original); (citing also *C.N. v. Ridgewood Bd. Of Educ.*, 430 F.3d at 187).

The district court rejected Hilsenrath's summary judgment claims because "[w]hile the students here were exposed to religious materials, there is no testimony from any individual that he or she experienced pressure to support or participate in the practice of any religion." *Id*. This ignores that the only student deposed was C.H., and that the deposition took place two years after he had completed the seventh grade and in the presence of his former teachers. The district court recognized "there is a baseline level of coercion in all public education, irrespective of the subject matter" but held "[t]he coercion relevant here, however, would be coerced participation in or adherence to a religious belief or practice." A18.

The district court held, without any citation to the record, that "[r]eligion was not taught as revealed truth, but rather as an important fact about the world." A19. This again ignores Hilsenrath's arguments and evidence including the actual content

and language in the videos, and testimony acknowledging there was no disclaimer that the views expressed were not those of the school, its teachers, or board, and the testimony of Superintendent LaSusa that none of the statements in the Intro to Islam video were factual. The court then repeated the observation from its November 2020 opinion, that "[a]lthough the video-creator can be perceived as believing those tenets, neither the lesson, Ms. Jakowski, nor even the video-creator invites or encourages the students to adopt those views." A19, n. 18. This again is contrary to the explicit language in the Intro to Islam video praying "May God help us all find the true faith, Islam, Ameen." A299 (Hilsenrath Dep., 130:5-7); A435 (Intro to Islam Video) and contrary to the content of the Five Pillars video that encourages Islamic prayer and invites viewers to schedule a tour of a mosque. A437 (Five Pillars Video).

The district court found that Hilsenrath's argument that it is a violation of the Establishment Clause for a public school to proselytize or to favor any one religion over others, "fails on the facts, and has only grown weaker in light of *Kennedy*'s newfound emphasis on coercion." A20 (Supp. Op.). But despite the district court's insistence that *Kennedy* developed a new legal standard that requires proof of "significant coercion" in Establishment Clause cases, the district court never addressed Hilsenrath's arguments and evidence showing coercion in that C.H. was required to watch videos that encouraged conversion to Islam as part of a required course and under threat of lower grades. A498-503 (Pl. Resp. Opp'n); A566-570 (Pl. Supp. Br.).

The district court repeated its November 2020 finding that the curriculum did not promote Islam over other religions because it "is not a standalone course of study" and included units and videos regarding other religions as well. A20. The district court concluded, "[i]n sum, the curriculum and materials here were not coercive and do not otherwise bear or resemble the 'hallmarks of religious establishments the framers sought to prohibit when they adopted the First Amendment.'" A21. The district court entered its order granting Defendants' motion for summary judgment and denying Hilsenrath's motion for summary judgment on October 16, 2023. A22. Hilsenrath filed a timely notice of appeal. A24.

## SUMMARY OF THE ARGUMENT

Looking to history and tradition as *Kennedy v. Bremerton* requires, confirms that a public school may not include in its curriculum videos that teach impressionable school children that one religion is superior to all others. The district court clearly erred by finding that the Intro to Islam and Five Pillars videos, which describe Islam as the "true faith" and exhort twelve-year-old students to engage in Islamic prayer and conversion and which explicitly pray "May God help us all find the true faith, Islam" are not proselytizing and are appropriate curricular material for public grade school. Chatham School Board's decision to include this religious recruitment material in its curriculum violated the Establishment Clause.

Additionally, *Kennedy v. Bremerton*, overruled the three-part test developed in *Lemon v. Kurtzman*, 403 U.S. 602 (1971). It did not overrule *Sch. Dist. of Abington Twp. v. Schemmp*, 374 U.S. 203, 225 (1963) (requiring the study of religion to be "presented objectively as part of a secular program of education") or *Larson v. Valente*, 456 U.S. 228, 244 (1982) (acknowledging "[t]he clearest command of the Establishment Clause is that one religious denomination cannot be officially preferred over another") or any of the numerous Supreme Court cases recognizing the longstanding principle that the Establishment clause forbids government favoritism of one religion over all others. *See e.g. Everson v. Bd. of Educ.*, 330 U.S. 1, 15 (1947); *Zorach v. Clauson,* 343 U.S. 306, 313-314 (1952); *Torcaso v. Watkins*, 367 U.S. 488, 493, 495 (1961); *Engel v. Vitale,* 370 U.S. 421, 431 (1962); *Epperson v. Arkansas*, 393 U.S. 97, 103-104, 106 (1968). *Kennedy* does not support the district court's requirement that a student show "significant coercion" nor does it hold that the only way a public school can violate the Establishment Clause is by coercing a student to "participat[e] in or adher[e] to a religious belief or practice." A18 (Supp. Op.).

Moreover, to the extent coercion is now necessary to prove a violation of the Establishment Clause, Hilsenrath submitted evidence showing coercion, which the district court wrongly disregarded or wholly ignored. C.H. was required to complete the WGC course and was required to complete all course work and assignments in

order to be successful in the class; this included watching the Intro to Islam and Five Pillars videos. The district court abandoned the standard for summary judgment when it accepted the testimony of the seventh grade teacher that the videos were not shown in class and were not required viewing, even though this testimony was contrary to the written directions on the Google Classroom PowerPoint slides, the testimony of C.H. that the videos were assigned as homework and one was shown in class, the directions in the MENA study guide, and the directions in the course syllabus. Additionally, Superintendent LaSusa testified that the statements contained in the Intro to Islam video are not factual statements. That proselytizing videos, which encouraged prayer and conversion, were required viewing and that religious beliefs were presented as fact with no disclaimer that they did not represent the views of the school – suffice as coercion under controlling Supreme Court case law. *See Sch. Dist. of Abington Twp.,* 374 U.S. at 221 (A claim under the Establishment Clause "does not depend upon any showing of direct governmental compulsion"); *Engel*, 370 U.S. at 430-431 ("When the power, prestige and financial support of government is placed behind a particular religious belief, the indirect coercive pressure upon religious minorities to conform to the prevailing officially approved religion is plain.").

History and tradition do not permit a public school to proselytize its students or to teach religious belief as fact. Thus, the district court's decision should be

reversed and judgment should be entered in Hilsenrath's favor awarding nominal damages and attorney's fees and declaring the Chatham School Board violated the Establishment Clause.

## STANDARD OF REVIEW

This Court reviews the "disposition of a summary judgment motion *de novo*, applying the same standard as the District Court." *Doe v. Luzerne Cnty.*, 660 F.3d 169, 174 (3d Cir. 2011) (citing *Pichler v. Unite*, 542 F.3d 380, 385 (3d Cir. 2008)). "Under this standard, a court will 'grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'" *Ramara, Inc. v. Westfield Ins. Co.*, 814 F.3d 660, 666 (3d Cir. 2016) (quoting Fed. R. Civ. P. 56(a)). Summary judgment must not be entered where "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986).

"On cross-motions for summary judgment, the court construes facts and draws inferences in favor of the party against whom the motion under consideration is made" and must not "weigh the evidence or make credibility determinations." *Pichler*, 542 F.3d at 386 (citations and internal quotation marks omitted). "Summary judgment may not be granted . . . if there is a disagreement over what inferences can be reasonably drawn from the facts even if the facts are undisputed." *Nathanson v. Med. Coll. of Pa.,* 926 F.2d 1368, 1380 (3d Cir. 1991) (citation omitted). Further, the

Court's "review over constitutional issues is plenary." *United States v. One Toshiba Color Television*, 213 F.3d 147, 151 (3d Cir. 2000) (citation omitted). And because this is a First Amendment case, this Court has a "duty to engage in a searching, independent factual review of the full record." *United States v. Scarfo*, 263 F.3d 80, 91 (3d Cir. 2001) (citations omitted).

## ARGUMENT

The facts of this case have not changed since Hilsenrath's initial appeal, but the law has. The Supreme Court in *Kennedy* overruled the *Lemon* test and directed parties and the lower courts to look to "historical practices and understandings" to determine whether the government has violated the Establishment Clause. *Kennedy*, 142 S. Ct. at 2428 (citing *Town of Greece v. Galloway*, 572 U.S. 565, 576 (2014) and *Am. Legion v. Am. Humanist Ass'n*, 139 S. Ct. 2067 (2019) (plurality opinion) (slip op., at 25)). In doing so, the Court stressed "[a]n analysis focused on original meaning and history . . . has long represented the rule rather than some 'exception' within the 'Court's Establishment Clause jurisprudence.'" *Id.* (quoting *Town of Greece*, 572 U.S. at 575). Thus, although the *Lemon* test is no longer good law, cases that are consistent with historical practices and understandings, including those predating *Lemon* remain valid and binding. *See e.g. Everson v. Bd. of Educ.*, 330 U.S. 1, 11, 15-16 (1947); *Engel v. Vitale*, 370 U.S. 421, 430-432 (1962); *Sch. Dist. of Abington*, 374 U.S. at 225; *Larson*, 456 U.S. at 244.

## I. KENNEDY DID NOT GRANT PERMISSION TO PUBLIC SCHOOLS TO ENGAGE IN RELIGIOUS INSTRUCTION AND PROSELYTIZATION.

*Kennedy v. Bremerton*, focused on the Free Exercise rights of school employees to privately pray and held that "a proper understanding" of the Establishment Clause does not "require the government to single out private religious speech for special disfavor." *Kennedy*, 142 S. Ct. at 2416. The *Kennedy* Court did not address the Establishment Clause violation presented by this case—direct proselytizing by the government. But the Court did condition its holding on the understanding that "none of this means the speech rights of public school employees are so boundless that they may deliver any message to anyone anytime they wish." *Id*. at 2423. Thus, *Kennedy* did not grant public schools permission to preach religion to students or to encourage students to change their religious beliefs—whether through statements of school employees or through presenting third party videos. *See Lee v. Weisman*, 505 U.S. 577, 587 (1992) (holding that a school official's choice to allow a rabbi to say a non-sectarian prayer "is a choice attributable to the State"). This much is absolutely clear from reading the *Kennedy* case itself. Further, the critical recognition of the purpose of the Establishment Clause, that government remain neutral in matters of religious belief, predates and is independent of the analysis set forth in *Lemon v. Kurtzman*, 403 U.S. 602, and this bedrock principle remains unchanged after *Lemon*'s demise in *Kennedy*.

A. **THE DIFFERENCES BETWEEN *KENNEDY V. BREMERTON* AND HILSENRATH'S CASE ILLUMINATE THAT THE CHATHAM SCHOOL BOARD'S VIOLATION OF THE ESTABLISHMENT CLAUSE WAS EGREGIOUS AND AVOIDABLE.**

In *Kennedy*, a high school football coach lost his job "because he knelt at midfield after games to offer a quiet prayer of thanks." *Kennedy*, 142 S. Ct. at 2415. Even though Mr. Kennedy offered his private prayers during a time when school employees were free to attend to personal matters and when "students were otherwise occupied" the Bremerton School District disciplined him because they believed "anything less could lead a reasonable observer to conclude (mistakenly) that it endorsed Mr. Kennedy's religious beliefs." *Id*. at 2415-16. The Supreme Court held the School District's reasoning was misguided and did not reflect a proper understanding of the Establishment Clause. *Id*. at 2416.

The Court reversed the lower court's decision and found Mr. Kennedy entitled to summary judgment on his First Amendment claims because "a government entity sought to punish an individual for engaging in a brief, quiet, personal religious observance doubly protected by the Free Exercise and Free Speech Clauses of the First Amendment." *Id*. at 2433. This does not come close to describing the speech at issue in Hilsenrath's case, in which the Free Exercise and Free Speech Clauses are not implicated. Here, the objectionable speech was not brief, quiet, or personal, but

24

rather direct religious recruitment in the form of videos contained in required seventh grade course curriculum.

**1. UNLIKE IN *KENNEDY*, THE SPEECH AT ISSUE IN HILSENRATH'S CASE IS INDISPUTABLY GOVERNMENT SPEECH.**

Crucial to the Supreme Court's decision was its finding that Mr. Kennedy's prayers were private, not government, speech. Where "a public employee speaks 'pursuant to [his or her] official duties,'" the speech is "for constitutional purposes at least—the government's own speech." *Id*. at 2423 (quoting *Garcetti v. Ceballos*, 547 U.S. 410, 421 (2006)). The Court found Mr. Kennedy demonstrated his speech was private because his prayers were not speech delivered in the ordinary scope of his duties as a coach, nor was he "engaged in any other speech the District paid him to produce as a coach." *Id*. at 2424. Additionally, the Court found, "Mr. Kennedy offered his prayers when students were engaged in other activities" and this "further suggests that those prayers were not delivered as an address to the team, but instead in his capacity as a private citizen." *Id*. at 2425.

Conversely, in Hilsenrath's case, there is no dispute that the speech at issue was government speech. The Intro to Islam and Five Pillars videos were assigned and presented to students as part of PowerPoint presentations that were created by Chatham teachers and posted to the school's Google Classroom as part of a required seventh grade course. This is speech "the government 'itself had commissioned or

created' and speech the [teacher] employee was expected to deliver in the course of carrying out [her] job." *See Kennedy*, 142 S. Ct. at 2424 (quoting *Garcetti*, 547 U.S. at 422). The videos were posted to Google Classroom specifically so that students would watch them. The written directions on Google Classroom required students, including C.H., to watch the Intro to Islam video and "[a]s you watch this video clip, write down words that describe Islam as presented by this video." A416 (Generalizations Presentation). And the material that was presented via Google Classroom was considered equivalent to similar items presented to C.H. during in class instruction. A381 (LaSusa Dep. 32:12-15), A171-172 (Maher Dep. 30:12-22, 34:5-18). C.H. was not presented with any information to counter the glowingly positive portrayal of Islam as a problem-free religion in the Intro to Islam and Five Pillars videos and the school did not attach a disclaimer that the content of the videos did not represent the views of the school or should not be accepted as factual information. A-373 (LaSusa Dep. 102:5-10).

"There is a crucial difference between *government* speech endorsing religion, which the Establishment Clause forbids, and *private* speech endorsing religion, which the Free Speech and Free Exercise Clauses protect." *Capitol Square Review & Advisory Bd. v. Pinette*, 515 U.S. 753, 765 (1995) (plurality opinion) (emphasis in original) (quoting *Bd. of Educ. v. Mergens*, 496 U.S. 226 (1990) (opinion of O'Connor, J.). Here C.H.'s teacher did not present these religious recruitment videos

to students as a private citizen, rather the speech at issue was indisputably government speech that endorsed religion. No argument or evidence to the contrary has ever been presented.

### 2. UNLIKE IN *KENNEDY*, THE RELIGIOUS SPEECH AT ISSUE IN HILSENRATH'S CASE WAS DELIVERED TO A CAPTIVE AUDIENCE OF SEVENTH GRADE STUDENTS WHO WERE DIRECTED TO WATCH THE VIDEOS AS PART OF A REQUIRED COURSE AND UNDER THREAT OF LOWER GRADES.

In its review of the *Kennedy* case, the Supreme Court emphasized that the School District disciplined Mr. Kennedy "*only* for his decision to persist in praying quietly without his players after three games in October 2015." *Kennedy*, 142 S. Ct. at 2422 (emphasis in original). The Court specified that the contested exercise under review "does not involve leading prayers with the team or before any other captive audience." *Id*. The Supreme Court noted in its decision that although Mr. Kennedy had previously prayed with his players, at the School District's request, he voluntarily ended his practice of offering locker room prayers and of incorporating religious references or prayers in his postgame talks with players. *Id*. Had this practice not ended, the Court's review obviously would have looked quite different.

The *Kennedy* Court cited *Zorach v. Clauson*, 343 U.S. 306 (1952) as support for its decision wherein the Court rejected a challenge to a public school program that permitted students to spend time off campus in private religious instruction because it found that "students were not required to attend religious instruction and

there was no evidence that any employee had 'used their office to persuade or force students' to participate in religious activity." *Kennedy*, 142 S. Ct. at 2431 (citing *Zorach*, 343 U.S. at 311). Conversely in Hilsenrath's case, the complaint is precisely that students were required to attend religious instruction in the form of religious recruitment videos that they were directed to watch as part of a required course. *See* A508 (Pl. SOMF 36). Students knew they risked lower grades if they failed to watch the videos because the WCG Course Syllabus described homework and classwork as comprising 10% of a student's grade and directed that "completion of all assignments is essential and expected in order to be successful in this course." A440-441 (WCG Syllabus).  The only reason C.H. watched the Intro to Islam or Five Pillars videos is because he was required to check Google Classroom for assignments and coursework and was thereby instructed to watch the videos for one of his required classes. *See* A310 (C.H. Dep. 36:1-4). These factors created impermissible coercion not present in *Kennedy* or *Zorach*.

### B.  THE DISTRICT COURT ERRED IN ITS INTERPRETATION OF WHAT IT DESCRIBES AS A "CIPHER" IN FOOTNOTE FIVE OF THE *KENNEDY* OPINION AS THE ENTIRETY OF THE CITED MATERIAL SUPPORTS HILSENRATH'S CLAIMS.

The District Court wrongly interpreted footnote five of the *Kennedy* opinion as being detrimental (if not fatal) to Hilsenrath's claims, finding the WCG "curriculum and materials do not present any of the 'hallmarks' associated with establishment of

religion" alluded to in *Kennedy*. A20 (Supp. Op.). But reading each citation in its entirety demonstrates that footnote five actually provides support for Hilsenrath's claims that the School Board's decision to include proselytizing material in its curriculum that favors Islam over all other religions violates the Establishment Clause.

The first citation in the footnote is to a portion of Justice Scalia's dissent in *Lee v. Weisman*. *Kennedy*, 142 S. Ct. at 2429 n. 5 (citing *Lee*, 505 U.S. at 640-642 (Scalia, J., dissenting)). In this section of the *Lee* opinion, Justice Scalia criticizes the Court's finding of what he describes as "peer-pressure" coercion in the context of the *Lee* case and notes that "[t]he coercion that was a hallmark of historical establishments of religion was coercion of religious orthodoxy and of financial support *by force of law and threat of penalty*." *Lee*, 505 U.S. at 640 (Scalia, J. dissenting) (emphasis in original). But in denying Hilsenrath's summary judgment motion, the district court wrongly focused only on the first page of the *Kennedy* Court's citation. *See* A14, 18 (Supp. Op.). Critically, within the same cited passage, Justice Scalia also concedes that:

> our constitutional tradition, from the Declaration of Independence and the first inaugural address of Washington . . . has, with a few aberrations . . . ruled out of order government-sponsored endorsement of religion – even when no legal coercion is present . . . where the endorsement is sectarian, in the sense of specifying details upon which men and women who believe in a benevolent, omnipotent Creator and Ruler of the World are known to differ (for example, the divinity of Christ).

29

*Lee*, 505 U.S. at 641. This fundamental recognition is precisely what is at issue in Hilsenrath's case—government sponsored endorsement of Islam that specified details upon which religious people are known to differ including "Allah is the one God;" "[Allah] has no equal and is all powerful" and "Muhammad (Peace be upon him) is the last & final Messenger of God." A435 (Intro to Islam Video).

Justice Scalia further stated in his dissent in *Lee*, that he saw "no warrant for expanding the concept of coercion beyond acts backed by threat of penalty." *Lee*, 505 U.S. at 642 (Scalia, J., dissenting). But here such an expansion is not necessary since there was a threat of penalty in Hilsenrath's case. C.H. was legally required to attend school, was required to complete the WCG course as part of seventh grade, and was required to view the Intro to Islam and Five Pillars videos that were posted to the school's Google Classroom page with the specific instructions "watch this video" appearing above the Intro to Islam video link. *See* A416 (Generalization Presentation); A395, 397 (Intro to Islam Presentation); A424 (MENA Study Guide); A508, 511-516 (Pl. SOMF 36, 47-50). Students had been informed via the syllabus that classwork and assignments consist of 10% of their grade and completion of all assignments was necessary to be successful in the class. A440-441 (WCG Syllabus). Consequently, C.H. only watched the videos at issue because he reasonably believed he was required to do so or his grade could be lowered. *See* A519-521, 524-525 (Pl. SOMF 52, 58).

Also significant is that later in his dissent in *Lee*, Justice Scalia reaffirms that the Court has "made clear our understanding that school prayer occurs within a framework in which legal coercion to attend school (i.e., coercion under threat of penalty) provides the ultimate backdrop." *Id*. at 643. This recognition further supports Hilsenrath's argument that, to the extent coercion is even necessary in an Establishment Clause claim, it has been demonstrated here. See *Engel,* 370 U.S. at 430 (recognizing "[t]he Establishment Clause, unlike the Free Exercise Clause, does not depend upon any showing of direct governmental compulsion"). Additionally, noteworthy is that Justice Scalia's dissent acknowledges the critical observation stressed by the Court in *Edwards v. Aguillard*, 482 U.S. 578 (1987) that "[f]amilies entrust public schools with the education of their children, but condition their trust on the understanding that the classroom will not purposely be used to advance religious views that may conflict with the private beliefs of the student and his or her family." *Lee*, 505 U.S. 643-644 (Scalia, J. dissenting) (quoting *Edwards*, 482 U.S. at 584). The Chatham School Board betrayed Hilsenrath's trust by using proselytizing videos in C.H.'s required seventh grade course to advance the religious views of Islam which conflict with the private beliefs of C.H.'s family.

Next in footnote five of the *Kennedy* opinion, Justice Gorsuch cites his own concurring opinion in *Shurtleff* wherein he discusses "coercion and certain other historical hallmarks of an established religion." *Kennedy*, 142 S. Ct. at 2429 n. 5

(citing *Shurtleff*, 596 U.S. at___ (Opinion of Gorsuch, J.) (slip op., at 10-13). In *Shurtleff*, Justice Gorsuch recognized that America's founders "resolved, each individual would enjoy the right to make sense of his relationship with the divine, speak freely about man's place in creation, and have his religious practices treated with respect." *Shurtleff*, 142 S. Ct. at 1608 (Gorsuch, J., concurring) (citing *West Virginia Bd. of Ed. v. Barnette*, 319 U.S. 624, 642 (1943)). It cannot be said that the Chatham School Board treated its non-Muslim students' religious practices with respect by including in its required curriculum videos that teach religious belief as fact and claim Islam is the perfected religion and the "true faith."

Additionally, Justice Gorsuch in *Shurtleff* criticized lower courts' use of the *Lemon* test and commented that the "abstract three-part test may seem a simpler and tempting alternative" because "[b]y demanding a careful examination of the Constitution's original meaning, a proper application of the Establishment Clause no doubt requires serious work and can pose its challenges." *Id*. at 1609. Justice Gorsuch then notes that "at least a partial remedy" to this problem is that "our constitutional history contains some helpful hallmarks that localities and lower courts can rely on." *Id*. He does not suggest these "helpful hallmarks" are required or that they will be evident in every violation of the Establishment Clause. The district court cited these traits which include:

> (1) "the government exerted control over the doctrine and personnel of the established church;" (2) "the government mandated attendance in

the established church and punished people for failing to participate;"
(3) "the government punished dissenting churches and individuals for
their religious exercise;" (4) "the government restricted political
participation by dissenters;" (5) "the government provided financial
support for the established church, often in a way that preferred the
established denomination over other churches;" and (6) "the
government used the established church to carry out certain civil
functions, often by giving the established church a monopoly over a
specific function."

A14 (Supp. Op.) (quoting *Shurtleff*, 596 U.S. at 285). The district court denied

Hilsenrath's motion for summary judgment and granted the School Board's motion

finding that these six examples are "the sole guides that *Kennedy* had furnished the

lower courts for the assessment of 'coercion' for purposes of an Establishment

Clause challenge in the context of public education" and they "do not fit the facts of

our case." A21.  But, an exact match to history is not required. *Range v. AG United

States*, 69 F. 4th 96, 103 (3d Cir. 2023) (en banc) (noting "[h]istorical tradition can

be established by analogical reasoning"). In other words, "when we draw on parallels

with the past to assess what is permissible in the present, we typically look to match

history in principle, not with precision." *Id*. at 116-117 (Krause, J., dissenting).

The second listed historical hallmark that "the government mandated

attendance in the established church and punished people for failing to participate,"

is analogous to the government mandating attendance in school and in C.H.'s case

mandating successful completion of the WCG course and punishing students for

failing to complete coursework or assignments, including viewing the Intro to Islam

and Five Pillars videos, by lowering the student's grade. Further, analogous to the fifth historical hallmark listed by Justice Gorsuch, that "the government provided financial support for the established church, often in a way that preferred the established denomination over other churches" is that here, tax dollars fund public education and by including proselytizing material in its curriculum for a required course, which describes Islam as the "true faith", encourages Islamic prayer, and explicitly calls for students to convert to Islam, the Chatham School Board showed impermissible preference for Islam over other religions. "As Thomas Jefferson, one of the leading drafters and proponents of [the Religion] Clauses, wrote, 'to compel a man to furnish contributions of money for the propagation of opinions which he disbelieves, is sinful and tyrannical.'" *Carson v. Makin,* 142 S. Ct. 1987, 2005 (2022) (Breyer, J., dissenting) (quoting *Everson,* 330 U.S. at 13).

Justice Gorsuch further notes that "Our Constitution was not designed to erase religion from American life; it was designed to ensure 'respect and tolerance.'" *Shurtleff,* 142 S. Ct. at 1610 (Gorsuch, J., concurring) (quoting *American Legion,* 588 U.S. at __, 139 S. Ct. 2067). Applied to Hilsenrath's case, respect and tolerance are not demonstrated by subjecting impressionable seventh grade students who are legally required to attend school to religious indoctrination videos that preach that "Allah is the one God," "[Allah] has no equal and is all powerful," "Muhammad (Peace be upon him) is the last & final Messenger of God", the Quran is "[d]ivine

revelation" a "Perfect guide for Humanity," "Guidance, Mercy and Blessing for all mankind" and that the "Beautiful Quran" provides "Guidance for the wise & sensible" and that "Muslims created a tradition of unsurpassable splendor," and Islam is a "shining beacon against the darkness of repression, segregation, intolerance and racism" and the one "true faith." A435 (Intro to Islam video). Here, the Chatham School Board showed disrespect for C.H.'s and his family's religious beliefs by flagrantly promoting the tenets of Islam as being superior to all other religions and even providing instructions via a link on Google Classroom regarding how to become Muslim.

Next in footnote five, Justice Gorsuch cites a page from the Annals of Congress wherein "Madison explain[ed] that the First Amendment aimed to prevent one or multiple sects from 'establish[ing] a religion to which they would compel others to conform'" *Kennedy,* 142 S. Ct. at 2429 n. 5 (quoting 1 Annals of Cong. 730-731 (1789)). This clearly demonstrates the Founders' pressing concern that the government not show preference for one religion over others. And the Chatham School Board's decision to include religious recruitment videos that extol Islam above all other faiths conflicts with this bedrock Establishment Clause principle.

Lastly, Justice Gorsuch cites a law review article from Michael McConnell, Establishment and Disestablishment at the Founding, Part I: Establishment of Religion, 44 Wm. & Mary L. Rev. 2105, 2144-2146 (2003) (hereinafter

"Establishment and Disestablishment"). The cited portion of the law review article discusses the sometimes severe penalties colonists faced for failing to attend religious services at established churches in the 1600s thru the early 1800s. Establishment and Disestablishment, 44 Wm. & Mary L. Rev. at 2144-2145. While true that C.H. and his classmates were not fined, whipped, or "condemned to the Gallies" if they did not view the religious videos at issue, in citing this historical record, Justice Gorsuch was certainly not implying such extreme coercion as existed in the colonies four-hundred years ago is necessary to show an Establishment Clause violation today. *See Id.* at 2144. If anything, what this cited material demonstrates is that the Founders had obvious and significant motivation to prohibit their newly formed government from being involved in any way with religion.

## II.   HISTORICAL PRACTICES AND UNDERSTANDINGS DO NOT PERMIT A SCHOOL BOARD TO FAVOR ONE RELIGION BY INCLUDING PROSELYTIZING VIDEOS IN ITS CURRICULUM FOR A REQUIRED SEVENTH GRADE COURSE THAT DESCRIBE ISLAM AS THE "TRUE FAITH" AND ENCOURAGE ISLAMIC PRAYER AND CONVERSION.

The most significant part of the *Kennedy* decision to the facts of Hilsenrath's case is its abandonment of the test established in *Lemon v. Kurtzman*, 403 U.S. 602 (1971) and corresponding instruction that the Establishment Clause of the First Amendment must be interpreted by reference to historical practices and understandings. Under this history and tradition analysis, it is clear that the proselytizing videos at issue, which promote one religion over all others in public

school curriculum, violates the Establishment Clause. *See Sch. Dist. of Abington Twp.,* 374 U.S. at 222 (recognizing history and purpose of the Establishment Clause require government neutrality toward religion) *see Marsh v. Chambers*, 463 U.S. 783, 794-795 (1983) (legislative prayer may not be "exploited to proselytize or advance any one, or to disparage any other, faith or belief").

It is not surprising that a direct historical example mirroring Hilsenrath's case cannot be found because "[i]n the colonial and early republican periods, there was no such thing as public education in the modern sense." Establishment and Disestablishment, 44 Wm. & Mary L. Rev. at 2171. Rather, "education was haphazard and informal" and "[t]here was little or no state involvement in finance or control." *Id*. And "[e]ven when the state became more involved, there was no sharp distinction between public and private, religious and secular schools, until well into the nineteenth century." *Id*. It was not until the time of the Civil War that "most northern and western states had established public school systems" and not until Reconstruction were "rudimentary public school systems" created in the South. *Id*. at 2174. Thus, "it is unlikely that the persons who drafted the First Amendment, or the state legislators who ratified it, anticipated the problems of interaction of church and state in the public schools." *Wallace v. Jaffree*, 472 U.S. 38, 80 (1985) (O'Connor, J. concurring) (citation omitted). "Even at the time of adoption of the Fourteenth Amendment, education in Southern States was still primarily in private

hands, and the movement toward free public schools supported by general taxation had not taken hold." *Id*. (citing *Brown v. Board of Education*, 347 U.S. 483, 489-490 (1954)).

The Supreme Court has previously noted that the historical approach it used to evaluate the Establishment Clause challenge *Marsh v. Chambers* was "not useful in determining the proper roles of church and state in public schools, since free public education was virtually nonexistent at the time the Constitution was adopted." *Edwards*, 482 U.S. at 583, n. 4 (citing *Wallace*, 472 U.S. at 80 (O'Connor, J. concurring in judgment)). But, consistent with the instruction in *Kennedy*, the general purposes of the Establishment Clause and the understandings of those who drafted and ratified it are applicable and guide the Court's history-based analysis. *See e.g., Sch. Dist. of Abington Twp.,* 374 U.S. at 232-242 (Brennan, J., concurring) (evaluating practice of Bible reading in public school in the context of what the Framers meant the Establishment Clause to prohibit).

In determining that public school-sponsored daily Bible reading was unconstitutional, Justice Brennan summarized that "the history which our prior decisions have summoned to aid interpretation of the Establishment Clause permits little doubt that its prohibition was designed comprehensively to prevent those official involvements of religion which would tend to foster or discourage religious worship or belief." *Id*. at 234 (Brennan, J. concurring). Justice Brennan's observation

is fully applicable today and leaves little doubt that videos that encourage Islamic prayer and exhort twelve-year-olds to convert to the religion may not be included in public school curriculum consistent with the demands of the Constitution.

Much of the "turmoil, civil strife, and persecutions" early American settlers suffered was "generated in large part by established sects determined to maintain their absolute political and religious supremacy." *Everson,* 330 U.S. at 8-9. Attempting to force loyalty to whatever religious group was favored by the government, men and women were "fined, cast in jail, cruelly tortured, and killed" for offenses such as "speaking disrespectfully of the views of ministers of government-established churches, non-attendance at those churches, expressions of non-belief in their doctrines, and failure to pay taxes and tithes to support them." *Id.* at 9. These practices "began to thrive in the soil of the new America." *Id.* Prior to the American Revolution, "religious establishments of differing denominations were common throughout the Colonies." *Larson*, 456 U.S. at 244 (citations omitted). "But the Revolutionary generation emphatically disclaimed that European legacy, and applied the logic of secular liberty to the condition of religion and the churches." *Id.* (citation and internal quotation marks omitted). "The history of governmentally established religion, both in England and in this country, showed that whenever government had allied itself with one particular form of religion, the inevitable result had been that it had incurred the hatred, disrespect and even contempt of those who

held contrary beliefs." *Engel*, 370 U.S. at 431. "By the time of the adoption of the Constitution, our history shows that there was a widespread awareness among many Americans of the dangers of a union of Church and State." *Id*. at 429. "[D]isestablishment assumed the importance of religion, and left it free of government control." M. McConnell, Religion and Its Relation to Limited Government, 33 Harv. J. L. & Pub. Pol'y 943, 948 (2010).

Many early settlers came to America from Europe to escape religious persecution and "laws which compelled them to support and attend government-favored churches." *Everson*, 330 U.S. at 8. Plainly, America's Founders, who sought to "escape the bondage of [such] laws", *Id*., would not have condoned or tolerated their children being taught, at a publicly funded school that they were required by law to attend, that Islam (or any faith other than their own) is the "true faith." Rather, the Establishment Clause is "an expression of principle on the part of the Founders of our Constitution that religion is too personal, too sacred, too holy, to permit its 'unhallowed perversion' by a civil magistrate." *Engel*, 370 U.S. at 432 (quoting Memorial and Remonstrance against Religious Assessments, II Writings of Madison at 187)

The Chatham School Board cannot point to any historical practice or understanding that justifies its decision to approve in its curriculum non-objective videos which present religious belief as fact and encourage students to convert to

40

Islam. A public school may not, consistent with the Establishment Clause, encourage students to "find the true faith, Islam" A435 (Intro to Islam video); *see Walz v. Egg Harbor Twp. Bd. of Educ.,* 342 F.3d 271, 280 (3d Cir. 2003) ("proselytizing speech . . . if permitted, would be at cross-purposes with [the school's] educational goal and could appear to bear the school's seal of approval").

### A. THE DISTRICT COURT APPLIED A HIGHER BURDEN OF PROOF THAN JUSTIFIED BY ANY PRECEDENT, WRONGLY REQUIRING HILSENRATH TO PRODUCE EVIDENCE OF "SIGNIFICANT COERCION."

The District Court wrongly granted the School Boards' motion for summary judgment after finding that "the record contains no evidence of significant coercion." A17 (Supp. Op. ). But *Kennedy* never set forth such a requirement. And the Supreme Court has been clear prior to *Kennedy* that demonstrating the government has engaged in impermissible religious coercion is sufficient, but not required, to demonstrate a violation of the Establishment Clause. "The distinction between the two [Religion] clauses is apparent—a violation of the Free Exercise Clause is predicated on coercion while the Establishment Clause violation need not be so attended." *Sch. Dist. of Abington Twp.*, 374 U.S. at 223; *see Cnty. of Allegheny v. ACLU*, 492 U.S. 573, 628 (1989) (O'Connor J, concurring in part) ("To require a showing of coercion, even indirect coercion, as an essential element of an Establishment Clause violation would make the Free Exercise Clause a redundancy.")

The *Kennedy* Court addressed what it considered the School District's "backup argument" that the Establishment Clause concerns "trump Mr. Kennedy's free exercise and free speech rights" because if it had not suppressed Mr. Kennedy's religious activity "it would have been guilty of coercing students to pray" and "coercing worship amounts to an Establishment Clause violation on anyone's account of the Clause's original meaning." *Kennedy*, 142 S. Ct. at 2428-2429. The Court rejected this argument finding the evidence lacking.

The Court recognized that its members have disagreed regarding "what exactly qualifies as impermissible coercion in light of the original meaning of the Establishment Clause." *Id*. at 2429. (citations omitted). But it did not elaborate on the proper understanding of coercion in light of the fact Mr. Kennedy's private religious exercise "did not come close to crossing any line one might imagine separating protected private expression from impermissible government coercion." *Id*. The Court stated that "[i]n short, Mr. Kennedy did not seek to direct any prayers to students or require anyone else to participate." *Id*. at 2429.  The Court addressed the School District's argument that coercion was present; it did not say that coercion is necessary in all cases under the Establishment Clause nor did it define what constitutes impermissible coercion.

The district court in Hilsenrath's case was persuaded that "[w]hile the students here were exposed to religious materials, there is no testimony from any individual

that he or she experienced pressure to support or participate in the practice of any religion." A17, n. 16. (Supp. Op.). In *Borden v. Sch. Dist. of Twp. of E. Brunswick,* the Third Circuit applied the endorsement test to determine that a coach's silent act of bowing his head during student led prayer violated the Establishment Clause because based on the coach's history of praying with the team "a reasonable observer would conclude that Borden was endorsing religion when he engaged in these acts." *Borden v. Sch. Dist. of Twp. of E. Brunswick,* 523 F.3d 153, 159 (3d Cir. 2008). In its analysis, the Third Circuit discussed that "[t]he Supreme Court has set forth three tests for determining whether governmental action violates the Establishment Clause: the coercion test, the Lemon test, and the endorsement test." *Id.* at 175 (citing *Modrovich v. Allegheny County*, 385 F.3d 397, 400-01 (3d Cir. 2004)). The Third Circuit did not address whether Borden's conduct violated the Establishment Clause under either the coercion or *Lemon* tests because it found the conduct violated the endorsement test. *Id.* In footnotes, the Third Circuit described what would be required under each of the tests it did not use. As to coercion, the Court stated: "[t]he coercion test looks at whether the government is "coerc[ing] anyone to support or participate in religion or its exercise . . . ." *Id.* at 175, n. 18. (quoting *Lee*, 505 U.S. at 587(alterations in original)). Rather than recognizing this as a simple explanation of a test the Court was not using, the district court in Hilsenrath's case asserted it was a "mandate" that was "consistent with *Kennedy*, that the reviewing court 'look[]

at whether the government is coerc[ing] anyone to support or participate in religion or its exercise.'" A17, n.16 (Supp. Op.) (quoting *Borden*, 523 F.3d at 175 n. 18 (alterations in original)). Notably, the concurrence in *Borden* considers that "a non-religious student or one who adheres to a minority religion might feel subtle (albeit unintentional) coercion" and this "raises a serious Establishment Clause issue under the Supreme Court's 'coercion' test." *Borden*, 523 F.3d at 181 (McKee, J., concurring).

Contrary to the district court's interpretation, the Supreme Court has not required students to show they were subject to significant coercion or that they were compelled or required to participate in a religious activity to demonstrate a violation of the Establishment Clause. *See e.g. Sch. Dist. of Abington Twp.,* 374 U.S. 203 (daily reading of Bible verses held unconstitutional even where students could be excused); *Engel*, 370 U.S. at 430 (nonmandatory recitation of one-sentence prayer held unconstitutional). Nor has the Supreme Court required coercion to be explicit. *See, e.g., Santa Fe Indep. Sch. Dist. v. Doe*, 530 U.S. 290, 312 (2000) ("the government may no more use social pressure to enforce orthodoxy than it may use more direct means"). Rather, the Court has recognized that "there are heightened concerns with protecting freedom of conscience from subtle coercive pressure in the elementary and secondary public schools." *Lee*, 505 U.S. at 592. "When the power, prestige and financial support of government is placed behind a particular religious

belief, the indirect coercive pressure upon religious minorities to conform to the prevailing officially approved religion is plain." *Engel*, 370 U.S. at 431.

The Establishment Clause forbids public schools from "conveying or attempting to convey a message that religion or a particular religious belief is *favored or preferred*." *Lee*, 505 U.S. at 604-605 (Blackmun, J. concurring) (quoting *County of Allegheny*, 492 U.S. at 593 (1989) (emphasis in original)). This is so "even if the schools do not actually 'impose pressure upon a student to participate in a religious activity.'" *Id.* (*quoting Board of Ed. Of Westside Community Schools (Dist 66) v. Mergens*, 496 U.S. 226, 261 (1990) (Kennedy, J., concurring in part and concurring in judgment)).

As reflected upon by Justice Sotomayor in her dissent in *Kennedy*, "*none* of this Court's major cases involving school prayer concerned school practices that required students to do any more than listen silently to prayers, and some did not even formally require students to listen, instead providing that attendance was not mandatory." *Kennedy,* 142 S. Ct. at 2451 (Sotomayor, J. dissenting) (emphasis in original) (citing *Santa Fe*, 530 U.S. at 296-298; *Lee*, 505 U.S. at 593; *Wallace*, 472 U.S. at 40; *School Dist. of Abington Township*, 374 U.S. at 205; *Engel*, 370 U.S. at 422) Yet the Supreme Court concluded in the cases cited above "that the practices were coercive as a constitutional matter." *Id.*

The role of the government in public schools is different than in other contexts because "[t]he State exerts great authority and coercive power" in schools "through mandatory attendance requirements." *Edwards*, 482 U.S. at 584. And children are more susceptible to "subtle coercive pressure" than adults. *Lee*, 505 U.S. at 588; *Town of Greece*, 572 U.S. at 590 (recognizing that "mature adults," unlike children, may not be "readily susceptible to religious indoctrination or peer pressure"). The district court's requirement that Hilsenrath provide evidence of "significant coercion" cannot be justified under controlling Supreme Court precedent.

### 1. Hilsenrath Pled Facts Showing Coercion And the District Court Committed Clear Error By Ignoring or Disregarding Them.

The School Board's decision to include religious recruitment videos in its curriculum for a required course, coupled with the directions on Google Classroom instructing students to watch the videos and the syllabus instructions that their grade would be negatively impacted if they did not complete all assignments and classwork, demonstrates coercion. The district court's factual finding that the seventh grade teacher did not play either video in class and the students were not required to watch them for homework, wrongly ignores Hilsenrath's evidence and arguments to the contrary. A4-5, 7 (Supp. Op.); A566-570 (Pl. Supp. Br.). Further, this is contrary to the standard for summary judgment which forbids courts from weighing evidence. *See Pichler*, 542 F.3d at 386. C.H. testified that he watched the videos as part of his homework A310 (C.H. Dep. 36:1-9) and that the Five Pillars

video was shown in class A308 (C.H. Dep. 34:7-16). The written directions on the PowerPoint slides direct students to "[w]atch this video" and "[a]s you watch this video clip, write down words that describe Islam as presented by this video." A416 (Generalizations Presentation); A332, 333 (LaSusa Dep. 48:21-25, 49:1-10). Thus, it is imminently reasonable for C.H. to believe he was required to watch the Intro to Islam and Five Pillars videos.

Additionally, the district court's finding that "C.H. expressly testified that he never felt coerced" does not accurately reflect C.H.'s testimony. See A17 (Supp. Op.). The pages of C.H.'s deposition that the district court cite describe that the School Board's counsel points to Ms. Jakowski and Ms. Keown, C.H.'s former seventh grade teachers, and asks C.H. whether either of them ever told him to "convert to Islam" and if he felt "pressured to convert to Islam in their class." A305, A107-109 (C.H. Dep. 24:1-25:1, 40:8-24, 41:22-25). That C.H. answered "no" hardly demonstrates that the WCG curriculum, particularly the religious indoctrination videos at issue, were non-coercive. The district court also relies on the fact that no "other student testif[ied] that he or she experienced the course material as coercive." A17 (Supp. Op.). But no other students ever testified in the case.

Further, the district court wrongly asserts that "[i]n his deposition, C.H. testified that he did not remember much about this video, and did not recall feeling

coerced." A6 (Supp. Op.) (citing C.H. Dep. At 24:24-25:1, 37:3-11). But other than not being able to recount much about the video, which is not surprising two years after watching it, the remainder of the district court's finding is not supported by the cited testimony. There is no testimony cited regarding C.H.'s feelings about the videos.

Additionally, the district court recognized that the PowerPoint and the worksheet that required students to complete the shahada, the Islamic statement of faith, each contained a link to a webpage describing the shahada. A6 n.8. (Supp. Op.). The website stated "'anyone who cannot recite [the shahada] wholeheartedly is not a Muslim' and '[r]eciting this statement three times in front of a witness is all that anyone need do to become a Muslim.'" A6-7, n.8 (Supp Op.) (citation omitted). The district court surmised, however, that because C.H. completed the worksheet by hand "there is no indication that he would or could have clicked on such a link." *Id*. But this ignores that the PowerPoint and worksheet were posted to Google Classroom, which is how Hilsenrath was able to click on the links. Students and parents were advised to use Google Classroom as "the primary source of information" for the WCG course. A441 (WCG Syllabus). Consequently, contrary to the district court's finding, there certainly is an indication that students could click on these links.

## III.    HISTORICAL PRACTICES AND UNDERSTANDINGS FORBID THE GOVERNMENT FROM FAVORING ONE RELIGION OVER ALL OTHERS.

In *Everson*, the Supreme Court recognized that the Establishment Clause was incorporated and applies to the States via the Fourteenth Amendment. *Am. Legion,* 139 S. Ct. at 2080 (citing *Everson*, 330 U.S. 1). And since *Everson*, the Supreme Court "has adhered to the principle, clearly manifested in the history and logic of the Establishment Clause, that no State can 'pass laws which aid one religion' or that 'prefer one religion over another.'" *Larson*, 456 U.S. at 246 (quoting *Everson*, 330 U.S. at 15). Further, the Court has clearly and unequivocally recognized that "the State may not adopt programs or practices in its public schools or colleges which 'aid or oppose' any religion" and this absolute prohibition forbids "the preference of a religious doctrine." *Epperson*, 393 U.S. at 106-107 (citing *Abington School District,* 374 U.S. at 225; *Id.* at 103-104 (recognizing government must be "neutral in matters of religious theory, doctrine, and practice" and "may not aid, foster, or promote one religion or religious theory against another").

*Kennedy* did not alter the fundamental demand of the Establishment Clause that the government not prefer one religion over another and not present information that encourages impressionable school children to convert to a particular religion. *See Kennedy*, 142 S. Ct. at 2422 (differentiating the case from one involving prayer with students or before a captive audience); *Lee*, 505 U.S. at 590 ("the central

meaning of the Religion Clauses of the First Amendment . . . is that all creeds must be tolerated and none favored); *Santa Fe Indep. School Dist.,* 530 U.S. at 309 (finding "[s]chool sponsorship of a religious message" impermissible under the Establishment Clause). Rather, "preservation and transmission of religious beliefs and worship is a responsibility and a choice committed to the private sphere." *Id.* at 310 (quoting *Lee*, 505 U.S. at 589). "The government must be neutral when it comes to competition between sects" and it "may not finance religious groups nor undertake religious instruction nor blend secular and sectarian education nor use secular institutions to force one or some religion on any person." *Zorach*, 343 U.S. at 314.

"The clearest command of the Establishment Clause is that one religious denomination cannot be officially preferred over another." *Larson*, 456 U.S. at 244. *Kennedy* did not alter this bedrock principle and its instruction that the Establishment Clause must be interpreted by "reference to historical practices and understandings" only confirms its continuing validity. The Court cites *Town of Greece*, 572 U.S. at 576 and *American Legion,* 139 S. Ct. 2067 as support for its historical requirement. Significantly, in the Court's legislative prayer cases, the Court not only recognized the historical and traditional foundations of legislative prayer, it also recognized that legislative prayer does not involve an attempt to proselytize, to advance one religion over others, or to coerce an unwilling or impressionable audience to engage in religious observance. *Town of Greece,* 572 U.S. at 581-583, 590; *Marsh*, 463 U.S. at

792, 794-795. The same is not true regarding the Chatham School Board's decision to include videos in its curriculum for a required seventh grade class that claim the Quran is a "perfect guide for Humanity," that "Muslims created a tradition of unsurpassable splendor," that contain excerpts from the Quran, the Islamic holy book, stating Islam is the perfected religion and the only religion for mankind and that pray "May God help us all find the true faith, Islam. Ameen." A435 (Intro to Islam video). There was no context or disclaimer presented with either the Intro to Islam or Five Pillars videos to suggest they were not to be accepted as fact. And no other religion was treated in the same manner. *See* A530-532 (Pl. SOMF 71-74).

The district court's finding that Islam was not favored because it was not a "standalone course of study" and included similar units on Hinduism and Buddhism, ignores the actual content of the religious recruitment videos, the fact that the Hinduism and Buddhism videos were factual and not proselytizing, and that no other religions were addressed in the same manner. Judaism and Christianity were not covered at all in the MENA portion of the WCG course despite their importance in the region. A59-60 (Pl. Compl. ¶81); A81 (Def. Answer ¶81). Presenting non-factual and non-objective material to public grade school students as part of a required course aided the religion of Islam to the exclusion of all other religions. The School Board has never provided any context that could transform blatantly proselytizing statements or explicit calls for conversion into appropriate curricular material for a

51

public school seventh grade class. There is no logical connection between a school lesson supposedly teaching "generalizations" and a video that teaches "Allah is the one God" and that ends with a prayer for all to "find the true faith, Islam." A435 (Intro to Islam video); See A335-339 (LaSusa Dep. 51:24-55:8).

The Supreme Court has emphasized that the study of religion or religious texts must be presented objectively as part of a secular program of education to be consistent with the First Amendment. *Sch. Dist. of Abington Twp.,* 374 U.S. at 225 (noting the "study of the Bible or of religion, when presented objectively as part of a secular program of education" may be "effected consistently with the First Amendment"). The Intro to Islam and Five Pillars videos are far from objective, rather, they seek to recruit followers to the religion. The Intro to Islam video extolls Islam, describing the Quran as the "perfect guide for humanity," that the Quran guides the "wise and sensible" and crediting Muslims with creating "a tradition of unsurpassable splendor, among other things. Religious imagery including text from the Quran and Muslim prayers is shown while the Qaseedah Burdah, which C.H. recognized as "prayer music" plays in the background. A314 (C.H. Dep. 61:22-25). Although the district court seemed to dismiss the religious music as irrelevant because the Qaseedah Burdah is being sung in Arabic and C.H. does not speak Arabic, the fact that the lyrics describe non-Muslims as infidels and contain verses praising Muhammad for slaughtering them, is relevant to recognizing the

proselytizing intent of the video. *See* A55-56 (Compl. ¶62). The video's creator almost certainly did understand the significance of the lyrics when choosing the music for the video and when providing links for viewers to download the song. The video's content makes clear that its purpose is to praise Islam and recruit followers to the Islamic faith, while treating other religions as inferior and their followers as "infidels." *See* A425-433 (Qaseedah Burdah with English Translation).

*Kennedy*'s direction to interpret the Establishment Clause by reference to historical practices and understandings obliges this Court to find the Chatham School Board violated the Establishment Clause by including the proselytizing videos at issue, which extol Islam and promote it over all other religions, in its public school curriculum. There is no historical practice or understanding that permits such blatant religious recruitment as part of public school curriculum.

Accordingly, this Court should reverse the erroneous decision of the District Court and remand the case for an appropriate judgment in Hilsenrath's favor.

## CONCLUSION

For the foregoing reasons, Plaintiff-Appellant Libby Hilsenrath respectfully requests that this Court reverse the decision of the district court and remand the case for entry of an appropriate judgment finding that Defendant-Appellee School Board violated C.H.'s rights under the Establishment Clause and awarding C.H. nominal damages and attorney's fees.

Dated: March 12, 2024

/s/ RICHARD THOMPSON
Richard Thompson
THOMAS MORE LAW CENTER
24 Frank Lloyd Wright Drive
P.O. Box 393
Ann Arbor, Michigan 48106
(734) 827-2001
rthompson@thomasmore.org

/s/ MICHAEL P. HRYCAK
Michael P. Hrycak, Esq.
316 Lenox Avenue
Westfield, New Jersey 07090
(908) 531-8800
michaelhrycak@yahoo.com

*Attorneys for Plaintiff-Appellant*

## COMBINED CERTIFICATIONS

I, the undersigned, hereby certify the following:

1.      That I am a member of the Bar of the United States Court of Appeals for the Third Circuit.

2.      This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because it contains <u>12,959 words</u> excluding the parts of the brief exempted by Fed. R. App. P. 32(f).

3.      This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word in 14 point Times New Roman.

4.      That the text of the electronic and paper versions of the foregoing brief are identical.

5.      That a virus check was performed on this brief using Avast Antivirus Software, and that no virus was indicated.

6.      That, on March 12, 2024, I caused the foregoing to be filed with the Clerk of Court using the CM/ECF System, which will send notice of such filing to all registered users.

Respectfully submitted,
*/s/ Richard Thompson*
Richard Thompson
THOMAS MORE LAW CENTER

*/s/ Michael P. Hrycak*
Michael P. Hrycak

*Counsel for Appellants*

# NO. 23-3030

In The

# 𝔘𝔫𝔦𝔱𝔢𝔡 𝔖𝔱𝔞𝔱𝔢𝔰 𝔆𝔬𝔲𝔯𝔱 𝔒𝔣 𝔄𝔭𝔭𝔢𝔞𝔩𝔰
## 𝔉𝔬𝔯 𝔗𝔥𝔢 𝔗𝔥𝔦𝔯𝔡 ℭ𝔦𝔯𝔠𝔲𝔦𝔱

**LIBBY HILSENRATH,**
on behalf of her minor child, C.H.,

*Appellant,*

**v.**

**SCHOOL DISTRICT OF THE CHATHAMS;
BOARD OF EDUCATION OF THE SCHOOL DISTRICT OF THE CHATHAMS;
MICHAEL LASUSA, In his official capacity as the Superintendent of the
School District of Chathams; KAREN CHASE, In her official capacity as the
Assistant Superintendent of Curriculum and Instruction at the
School District of the Chathams; JILL GIHORSKI, In her official capacity as the
Principal of Chatham Middle School; STEVEN MAHER, In his official capacity
as the Supervisor of Social Studies for the School District of the Chathams;
MEGAN KEOWN, In her official capacity as a Social Studies teacher for
Chatham Middle School; CHRISTINE JAKOWSKI, In her official capacity as a
Social Studies teacher for Chatham Middle School.**

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

_____

## JOINT APPENDIX – Volume I of III
### (Pages: 1 – 25)

_____

Richard Thompson
THOMAS MORE LAW CENTER
24 Frank Lloyd Wright Drive
P.O. Box 393
Ann Arbor, MI 48106
(734) 827-2001
rthompson@thomasmore.org

Michael P. Hrycak
ATTORNEY AT LAW
316 Lenox Avenue
Westfield, NJ 07090
(908) 789-1870
michaelhrycak@yahoo.com

Ruby Kumar-Thompson
Anthony P. Seijas
CLEARY GIACOBBE ALFIERI & JACOBS
169 Ramapo Valley Road
Upper Level 105
Oakland, NJ 07436
(973) 845-6700
rkumarthompson@cgajlaw.com
aseijas@cgajlaw.com

*Counsel for Appellant*

*Counsel for Appellant*

*Counsel for Appellee
Board of Educ. Of the Dist. Of Chathams*

# TABLE OF CONTENTS
## Joint Appendix – Volume I of III

**Page:**

**Supplemental Opinion on Remand**
      **filed October 16, 2023 [DE101]** ....................................................................1

**Order**
      **filed October 16, 2023 [DE102]** ................................................................22

**Notice of Appeal**
      **filed November 13, 2023 [DE103]** ..........................................................24

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| **LIBBY HILSENRATH, on behalf of her minor child, C.H.,**<br><br>     **Plaintiff,**<br><br>     **v.**<br><br>**SCHOOL DISTRICT OF THE CHATHAMS, BOARD OF EDUCATION OF THE SCHOOL DISTRICT OF THE CHATHAMS, MICHAEL LASUSA, KAREN CHASE, JILL GIHORSKI, STEVEN MAHER, MEGAN KEOWN, and CHRISTINE JAKOWSKI,**<br><br>     **Defendants.** | Civ. No. 18-00966 (KM) (MAH)<br><br>**SUPPLEMENTAL OPINION ON REMAND** |

**<u>KEVIN MCNULTY, U.S.D.J.</u>:**

This case is an Establishment Clause challenge brought by Libby Hilsenrath on behalf of her son, C.H.,[1] to instruction about Islam in C.H.'s seventh-grade World Cultures and Geography course in the Chatham public schools. On November 12, 2020, this Court granted Defendants' motion for summary judgment and denied Hilsenrath's cross-motion for summary judgment, holding as follows:

(1) Hilsenrath has standing to pursue a claim for nominal damages, but not for prospective injunctive or declaratory relief;

(2) the School Board for the School District of the District of the Chathams (the "Board") is a proper defendant, and Superintendent LaSusa's involvement in the curricular decisions is sufficient to trigger potential liability under *Monell v. Department of Social Services*, 436 U.S. 658 (1978);

---

[1] The identity of C.H., the minor child on whose behalf Ms. Hilsenrath sues, is properly anonymized.

(3) the claims against the individual defendants and the School District of the Chathams (the "District") must be dismissed; and

(4) the seventh-grade World Cultures and Geography curriculum and materials did not violate the Establishment Clause.

On July 20, 2022, following an appeal by Hilsenrath, the Third Circuit vacated this Court's judgment and remanded the case "for further consideration in light of the Supreme Court's opinion in *Kennedy v. Bremerton Sch. Dist.*, 142 S. Ct. 2407 (June 27, 2022)." (DE 87.) That case, decided after I rendered my decision, bears on the proper test that should be applied in analyzing Hilsenrath's Establishment Clause claims.

Again before the Court on remand are Defendants' motion for summary judgment (DE 62) and Hilsenrath's cross-motion for summary judgment (DE 63). At the Court's invitation, each side filed a supplemental brief on remand. (DE 99, 100 (as corrected).) What follows amounts to an amendment of my prior decision, revised in accordance with *Kennedy v. Bremerton* and the parties' supplemental briefing. It should be read, *mutatis mutandis*, against the backdrop of the fuller discussion in my earlier decision. For the following reasons, Defendants' motion for summary judgment is again **GRANTED**, and Hilsenrath's motion for summary judgment is **DENIED**.[2]

---

[2]     My previous Opinion's prefatory note regarding the delicate nature of the issues raised by this case bears repeating here:

> This well-framed case presented sensitive issues requiring factual inquiry and . . . [n]o one's educational, ideological, or religious priors were sufficient to decide it. I understand well the strong feelings that accompany such issues and claims. I do not dismiss the plaintiff's concerns, and I am by no means unsympathetic with parents' desire to control their children's exposure to religious indoctrination. I am also acutely aware that this is public, not parochial, education. Religion, however, is a fact about the world, and no study of geography and cultures is complete without it. There is, to be sure, a line to be drawn between teaching about religion and teaching religion. On this record, I must conclude that the school did not cross that line.

(500 F. Supp. 3d at 277–78, SJ Op. at 2.)

## I. BACKGROUND[3]

### A. Facts

#### 1. The World Cultures and Geography Course

During the 2016–2017 school year, C.H. was a seventh-grade student at Chatham Middle School, in the School District of the Chathams. He was

---

[3]    Certain citations to the record are abbreviated as follows:

> DE = Docket entry number in this case
>
> Compl. = Complaint (DE 1)
>
> Def. SMF = Defendants' Statement of Material Facts (DE 62-2)
>
> C.H. Dep. = C.H. Deposition Transcript, Exhibit F to Defendants' Motion for Summary Judgment (DE 62-10)
>
> Jakowski Dep. = Christine Jakowski Deposition Transcript, Exhibit Y to Defendants' Motion for Summary Judgment (DE 62-29)
>
> LaSusa Dep. = Michael LaSusa Deposition Transcript, Exhibit K to Defendants' Motion for Summary Judgment (62-15)
>
> Weber Dep. = Jill Weber Deposition Transcript, Exhibit I to Defendants' Motion for Summary Judgment (DE 62-13)
>
> Video 1 = Introduction to Islam Video, Exhibit 17 to Plaintiff's Motion for Summary Judgment, https://www.youtube.com/watch?v=ZHujiWd49l4 (DE 63-18)
>
> Video 2 = 5 Pillars of Islam Video, Exhibit 18 to Plaintiff's Motion for Summary Judgment, https://www.youtube.com/watch?v=ikVGwzVg48c (DE 63-19)
>
> Worksheet = Introduction to Islam Worksheet, Exhibit PP to Defendants' Motion for Summary Judgment (DE 62-46)
>
> SJ Op. = November 20, 2020 Opinion granting Defendants' motion for summary judgment and denying Plaintiff's cross-motion for summary judgment (DE 82). The published version of this Opinion can be found at *Hilsenrath on behalf of C.H. v. Sch. Dist. of Chathams*, 500 F. Supp. 3d 272 (D.N.J. 2020).
>
> Pl. Br. = Plaintiff's Supplemental Brief in Support of Summary Judgment after the Third Circuit's Order to Vacate and Remand (DE 99)
>
> Def. Br. = Supplemental Brief in Further Support of Defendants' Motion for Summary Judgment on Remand from the Third Circuit (DE 100)

enrolled in a mandatory course called World Cultures and Geography, taught by defendants Megan Keown and Christine Jakowski. (Def. SMF ¶¶ 96–98, 125.)[4] The aim of the course was to "develop[] a broad understanding of the world and its people" so that "students will become active and informed global citizens." (DE 62-36 at 1.) To that end, the course devoted a unit of study to each of the world's major geographic regions. (*Id.*) As part of the study of each region, students learned about the religions commonly practiced in each. (*See, e.g.*, *id.*; DE 62-39.)

One unit was devoted to the Middle East and North Africa ("MENA"). As part of that unit, students learned about Islam, the religion that is prevalent in that region and is a central component of many of those countries' governments, laws, and cultures.[5] (DE 62-41.) This particular unit comprised nine lessons. Most covered geography and current events, but two of the nine focused on Islam. (*Id.*)

### (a)  *Introduction to Islam* **Video**

The first lesson was aimed at teaching students about the general attributes of the Islamic faith. (*Id.* at 2.) Ms. Jakowski presented a PowerPoint, a copy of which was posted on Google Classroom, an online platform for teachers to post course materials for their students. (Jakowski Dep. at 29:8–18.) The last of the PowerPoint slides asked students to write down words they associated with Islam, to watch a linked video introducing students to Islam ("Video 1"), and then to discuss what generalizations they could make after watching the video and consider whether those generalizations were valid. (DE 62-42 at 11.) However, Ms. Jakowski did not play Video 1 in class and

---

[4]    Ms. Keown prepared the syllabus for the class and taught until November 2016, when she went on maternity leave. Ms. Jakowski replaced her and taught the unit at issue. (Def. SMF ¶¶ 96–98.)

[5]    To put it another way, these students are citizens of a country which prohibits establishment of an official religion, but in this unit they were studying countries which emphatically do not. It is impossible to study the government and culture of, for example, the Islamic Republic of Iran while avoiding exposure to the tenets of Islam.

students were not required to watch it as homework. (Jakowski Dep. at 30:21–31:1, 36:4–6, 45:11–19.) Nonetheless, C.H., with his mother, did access the presentation and Video 1 from Google Classroom and watched it at home. (C.H. Dep. at 35:23–36:9.)[6]

Video 1 is a five-minute introduction to Islam. The video scrolls through pictures of Middle Eastern and North African peoples, Islamic art, and Muslim sites, with singing in the background.[7] Interspersed with these images for the first half of the video are slides of text asking and answering questions about Islam:

- "What is Islam? . . . Faith of divine guidance for Humanity, based on peace, spirituality and the oneness of God[.]" (Video 1 at 0:17.)

- "Who is Allah? Allah is the one God who created the heavens and the earth, who has no equal and is all powerful[.]" (*Id.* at 0:29.)

- "Who is Muhammed (S)? Muhammed (Peace be upon him) is the last & final Messenger of God. God gave him the Noble Quran[.]" (*Id.* at 1:01.)

- "What is the Noble Quran? Divine revelation sent to Muhammed (S) last Prophet of Allah. A Perfect guide for Humanity[.]" (*Id.* at 1:38.)

- "What does history say about Islam? Muslims created a tradition of unsurpassable splendor, scientific thought and timeless art[.]" (*Id.* at 2:10.)

Around the two-minute mark, the video begins to focus less on Islam as a religion *per se*, and more on the achievements of Islamic civilization. (*Id.* at

---

[6]     A study guide for the MENA unit advised students that the test would be open note, that their notes should include "general knowledge about [Islam] and 5 Pillars," and that they should "[u]se slides on Google Classroom to ensure that you have all important information in your notes or on the handouts." (DE 63-14 at 2.)

[7]     On the YouTube page, the description from the video-creator states that the music playing in the background is "Qasida Burdah" and provides two links for download, but neither link seems to be currently active. Hilsenrath has provided what she attests is a translation of the text of the song, which is religious in nature. (DE 63-17.) There is no testimony from C.H. that he clicked the links at the time of viewing the video or understood what the song, which was in Arabic, signified.

2:39, 3:02–25.) Also interspersed throughout the video are quotations (with attributions) from Muslim prayers, the Quran, and Muhammed. (*Id.* at 0:38, 1:14, 1:24, 1:48, 4:30, 4:19.) The video closes with a text slide stating, "May God help us all find the true faith, Islam. Ameen" (*id.* at 4:42), and another slide, seemingly from the video-creator, thanking family members and Allah (*id.* at 4:50).

In his deposition, C.H. testified that he did not remember much about this video, and did not recall feeling coerced. (C.H. Dep. at 24:24–25:1, 37:3–11.) That, of course, is relevant but not dispositive.

### (b)  Worksheet

The second lesson further explored the tenets of Islam. (DE 62-45 at 2.) Ms. Jakowski presented a second PowerPoint to the class that provided an overview of Islam's major characteristics and its five pillars, "the five obligations that every Muslim must satisfy in order to live a good and responsible life according to Islam." (*Id.* at 11.) As students listened to that lesson, they were given a worksheet that corresponded to the presentation. The worksheet had blanks which students would fill in, or incorrect statements which they would correct, based on information they had learned. (Jakowski Dep. at 40:1–10.) The PowerPoint and worksheet covered a range of topics at a general level: for example, how often Muslims pray, the practice of alms giving, and why Muslims fast. (Worksheet at 3–5; DE 62-45 at 11–20.)

One slide and corresponding page of the worksheet concerned the pillar called *shahadah*, or "Testimony of Faith." (DE 62-45 at 14.) The *shahadah* is described as "[t]he basic statement of the Islamic faith," and the text of the *shahadah* was included in the PowerPoint. (*Id.* at 14.)[8] The worksheet

---

[8]    Hilsenrath contends that the PowerPoint and worksheet also contained a link to a webpage that teaches visitors how to convert to Islam, and claims that students viewed it. (*See* 500 F. Supp. 3d at 280 n.5, SJ Op. at 5 n.5 (referring to Hilsenrath's original brief in support of her motion).) There is indeed a link in both documents to an informational webpage from the BBC describing the *shahadah*. (DE 68-9 at 31, 42.) The webpage states, among other things, that "anyone who cannot recite [the *shahadah*] wholeheartedly is not a Muslim" and "[r]eciting this statement three times

contained an incomplete version of the *shahadah*, and students filled in the underlined blanks of the statement: "There is no god but _____ and _____ is his messenger." (Worksheet at 4, the correct answers being "Allah" and "Muhammed.") C.H. completed part of the worksheet, including the *shahadah* page. (C.H. Dep. at 36:1–9; DE 62-47.)[9]

### (c)   Five Pillars Video

Like the first presentation, the five-pillars presentation contained a link to a video ("Video 2") (DE 62-45 at 10), but Video 2 was not played in class or assigned as homework. (Jakowski Dep. at 36:4–6). C.H., evidently a diligent student, nevertheless watched it at home with his mother. (C.H. Dep. at 35:23–36:9). Video 2, five minutes long, opens with text stating that "the following is an Islamic educational presentation for primary and secondary schools." (Video 2 at 0:02 (capitalization altered).) Video 2 features two cartoon-animation boys, Alex and Yusuf, discussing Islam. Alex asks Yusuf, who is Muslim, questions about his religion. For example, Alex asks Yusuf when he prays and what Muslims believe. (*Id.* at 0:50–2:00.) Yusuf states that "Allah is the creator of everything." (*Id.* at 1:30–34.) Yusuf then describes the five pillars to Alex and recites the *shahadah*. (*Id.* at 2:00–2:30.) Video 2 concludes with text instructing that the viewer can order more information from the video creator,

---

in front of witnesses is all that anyone need do to become a Muslim." *Shahadah: the statement of faith*, BBC, http://www.bbc.co.uk/religion/religions/islam/practices/shahadah.shtml (last updated Aug. 23, 2009). Other than Hilsenrath's own testimony (DE 63-2 at 129–30), which does not seem to reflect firsthand observations, there is no indication that Ms. Jakowski instructed students to follow links in the PowerPoints at home or that C.H. himself followed any such link. (*E.g.*, Jakowski Dep. at 45:11–19.) As to the worksheet, Ms. Jakowski testified that it was provided in class, presumably in hard copy (*id.* at 40:1–3), and C.H. completed the worksheet by hand, so there is no indication that he would or could have clicked on such a link (C.H. Dep. at 44:23–45:5; *see also* DE 62-47).

[9]    Ms. Jakowski described the worksheet as an in-class assignment. C.H. could not recall whether he completed it at home or in class. (*Compare* Jakowski Dep. at 40:1–10, *with* C.H. Dep. at 45:9–10.) At any rate, it is undisputed that C.H. reviewed the PowerPoint and completed the worksheet as part of the course. (*See id.*)

an organization called Discover Islam, and can organize a mosque tour. (*Id.* at 5:20.) It is clear that Discover Islam is a United Kingdom organization because its website ends in "co.uk," the text of the video uses British spelling, and Yusuf and Alex speak with British accents.

### 2. Hilsenrath's Complaints and Defendants' Response

After watching the videos with C.H. and reviewing the worksheet, Hilsenrath felt that the curriculum favored Islam at the expense of Christianity and Judaism. She sent emails expressing her concerns to (1) Steven Maher, Social Studies Content Supervisor for the School District; (2) Superintendent of Curriculum Karen Chase; (3) Superintendent Michael LaSusa; and (4) the Board of Education of the School District.[10] (DE 62-48; DE 62-50.)

---

[10]    For context, I note the roles and responsibilities of each of these parties:

- Supervisor Maher develops the social studies curriculum and supervises the social studies teachers. (Def. SMF ¶¶ 85–88.)

- Assistant Superintendent Chase is responsible for oversight of the curriculum and Supervisor Maher. (*Id.* ¶ 78.)

- Superintendent LaSusa, under New Jersey law, is the "chief executive" of the District and has the power of "general supervision over all aspects, including . . . instructional programs, of the schools of the district." N.J. Stat. Ann. § 18A:17-20(b); *see also* Def. SMF ¶ 72. He oversees District policy regarding curriculum and course materials, and Assistant Superintendent Chase reports to him. (Weber Dep. at 20:1–21:1, 35:10–15, 54:13–16; La Susa Dep. at 9:22–25.) He also has the responsibility to "ensure that teachers follow" District policy that religion is treated neutrally. (DE 63-15.) Although the Board has the power to hire and fire the superintendent, the Board does not have the power to overrule him on decisions regarding instructional materials and curriculum. (Weber Dep. at 20:1–21:8.) Ultimately, it is his decision to remove materials from courses, a decision that does not require approval from the Board, and his determination is deemed to represent that of the Board and District. (*Id.* at 51:7–14, 57:7–11; LaSusa Dep. at 101:2–102:2.)

- The Board, under New Jersey law, is the "body corporate" that supervises the District. N.J. Stat. Ann. §§ 18A:10-1, 18A:11-1(c)–(d). It consists of nine members and requires five votes to take any action. (Weber Dep. at 34:9–10; *see also* N.J. Stat. Ann. § 18A:10-6.) Nonetheless, the superintendent retains final authority on most day-to-day matters

After sending those emails, Hilsenrath attended a Board meeting in February 2017 and voiced her concerns. (Def. SMF ¶ 186.) In response, the Board's Curriculum Committee convened to discuss those concerns. (*Id.* ¶ 191.) When such complaints are raised, the Committee reviews and researches them and then publicly presents findings and any recommendations to the Board. (Weber Dep. at 19:7–25.) The Board usually does not take formal action regarding Committee recommendations but leaves that to the superintendent. (*Id.* at 20:1–21:8.) Here, the Committee meeting included Superintendent LaSusa, Assistant Superintendent Chase, Supervisor Maher, social studies teacher Stephanie Lukasiewicz, Board Member Michelle Clark, and Board President Jill Weber. (Def. SMF ¶ 195; LaSusa Dep. at 93:25–94:1.)

After reviewing the curriculum and materials, Superintendent LaSusa and the Committee determined that no changes were necessary. They presented their findings at the next Board meeting, emphasizing that the curriculum as a whole aligned with the District policy of religious neutrality. (DE 62-53, at 2–4; DE 62-54, link to video, *passim*; DE 63-5 at 24:1–14.) Prior to the meeting, however, Hilsenrath (and others) appeared on a national television show to voice her concerns. Seemingly in reaction to what they regarded as misstatements on the show and the ensuing disruption, Superintendent LaSusa and Supervisor Maher had the links to the videos removed from the PowerPoints. (*E.g.*, LaSusa Dep. at 87:6–18; DE 63-23 at 3–4 (referring to reports of violent and vulgar communications).)

### B. Procedural History

Months later, when C.H. was in eighth grade and no longer in the World Cultures and Geography course, Ms. Hilsenrath sued the District, the Board, Superintendent LaSusa, Assistant Superintendent Chase, Principal Jill Gihorski, Supervisor Maher, and the two teachers, Ms. Keown and Ms.

---

involving the schools, including the curriculum, an area which the Board avoids. (Weber Dep. at 21:4–8.)

Jakowski. (Compl. ¶¶ 12–39.) Her claims against the individual defendants name them in their official capacities only. (*Id.* at 2.) She alleges a single claim under 42 U.S.C. § 1983: that the curriculum, with particular focus on the videos and worksheet, violates the Establishment Clause of the First Amendment to the United States Constitution. (*Id.* ¶¶ 99–116.) She seeks (1) an injunction prohibiting Defendants "from funding and implementing religious instruction that endorses Islam or that favors Islam," (2) a declaration that Defendants violated the rights of herself and C.H. under the Establishment Clause, (3) a declaration that Defendants' "training, supervision, policies, practices, customs, and procedures that promote Islam violate the Establishment Clause," (4) nominal damages, and (5) attorney's fees. (*Id.*, Prayer for Relief.)

Defendants moved to dismiss the complaint. I denied that motion, holding that the Complaint on its face sufficiently alleged an Establishment Clause claim. *Hilsenrath on behalf of C.H. v. Sch. Dist. of Chathams*, Civ. No. 18-966, 2018 WL 2980392, at *3–4 (D.N.J. June 13, 2018). Following discovery, the parties cross-moved for summary judgment. (DE 62, 63.) On November 12, 2020, I granted Defendants' motion for summary judgment, denied Hilsenrath's motion for summary judgment, and dismissed Hilsenrath's Complaint. *See* SJ Op., 500 F. Supp. 3d 272 (D.N.J. 2020). Hilsenrath appealed. On July 20, 2022, the Third Circuit vacated the judgment without reaching the merits as such; rather it remanded the case to this Court "for further consideration in light of the Supreme Court's opinion in *Kennedy v. Bremerton Sch. Dist.*, 142 S. Ct. 2407 (June 27, 2022)," which had been decided in the interim, while the appeal was pending. *See Hilsenrath on behalf of C.H. v. Sch. Dist. of Chathams*, No. 20-3474, 2022 WL 2913754, at *1 (3d Cir. July 20, 2022). I then ordered supplemental briefing on the issues raised by the Third Circuit's remand (DE 90), and the parties submitted briefs accordingly (DE 99, 100).

Having considered the parties' supplemental submissions, I am now prepared to rule again on the parties' motions as directed by the Third Circuit.

## II.    LEGAL STANDARD

Federal Rule of Civil Procedure 56(a) provides that "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." I incorporate from my prior opinion the remaining discussion of the legal standards governing motions and cross-motions for summary judgment. SJ Op. 10–11, 500 F. Supp. 3d at 282–83.

## III.   DISCUSSION

The sole issue before the Court concerns Ms. Hilsenrath's Establishment Clause claim for nominal damages.[11] In accordance with the Third Circuit's directive remanding this case "for further consideration in light of the Supreme Court's opinion in *Kennedy v. Bremerton Sch. Dist.*, 142 S. Ct. 2407 (June 27, 2022)" (DE 87), I now revisit the parties' cross-motions for summary judgment. I begin my discussion with a brief summary of the *Kennedy* case and its bearing on the Establishment Clause challenge here. (Section III.A.) I then proceed to reanalyze the parties' motions consistent with that decision. (Section III.B.)

### A. The *Kennedy* Opinion

In *Kennedy*, the Supreme Court considered an appeal by a part time football coach, Joseph Kennedy, who claimed that he lost his job with the Bremerton School District for "kneel[ing] at midfield after games to offer a quiet prayer of thanks," or for leading "pregame or postgame prayers in the locker

---

[11]    The first three of my four original holdings are not implicated by *Kennedy* and therefore remain intact. *See* pp. 1–2, *supra*.

This case having been narrowed to a pure Establishment Clause claim, I also do not analyze any other constitutional claim, *e.g.,* violation of Fourteenth Amendment guarantees of substantive due process. *See generally Troxel v. Granville*, 530 U.S. 57 (2000); *C.N. v. Ridgewood Bd. of Educ.*, 430 F.3d 159, 185 (3d Cir. 2005); *Gruenke v. Seip*, 225 F.3d 290, 303–04 (3d Cir. 2000).

room." *Kennedy*, 142 S. Ct. at 2415–16. Kennedy sued in federal court, alleging that the school district had violated the First Amendment's Free Speech and Free Exercise Clauses. *Id.* at 2416. The Supreme Court found that Kennedy had discharged his initial burden to go forward with his free speech and free exercise claims. *Id.* at 2422–23. The burden thus shifted to the school district to demonstrate that its actions were justified. *Id.* at 2426.[12] Relevant here are the majority's holdings with respect to the justification proffered by the school district that "its suspension of Mr. Kennedy was essential to avoid a violation of the Establishment Clause." *Id.* The majority in *Kennedy* rejected this justification and, in so doing, rejected the so-called "*Lemon* test."[13] In fact, the majority suggested that the Supreme Court had *already* impliedly abandoned *Lemon* and "instructed that the Establishment Clause must [instead] be interpreted by 'reference to historical practices and understandings.'" *Id.* at 2428 (citing *Town of Greece, N.Y. v. Galloway*, 572 U.S. 565, 576 (2014); *Am. Legion v. Am. Humanist Ass'n*, 139 S. Ct. 2067, 2087 (2019) (plurality opinion)). The majority continued:

> "'[T]he line'" that courts and governments "must draw between the permissible and the impermissible" has to "'accor[d] with history and faithfully reflec[t] the understanding of the Founding Fathers.'" *Town of Greece*, 572 U.S. at 577, 134 S.Ct. 1811 (quoting *School*

---

[12]     I do not dwell on distinctions between the particular burdens associated with proving Free Exercise and Free Speech claims. The Court ruled that "[w]hether one views [Kennedy's] case through the lens of the Free Exercise or Free Speech Clause," Kennedy successfully discharged that initial burden, and that therefore "the burden shift[ed] to the District." *Kennedy*, 142 S. Ct. at 2426.

[13]     The reference is to *Lemon v. Kurtzman*, 403 U.S. 602 (1971). *Lemon* imposed a three-part inquiry for analyzing Establishment Clause claims, asking (1) whether the government practice had a secular purpose; (2) whether its "principal or primary effect" advanced or inhibited religion; and (3) whether it created "an excessive government entanglement with religion." *Id.* at 612–13.

In my prior decision, I applied the now-abandoned *Lemon* test to analyze Hilsenrath's Establishment Clause claim. In doing so, I cited then-current Third Circuit law noting that *Lemon* had been eroded in many respects, but maintained its vitality in the area of public education. SJ Op. at 21, 500 F. Supp. 3d at 289–90.

> *Dist. of Abington Township v. Schempp*, 374 U.S. 203,
> 294, 83 S.Ct. 1560, 10 L.Ed.2d 844 (1963) (Brennan,
> J., concurring)). An analysis focused on original
> meaning and history, this Court has stressed, has long
> represented the rule rather than some "'exception'"
> within the "Court's Establishment Clause
> jurisprudence." 572 U.S. at 575.

*Id.* at 2428 (additional citations omitted).

While clearly rejecting the *Lemon* test, the majority in *Kennedy* was less clear about what would replace it—*i.e.*, what would constitute a proper "historical analysis" of a party's Establishment Clause claim in all cases. Nevertheless, the majority did lay down certain markers which I take as a guide for this Court's analysis of these motions.

The most prominent of those markers is the majority's emphasis on the presence, or not, of coercion: "[T]his Court has long held that government may not, consistent with a historically sensitive understanding of the Establishment Clause, 'make a religious observance compulsory.'" *Id.* at 2429 (quoting *Zorach v. Clauson*, 343 U.S. 306, 314 (1952)). The majority emphasized that "coercion along these lines was among the foremost hallmarks of religious establishments the framers sought to prohibit when they adopted the First Amendment." *Id.*

Further guidance as to what other facts might constitute "hallmarks" of an Establishment Clause violation may be found at the *Kennedy* majority decision footnote 5. That footnote has been described, plausibly in my view, as a "cipher for interpreting how the Court interprets the Establishment Clause by reference to history and tradition." Daniel L. Chen, *Kennedy v. Bremerton School District: The Final Demise of Lemon and the Future of the Establishment Clause*, 21 Harvard J. L. & Pub. Policy Per Curiam, 9 (Summer 2022). Most helpful is that footnote's reference to a portion of Justice Gorsuch's concurrence in *Shurtleff v. City of Boston, Massachusetts,* in which he reviews "our constitutional history [for] some helpful hallmarks that localities and lower courts can rely on." 596 U.S. 243, 285 (2022) (Gorsuch, J., concurring). There, Justice Gorsuch wrote that "[b]eyond a formal declaration that a religious

denomination was in fact the established church, . . . founding-era religious establishments often bore certain other telling traits," including (1) "the government exerted control over the doctrine and personnel of the established church;" (2) "the government mandated attendance in the established church and punished people for failing to participate;" (3) "the government punished dissenting churches and individuals for their religious exercise;" (4) "the government restricted political participation by dissenters;" (5) "the government provided financial support for the established church, often in a way that preferred the established denomination over other churches;" and (6) "the government used the established church to carry out certain civil functions, often by giving the established church a monopoly over a specific function." *Id.*[14] At least four of these contain a strong element of compulsion, corroborating the primacy of coercion in the Court's analysis.

     To evaluate an Establishment Clause claim in a manner that is "consistent with a historically sensitive understanding of the Establishment Clause," then, I must determine whether Hilsenrath's case bears the

---

[14]    In his concurring opinion in *Shurtleff*, Justice Gorsuch cited to and adopted the position of Professor Michael McConnell when he enumerated these six hallmarks of founding-era religious establishments. *See Shurtleff v. City of Bos., Massachusetts*, 596 U.S. 243, 285–86(2022) (citing Michael W. McConnell, Establishment and Disestablishment at the Founding, Part I: Establishment of Religion, 44 William & Mary L. Rev. 2105 (2003)). Underscoring the Court's adoption of these hallmarks as the guiding principles for Establishment Clause jurisprudence, footnote 5 of the majority opinion in *Kennedy* also cites directly to Professor McConnell's scholarship. *See Kennedy*, 142 S. Ct. at 2429 n.5 (citing same).

    Footnote 5 of the majority opinion in *Kennedy* includes two additional citations, both of which refer to sources that elaborate further on the element of coercion. One citation is to a section of Justice Scalia's dissent in *Lee v. Weisman* in which he explains that one of the "hallmark[s] of historical establishments of religion was coercion of religious orthodoxy and of financial support *by force of law and threat of penalty*," 505 U.S. 577, 640–642 (1992) (Scalia, J., dissenting) (emphasis in original), and the other citation refers to a record of statement by James Madison in the Annals of Congress explaining that the First Amendment is aimed to prevent one or multiple sects from "establish[ing] a religion to which they would compel others to conform," 1 Annals of Cong. 730–731 (1789).

"hallmarks of religious establishments the framers sought to prohibit when they adopted the First Amendment." *Kennedy*, 142 S. Ct. at 2429. I now proceed to apply those principles to the summary judgment motions currently before the Court.

### B. The Summary Judgment Motions on Remand

As directed by the Third Circuit, I reanalyze Hilsenrath's Establishment Clause claim for nominal damages, not under the *Lemon* test, but under the approach announced recently in *Kennedy*.

I begin with some general observations. Lurking behind the Supreme Court's analysis is the well-recognized tradeoff between the First Amendment Establishment Clause and Free Exercise Clause in particular cases. *See generally Cutter v. Wilkinson*, 544 U.S. 709, 719 (2005) (these two Clauses, while "express[ing] complementary values," will "often exert conflicting pressures"); *Locke v. Davey*, 540 U.S. 712, 718 (2004) (describing the Clauses as "frequently in tension"). Any attempt to expand the scope of religious free exercise in the context of public institutions tends to be met by a corresponding objection that the state is threatening to establish a particular religion. Thus, in *Kennedy,* the coach argued that a school district's restrictions on his prayers would interfere with his religious observances under the Free Exercise Clause; the school district replied that its hands were tied by the Establishment Clause, under which it could not permissibly endorse the coach's religious observances or force others to participate in them. The *Kennedy* Court, however, found this to be a "false choice," because at least on the facts of that case, these two constitutional commands were not "at odds." 142 S. Ct. at 2432. Because students and other observers were (to varying degrees) exposed to the coach's prayers, but not coerced to participate in them, there arose "no conflict between the constitutional commands" of the Establishment Clause and the Free Exercise Clause. *Id.* In short, the facts "did not come close to crossing any line one might imagine separating protected private expression from impermissible government coercion." *Id.* at 2429.

In a very general sense, *Kennedy* may be seen as restricting the scope of the Establishment Clause and, in the name of Free Exercise, granting a bit more leeway for the presence of religion in the setting of public education. Under the prior *Lemon* test, a practice might have been found impermissible if it lacked a "secular purpose," "advance[d]" religion, or resulted in excessive "entanglement" of government and religion. *Kennedy* emphasizes official coercion and tradition, a test which will often set a higher threshold for an Establishment Clause challenge.[15]

*Kennedy* is not, however, legally or factually on point with our case. To begin with, there is no countervailing Free Exercise issue in our case that resembles the one in *Kennedy*; no coaches, faculty members, or even students are claiming that the authorities punished them for practicing their religion on school property. So in remanding, the Third Circuit surely was not saying that *Kennedy* is directly on point, but rather was responding to this Court's application of the *Lemon* test, which *Kennedy* has now declared to have been superseded.

Ms. Hilsenrath's is a pure Establishment Clause claim. Therefore, I eschew the now-superseded *Lemon* test and, gleaning what guidance I can find from *Kennedy,* I will analyze whether the challenged materials from C.H.'s World Cultures and Geography course bear any of the historical "hallmarks of religious establishments." *Id.* at 2407 n.5. As before, I analyze the challenged materials as a whole and in the context of the curriculum. *See, e.g., Cnty. of Allegheny v. ACLU Greater Pittsburgh Chapter*, 492 U.S. 573, 597 (1989), *abrogated on other grounds by Town of Greece*, 572 U.S. 565. Nothing about *Kennedy* undermines the principle that context remains critical, or vitiates the warning that to "[f]ocus *exclusively* on the religious component of any activity would inevitably lead to [the activity's] invalidation." *Lynch v. Donnelly*, 465

---

[15]    That is not to say that the considerations underlying the *Lemon* test have become irrelevant; far from it. *Kennedy* makes it clear, however, that the legal test has changed.

U.S. 668, 679–80 (1984) (emphasis added); *see also Wood v. Arnold*, 915 F.3d 308, 314 (4th Cir. 2019) ("[C]ourts . . . consistently have examined the entire context surrounding the challenged practice, rather than only reviewing the contested portion." (collecting cases from the Fourth, Fifth, Sixth, Seventh, Ninth, and Eleventh Circuits)), *cert. denied*, 140 S. Ct. 399 (2019).

I first consider whether the challenged World Cultures and Geography curriculum and materials were coercive. The *Kennedy* Court recognized coercion to be "among the foremost hallmarks of religious establishments the framers sought to prohibit when they adopted the First Amendment." 142 S. Ct. at 2429. After reviewing the parties' submissions, I find that the record contains no evidence of significant coercion.[16]

To begin with, C.H. expressly testified that he never felt coerced. In fact, C.H. (correctly, in the District's view) perceived the purpose and effect of the lessons as being to educate students about world religions and the importance of avoiding group generalizations. (C.H. Dep. at 24:18–25:1, 40:8–24, 41:22–25.) Nor did any other student testify that he or she experienced the course materials as coercive. In short, direct, subjective evidence of coercion is lacking.

---

[16]    The analysis here is hampered somewhat by the *Kennedy* Court's having found it unnecessary to define "what exactly qualifies as impermissible coercion in light of the original meaning of the Establishment Clause." *Kennedy*, 142 S. Ct. at 2429. Precision may not be required, however; here, as in *Kennedy*, the challenged curriculum and materials, however repugnant to any individual's sectarian religious beliefs, "did not come close to crossing any line one might imagine separating [secular public education] from impermissible government coercion." *Id.* Unless and until the Third Circuit holds to the contrary, I continue to be guided by its mandate, which I take to be consistent with *Kennedy*, that the reviewing court "look[] at whether the government is coerc[ing] anyone to support or participate in religion or its exercise." *Borden v. Sch. Dist. of Twp. of E. Brunswick*, 523 F.3d 153, 175 n.18. (3d Cir. 2008) (citation omitted); *see also C.N. v. Ridgewood Bd. of Educ.*, 430 F.3d at 187. While the students here were exposed to religious materials, there is no testimony from any individual that he or she experienced pressure to support or participate in the practice of any religion.

Even through an objective lens, however, the materials cannot be viewed as tending to compel a student "by force of law and threat of penalty," to adhere to a particular religious belief or participate in a particular religious practice. *Lee v. Weisman*, 505 U.S. at 640–42 (Scalia, J., dissenting). For the reasons expressed in my prior Opinion, I adhere to my conclusion that "Video 1 was used to introduce students to the tenets of Islam . . . [and] Video 2 likewise explored Islam through a neutral question-and-answer format that could not be regarded as proselytizing." SJ. Op. at 23, 500 F. Supp. 3d at 291. And while "the worksheet contained fill-in-the-blanks questions, as is typical at the middle-school level[,] . . . [t]he format fell well short of compelled recitation of a prayer," as the worksheet was "clearly designed to assess the students' understanding of the lesson on Islam," not to inveigle them into praying. *Id.* (citation and quotation omitted). Now of course there is a baseline level of coercion in all public education, irrespective of the subject matter.[17] The coercion relevant here, however, would be coerced participation in or adherence to a religious belief or practice. The educational units at issue, while exposing students to the tenets of religious faiths in various regions of the world, did not require or coerce students "to *support* or *participate* in" the religious faith covered by that unit. *Borden*, 523 F.3d at 175 n.18. (3d Cir. 2008) (emphasis added). Reasonable students, teachers, and parents would understand that the school's mission here was pedagogical, even if these course units exposed students to world religions whose adherents engage in proselytization. My prior observation on that point, although phrased in terms of the *Lemon* test, remains valid. *See* SJ Op. at 23, 500 F. Supp. 3d at 291 ("Of course, the statements of a religion's adherents have a religious purpose, *in the mouths of*

---

[17]    For example, students are required to attend school from the ages of 6 to 16, https://nj.gov/education/safety/sandp/attendance (citing N.J. Stat. Ann. §§ 18A:38-28 through 31) (last visited Sept. 25, 2023), and their completion of assignments is enforced by the grading system. I note in passing that the Board apparently had a policy permitting students to be excused from any part of instruction which the student or parent finds morally, conscientiously, or religiously offensive. (Def. SMF ¶ 38.)

*those adherents.* But for secular educators to teach and study *about* such statements is not to espouse them, or to proselytize.").[18]

The all-important context here is that this unit was part of a comprehensive curriculum on world cultures, which necessarily included units about the predominant religions in the particular area of the world being studied. Religion was not taught as revealed truth, but rather as an important fact about the world. *Kennedy* itself only reinforces the view, expressed at more length in my prior opinion, that *exposure* to a variety of viewpoints, including religious ones, is a proper goal. That goal is not undermined, and indeed may be enhanced, by non-coercive exposure to opposing beliefs. *See Kennedy*, 142 S. Ct. at 2431 (any rule suppressing coach's religious expression "would undermine a long constitutional tradition under which learning how to tolerate diverse expressive activities has always been 'part of learning how to live in a pluralistic society.'").[19]

In her brief, Hilsenrath does not meaningfully address the Third Circuit's mandate on remand, but for the most part hews to her prior general argument

---

[18]    The following observations from my prior Opinion, although presented in the context of the *Lemon* "endorsement" test, remain valid to my point here that the curriculum was educational, not coercive:

> Although the video-creator can be perceived as believing those tenets, neither the lesson, Ms. Jakowski, nor even the video-creator invites or encourages the students to adopt those views. This is par for the course; to take the Ninth Circuit's cogent example, "Luther's 'Ninety-Nine Theses' are hardly balanced or objective, yet their pronounced and even vehement bias does not prevent their study in a history class's exploration of the Protestant Reformation, nor is Protestantism itself 'advanced' thereby." [*Brown v. Woodland Joint Unified Sch. Dist.*, 27 F.3d 1373, 1380 (9th Cir. 1994)]. When, as here, religious beliefs are presented to educate, not convert, students, there is no endorsement of religion.

SJ. Op. at 25–26, 500 F. Supp. 3d at 292.

[19]    The prior Opinion's discussion of the curriculum's secular purpose, primary effect, and entanglement, although keyed to the *Lemon* test, is highly pertinent and more comprehensive than the discussion here. SJ Op. at 21–29, 500 F. Supp. 3d at 290–95. It should be read in conjunction with this Opinion.

that it is a violation of the Establishment Clause for a public school "to proselytize or to favor any one religion over others." (Pl. Br. at 7.) Whatever its legal merits, that argument fails on the facts, and has only grown weaker in light of *Kennedy*'s newfound emphasis on coercion. *Kennedy,* in my view, does not undermine the case law cited in my prior Opinion, at least insofar as it applies to this fact pattern. *See* SJ Op. at 21–29, 500 F. Supp. 3d at 289–95.

The findings of undisputed fact in my prior Opinion dispel any notion that the World Cultures and Geography course promoted Islam at the expense of other religions. The evidence, I found, demonstrates that "the curriculum treats Islam equally with other religions. It is not a standalone course of study, but is part of a larger survey of world regions and religions." SJ Op. at 24, 500 F. Supp. 3d at 291. Thus "the World Cultures course includes similar units on, for example, Hinduism and Buddhism, in which students watch videos on those religions to understand their tenets and practices." *Id.* (citing DE 62-39 at 4, 8–11; DE 68-8). I also rejected Hilsenrath's argument that "because the videos on Hinduism and Buddhism are from the perspective of a more neutral narrator, the World Cultures course does not treat all religions equally and proselytizes when it comes to Islam." *Id.* at 25 n.14. The reader is referred to the Court's discussion of these arguments in the prior summary judgment Opinion.

By focusing on these prior arguments, Hilsenrath fails to grapple with the task placed before the Court by the mandate of the Third Circuit, *i.e.,* to set aside the old *Lemon* test and revisit the case in light of the largely coercion-based standard adopted by the majority in *Kennedy.*

The World Cultures and Geography curriculum and materials do not present any of the "hallmarks" associated with establishment of religion to which *Kennedy* alluded. There is no evidence that by assigning middle school students activities and homework regarding various religions and cultures, the Board "exerted control over the doctrine and personnel of [an] established church," "mandated attendance in [an] established church and punished

20

**-20-**

people for failing to participate," "punished dissenting churches and individuals for their religious exercise," "restricted political participation by dissenters," "provided financial support for [an] established church," or "used the established church to carry out . . . civil functions." *Shurtleff*, 596 U.S. at 286 (Gorsuch, J., concurring). These, the sole guides that *Kennedy* has furnished the lower courts for the assessment of "coercion" for purposes of an Establishment Clause challenge in the context of public education, do not fit the facts of our case.

*   *   *

In sum, the curriculum and materials here were not coercive and do not otherwise bear or resemble the "hallmarks of religious establishments the framers sought to prohibit when they adopted the First Amendment." Accordingly, the Board did not violate the Establishment Clause. I will enter summary judgment in the Board's favor on Hilsenrath's remaining nominal-damages claim.

## IV.  CONCLUSION

For the reasons set forth above, Defendants' motion for summary judgment, reconsidered on remand with the benefit of additional briefing, is **GRANTED**, and Hilsenrath's motion for summary judgment is **DENIED**.

An appropriate order follows.

Dated: October 16, 2023

/s/ Kevin McNulty

_____

**Hon. Kevin McNulty**
**United States District Judge**

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| **LIBBY HILSENRATH, on behalf of her minor child, C.H.,**<br><br>  **Plaintiff,**<br><br>  **v.**<br><br>**SCHOOL DISTRICT OF THE CHATHAMS, BOARD OF EDUCATION OF THE SCHOOL DISTRICT OF THE CHATHAMS, MICHAEL LASUSA, KAREN CHASE, JILL GIHORSKI, STEVEN MAHER, MEGAN KEOWN, and CHRISTINE JAKOWSKI,**<br><br>  **Defendants.** | Civ. No. 18-00966 (KM) (MAH)<br><br>**ORDER** |

**THIS MATTER** having come before the Court via remand from the Court of Appeals for reconsideration of the motion for summary judgment filed by Defendants (DE 62), and the cross-motion for summary judgment filed by Plaintiff (DE 63); and the Court having considered the submissions and supplemental submissions on remand (DE 62, 63, 68–71, 99, 100) without oral argument pursuant to Fed. R. Civ. P. 78(b); for the reasons stated in the Court's original Opinion (DE 82), as revised and extended in the accompanying Supplemental Opinion on Remand; and good cause appearing therefor;

  **IT IS** this 16th day of October, 2023,

  **ORDERED** that Defendants' motion for summary judgment (DE 62) is **GRANTED**; and

  **IT IS FURTHER ORDERED** that Plaintiff's motion for summary judgment (DE 63) is **DENIED**.

The clerk is directed to close the file.

/s/ Kevin McNulty

_____

**Kevin McNulty**
**United States District Judge**

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW JERSEY**

LIBBY HILSENRATH, on behalf of
her minor child, C.H.,

     **Plaintiff,**

v.

SCHOOL DISTRICT OF THE
CHATHAMS, BOARD OF EDUCATION
OF THE SCHOOL DISTRICT OF THE
CHATHAMS, MICHAEL LASUSA,
KAREN CHASE, JILL GIHORSKI,
STEVEN MAHER, MEGAN KEOWN,
and CHRISTINE JAKOWSKI,

     **Defendants.**

Case No. 18-00966 (KM) (MAH)

_____/

## <u>NOTICE OF APPEAL</u>

NOTICE is hereby given that Plaintiff Libby Hilsenrath, on behalf of her minor child, C.H.,

hereby appeals to the United States Court of Appeals for the Third Circuit from the Order and

Supplemental Opinion on Remand entered in this civil action on October 16, 2023, granting

Defendants' Motion for Summary Judgment and denying Plaintiff's Motion for Summary

Judgment and dismissing all claims.

Respectfully Submitted,

*/s/ Michael P. Hrycak*
Michael P. Hrycak
The Law Office of Michael P. Hrycak
NJ Attorney ID # 2011990
316 Lenox Avenue
Westfield, NJ 07090
(908)789-1870
michaelhrycak@yahoo.com

Richard Thompson*
MI Bar # P21410
Thomas More Law Center

24 Frank Lloyd Wright Drive
P.O. Box 393
Ann Arbor, MI 48106
(734) 827-2001
rthompson@thomasmore.org
*Admitted Pro Hac Vice

***Attorneys for Plaintiff***

DATED:  November 13, 2023