# United States Court of Appeals

*for the*

# Third Circuit

Case No. 23-3030

LIBBY HILSENRATH, On behalf of her minor child, C.H.,

*Appellant,*

— v. —

SCHOOL DISTRICT OF THE CHATHAMS; BOARD OF EDUCATION OF THE SCHOOL DISTRICT OF THE CHATHAMS; MICHAEL LASUSA, In his official capacity as the Superintendent of the School District of Chathams; KAREN CHASE, In her official capacity as the Assistant Superintendent of Curriculum and Instruction at the School District of the Chathams; JILL GIHORSKI, In her official capacity as the Principal of Chatham Middle School; STEVEN MAHER, In his official capacity as the Supervisor of Social Studies for the School District of the Chathams; MEGAN KEOWN, In her official capacity as a Social Studies teacher for Chatham Middle School; CHRISTINE JAKOWSKI, In her official capacity as a Social Studies teacher for Chatham Middle School

*Defendants.*

ON APPEAL FROM AN ORDER OF THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF NEW JERSEY IN CASE NO. 2:18-CV-00966, HONORABLE KEVIN MCNULTY, U.S. DISTRICT JUDGE

## BRIEF ON BEHALF OF DEFENDANT-APPELLEE, BOARD OF EDUCATION FOR THE SCHOOL DISTRICT OF THE CHATHAMS

RUBY KUMAR-THOMPSON, ESQ.
CLEARY GIACOBBE ALFIERI JACOBS, LLC
169 Ramapo Valley Road, UL 105
Oakland, New Jersey 07436
(973) 845-6700
rkumarthompson@cgajlaw.com
*Attorneys for Defendant-Appellee, Board of Education for the School District of the Chathams*

**TABLE OF CONTENTS**

**Page**

TABLE OF CONTENTS ............................................................................. i

TABLE OF AUTHORITIES ...................................................................... iii

STATEMENT OF THE ISSUES ON APPEAL ........................................... 1

STATEMENT OF THE CASE ................................................................... 1

   Background Facts...................................................................................... 1

   The Chatham Middle School World Cultures and Geography Class........................... 3

   MENA Unit 4........................................................................................... 6

   Critical Thinking Making Generalizations Power Point ............................... 8

   Video #1 ("Intro to Islam") ..................................................................... 10

   Introduction to Islam Power Point and Worksheet.................................... 12

   C.H.'s Review of The Videos .................................................................. 16

SUMMARY OF THE ARGUMENT............................................................ 18

LEGAL ARGUMENT ............................................................................... 22

   Scope and Standard of Review ................................................................ 22

   I.    THE CLAIMS FOR DECLARATORY AND INJUNCTIVE RELIEF HAVE BEEN ABANDONED AND WAIVED.................................. 23

   II.    SUMMARY JUDGMENT WAS APPROPRIATELY GRANTED ON C.H.'S ESTABLISHMENT CLAUSE CLAIM SEEKING NOMINAL DAMAGES DUE TO THE ABSENCE OF SIGNIFICANT COERCION TOWARDS HIM TO CONFORM TO A PARTICULAR RELIGIOUS BELIEF OR PRACTICE.................................................. 24

   III.   C.H. CANNOT PREVAIL ON A THEORY OF INDIRECT COERCION AS HE WAS NOT SUBJECTED TO A FORMAL RELIGIOUS PRACTICE ................................................................. 35

IV.    THE STUDY ABOUT RELIGIONS FOR A PEDOGOGICAL GOAL HAS BEEN CONSTITUTIONALLY PERMISSIBLE THROUGHOUT 20TH CENTURY HISTORY ............................................................................... 39

V.    THE ABSENCE OF ANY EVIDENCE OF DEFENDANT DIRECTLY FAVORING ISLAM OUTSIDE OF THE CURRICULUM ITSELF IS FATAL TO C.H.'S ESTABLISHMENT CLAUSE CLAIM.................................................. 43

CONCLUSION ............................................................................................ 50

### TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*American Legion v. American Humanist Association*, --U.S.---,
 139 S.Ct. 2067 (2019)..........................................................................25, 26, 29

*Armour v. County of Beaver, Pa*, 271 F.3d. 417 (3d. Cir. 2001)..............................22

*Borden v. School District of the Township of East Brunswick,* 523 F.3d 153
 (3d Cir 2008), *cert. den.,* 129 S.Ct. 1524 (2009) ....................................... 36

*Brown v. Woodland Joint Unified Sch. Dist.*, 27 F.3d 1373 (9th Cir. 1994) ..............41, 44, 45

*C.N. v. Ridgewood Board of Ed.*, 430 F.3d 159 (3d Cir. 2005)........................................36, 42

*California Parents for the Equalization of Educational Materials v. Torlakson,*
 973 F.3d 1010 (9th Cir. 2020), cert. denied, 141 S.Ct. 2583 (2021) ................32, 46, 48

*Carey v. Bd of Educ.*, 98 F2d 535 (10th Cir. 1979) ................................................. 44

*Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986) ........... 23

*City of Ocala, Florida v. Art Rojas*, 143 S.Ct. 764 (2023) ...............................................27, 28

*Donovan ex rel. Donovan v. Punxsutawney Area Sch. Bd.*, 336 F.3d 211
 (3d Cir. 2003) .................................................................................. 23

*Doremus v. Board of Ed. Of Borough of Hawthorne*, 342 U.S. 429 (1952)..............................23

*Doremus v. Board of Education,* 5 N.J. 435 (1950) ....................................................... 40

*Dougherty v. Vanguard Charter School Academy,* 116 F.Supp.2d 897
 (W.D. Mich. 2000) .............................................................................. 35

*Downs v. Los Angeles Unified Sch. District*, 228 F.3d 1003 (9th Cir. 2000)........................ 48

*Edwards v. Aguillard,* 482 U.S. 578 (1987) .............................................................. 40

*Eklund v. Bryon Union Sch. Dist.*, 154 Fed Appx. 648 (9th Cir. 2005),
 *cert. denied*, 549 U.S. 942 (2006) ...................................................... 45

*Elk Grove Unified School Dist. v. Newdow*, 542 U.S. 1 (2004) .........................................26, 38

*Engel v. Vitale*, 370 U.S. 421 (1962)................................................................37, 40

*Epperson v. State of Arkansas,* 303 U.S. 97 (1968) ......................................45, 46

*Everson v. Board of Education of Ewing*, 330 U.S. 1 (1947) ..................................... 40

*FFRF v. Hanover School Dist.*, 626 F.3d 1 (1st Cir. 2010) ..............................39, 47

*FFRF v. New Kensington Arnold Sch. Dist.*, 832 F.3d 469 (3d Cir. 2013) ........................ 34

*FFRF, Inc. v. Concord Community Schools*, 885 F.3d 1038 (7th Cir. 2018) ...................... 47

*Fleischfresser v. Dirs. Of Sch. Dist. 200*, 15 F.3d 680 (7th Cir. 1994) ...........................29, 33

*Florey v. Soux Falls School District 49-5*, 619 F.2d 1211 (8th Cir. 1980) .......................... 49

*Good News Club v. Milford Central School*, 533 U.S. 98 (2001) .......................................... 47

*Gorum v. Sessoms*, 561 F.3d 179 (3d Cir. 2009) ................................................................... 22

*Grove v. Mead School Dist. No. 354*, 753 F.2d 1528 (9th Cir. 1985)
   *cert. denied*, 474 U.S. 826 (1985) ...........................................................33, 38, 49

*Illinois ex. Rel. McCollum v. Board of Education*, 333 U.S. 203 (1948).................................. 41

*James v. Bd. of Educ. Of Central District No. 11*, 461 F.2d 566 (2d Cir.),
   *cert. denied*, 409 U.S. 1042 (1972) ...................................................................... 44

*Kars 4 Kids, Inc., v. America Can!*, ---F.4th---, 2024 WL 1647746
   (3d Cir.  April 17, 2024) ..................................................................................... 23

*Katz v. Aetna Cas. & Sur. Co.*, 972 F.2d 53 (3d Cir. 1992) ................................................ 23

*Kennedy v. Bremerton School Dist.*, 597 U.S. 507, 142 S.Ct. 2407
   (2022) .................................................................... 24, 25, 27, 28, 29, 32, 43

*Keyishian v. Board of Regents*, 385 U.S. 589 (1967)............................................................... 46

*Larson v. Valente*, 456 U.S. 228 (1982) .............................................................................. 43

*Lee v. Weisman*, 505 U.S. 577 (1992)......................................................26, 27, 35, 36, 37

*Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 110 S. Ct. 3177,
   111 L.Ed.2d 695 (1990) .................................................................................... 22

*Lynch v. Donnelly*, 465 U.S. 668 (1983) .......................................................... 44, 47

*Malnak v. Yogi*, 592 F.2d 197 (3d Cir. 1979) ......................................... 36

*Mitchell v. Helms*, 530 U.S. 793 (2000) ................................................ 46

*Morse v. Frederick*, 551 U.S. 393 (2007) .............................................. 44

*Newdow v. Rio Linda Union School District*, 597 F.3d 1007 (9th Cir. 2010) ......................... 38

*Newdow v. U.S. Congress*, 328 F.3d 466 (9th Cir. 2003) (O.Scannlain, J., dissenting), *rev'd o.b., Elk Grove Unified Sch. Dist. v. Newdow*, 542 U.S. 1 (2004) .............................. 37

*Pico v. Board of Education, Island Trees Union Free School Dist.*, 457 U.S. 853 (1982) ... 45, 49

*Roberts v. Madigan*, 921 F.3d 1047 (10th Cir. 1990) .......................................... 20

*Santa Fe Independent School District v. Doe*, 530 U.S. 290 (2000) .................................. 27, 36

*School Dist. of Abington Township v. Schempp*, 374 U.S. 203 (1963) ........................... 24, 29, 35, 37, 39, 40, 41

*Shurtleff v. City of Boston, Mass.*, --U.S.--, 142 S.Ct. 1583 (May 2, 2022) ............... 25, 26, 45

*Simko v. U.S. Steel Corp.*, 992 F.3d 198 (3d Cir. 2021) ...................................... 23

*Stone v. Graham*, 449 U.S. 39 (1980) ..................................................... 39, 40

*Town of Greece v. Galloway*, 572 U.S. 577 (2014) ................................ 24, 27, 28, 46

*United States v. Quillen*, 335 F.3d 219 (3d Cir. 2003) ....................................... 23

*Valley Forge Christian College v. Americans United for Separation of Church and State, Inc.*, 454 U.S. 464 (1982) ...................................................................... 28

*Van Orden v. Perry*, 545 U.S. 677 (2005) ..................................................... 26, 44

*Wallace v. Jaffree*, 472 U.S. 38 (1985) ..................................................... 37, 40

*Wiley v. Franklin*, 497 F.Supp. 390 (E.D. Tenn, Northern Div. 1980) .................... 33, 44

*Wood v. Arnold*, 915 F.3d 308 (4th Cir. 2019), *cert. denied*, 140 S.Ct. 399 (2019).................................................................. 32, 41, 44

*Zorach v. Clauson*, 343 U.S. 306 (1952) ..................................................... 32, 38

**Statutes**

*N.J.S.A.* 18A:35-4.36a ................................................................................... 48

**Constitutional Provisions**

*U.S. Const., Am. 1* .................................................................................... 24

***STATEMENT OF THE ISSUES ON APPEAL***

1. Whether, in the absence of any facts to establish that C.H. or any other student was significantly coerced, either directly or indirectly, to adhere to any particular religious belief or into participating in any formal religious activity through the inclusion of two videos and a worksheet pertaining to Islam during two class periods as part of a larger comparative survey of world regions and religions in a year-long World Cultures and Geography Class, the District violated the Establishment Clause. (A1-21 Opinion of October 16, 2023).

2. Whether Plaintiff waived and abandoned the claims for declaratory and injunctive relief on behalf of her son C.H., who has since graduated from the public school system, by failing to brief those issues on appeal. (A535-564 Opinion of November 12, 2020).

***STATEMENT OF THE CASE***

**<u>Background Facts</u>**

1.      During the 2016-2017 school year (the "Relevant Period"), C.H. was a 7th grade middle school student at Chatham Middle School, a public school that is located within the School District of the Chathams, and operated by the Appellee, the Board of Education of the School District for the District of the Chathams ("District"). (A44-A50 Complaint).

1

2.      So as to assure that Chatham Middle School children are intellectually and socially prepared to become self-reliant members of 21st Century society, the State of New Jersey's Department of Education has mandated that middle school students be knowledgeable about various major world religions, including Islam, and that, by 8th grade, to be able to [c]ompare and contrast the tenets of various world religions developed in or around this time period (i.e., Buddhism, Christianity, Confucianism, Hinduism, Islam, Judaism, Sikhism, and Taoism), their patterns of expansion, and their responses to the current challenges of globalization, as well as the Core Curriculum Content Suggested Framework for Social Studies Instruction. (A127 State Content Learning Standards for Social Studies Instruction 6.2.8.D.3.d).

3.      As per the state-mandated Learning Standards 6.2.8D.3.d. and materials and methods "designed to broaden the pupil's understanding of the many cultures of the world" and representing "the many religious, ethnic, and cultural groups and their contribution to American heritage," and appropriate instruction regarding different religions were included for its cultural and social impact as a part of the broader multicultural social studies curriculum of the School District of the District of the Chathams at every grade level, including but not limited to the 7th grade WCG class. (A156 Curriculum; A178-189 Religion References in Social Studies Instruction; and A346 Dr. LaSusa Testimony at T73:1-73:9).

2

**The Chatham Middle School World Cultures and Geography Class**

4.       During the 2016-2017 school year, Chatham Middle School had three (3) World Cultures and Geography ("WCG") classes that were taught by three different social studies teachers. (A174 Maher Testimony at T97:1-6) (see also DE 62-23 Defs. Summary Judgment "Exhibit S," Keown Testimony at T30:5-10). C.H. was enrolled in a class that was assigned to be taught by Megan Keown during the 2016-2017 school year, however, she was on maternity leave during the relevant time period of the events set forth in the Complaint. (A147 & A150 Keown Testimony at T5:11-20 and T29:9-15; and A173 Maher Testimony at T46:19-T48:2).

5.       Ms. Keown was replaced by a substitute teacher, Christine Jakowski, who was employed to teach C.H.'s WCG class from November 7, 2016 until April 23, 2017. (A147 Keown Testimony at T5:15-25; and A218-A219 Jakowksi Testimony at T5:8-20; and T7:11-21).

6.       The Syllabus prepared for the WCG class by Ms. Keown collaboratively with the other WCG teachers included the study of the history, culture, geography, and religious heritage of several different world regions that were separated into serial units, namely Latin America, Middle East and North Africa ("MENA"), Europe, Sub-Saharan Africa, Australia/Oceania and Asia. (A439 Syllabus; and A150 Keown Testimony at T29:18-25).

7.     When Ms. Jakowski first started teaching the WCG class as a substitute, the class was at the "tail end of the Latin America unit." (A219 Jakowski Testimony at T7:25-T8:7).

8.     Christianity was a topic during the Latin American unit and C.H. recalls learning about "God" and "Jesus." (A107 C.H. Testimony at T26:19-27:4; and A96 Hilsenrath's Testimony at T40:3-16). At the end of the Latin American Unit, Students were given an open note assignment to compare and identify similarities amongst the cultures in the different regions that comprise Latin America, including their religion, language, holidays, government structure, and traditions. (See DE 62-56, Defs. Summary Judgment "Exhibit ZZ," Latin American cultures: Note-taking guide and Latin America Open Note Assessment, #9).

9.     In addition to Christianity, C.H. learned about the basic religious beliefs of Buddhists, and Hindus and Judaism from his 7th grade social studies teachers. (A305 C.H. Testimony at T24:14-17; and A289 Hilsenrath Testimony at T58:2-4).

10.     For Asia Unit 6, C.H. was also required to watch two different videos regarding the religious tenets and beliefs of Hindus and Buddhists and took notes on the key tenets of each religion. (A255 Hinduism and Buddhism PowerPoint; A259 Hinduism and Buddhism Videos Worksheet; and A98, A373, Hilsenrath Testimony at T80:8-16; and T102:17-103:8).

11.     The lessons involving Buddhism during the Asia Unit 6 of the WCG class, required C.H. to learn about "nirvana" and also that it was "almost heaven" and "like

4

how they had to be a good person to not get reincarnated to go into nirvana." (A239 Unit 6: South and East Asia Unit Plan; A240-241 Daily Lesson Plans: South Asia; A250 Lesson Plan 6.8-6.9; A456 Teacher's Video Notes; and A321 C.H. Testimony at T29:10-20).

12.     C.H. was also instructed to compare the central beliefs and tenets of Buddhism with what he had learned about the Islamic faith earlier in the school year. (A264 C.H. handwritten notes).

13.     At no time did either Ms. Keown or Ms. Jakowski, who are non-Muslim, express any belief that any one faith was favored or preferred over any religious belief. (A305 C.H. Testimony at T24:18-20; and A99 Hilsenrath's Testimony, T84:2-6).

14.     Contrary to the allegations in the Complaint, neither teacher had ever denigrated or disparaged any religion in the classroom, nor advised C.H. that Islam is a "better" faith than Christianity. (A108 C.H. Testimony at T40:16-24).

15.     At no time in class was C.H. instructed or encouraged by Ms. Jakowski, who never discussed her personal religious beliefs with him, to participate in any religious activity pertaining to Islam, including but not limited to, reciting a prayer, visiting a Mosque, professing his belief in the Shahada, or to subscribe to the words, "find the true faith, Islam." (A226 Jakowski Testimony at T39:15-T40:22; A108-A109, A110 C.H. Testimony at T40:8-15; T44:8-13 and A94 & A99 Hilsenrath Testimony at T32:4-23 and T84:2-85:9).

16.    C.H. did not recall any favoring of Islam by Ms. Jakowksi, when all that C.H. could remember learning about the Five Pillars was that Mulsims believed in "Allah" and "Muhammad." (A107 C.H. Testimony at T26:14-18) (see also DE 62-47, Defs. Summary Judgment "Exhibit QQ" Incomplete Worksheet)

**MENA Unit 4**

17.    The lessons during the MENA Unit 4 had spanned a total of two (2) class periods out of a total of 135 class periods in the year-long WCG Class. (A267-268 Unit Four Daily Lesson Plans) (see also DE 62-33 Defs. Summary Judgment "Exhibit CC" Christine Jakowski Answers to Interrogatories, #9; and DE 62-25, Defs. Summary Judgment "Exhibit U," Maher Transcript, T55:1-16).

18.    In addition to Islam, the MENA Unit 4 consisted of discussions about current events in the Middle East and North Africa, the geography, the water crisis, the global impact of the Syrian War, and about obesity in Qatar. (A266-A269 Unit 4 Daily Lesson Plan; and A98 Hilsenrath Testimony at T80:2-7).

19.    As part of MENA Unit lessons 4.5 and 4.6, two in-class PowerPoint slide presentations (hereinafter, the Making Generalizations Presentation is referred to as Power Point # 1 and the Intro Islam Presentation is referred to as Power Point #2) were presented to the students in class and posted to Ms. Keown's online shared Google Classroom webpage. (A271 & A272 Lesson 4.5 and Lesson 4.6 objectives and activities; and A223-A225 Jakowksi Testimony at T29:8-18; T33:12-34:1).

20.    Google Classroom is an online "tool" where materials that were already presented during a physical class period are posted and where "a teacher has the ability to also post assignments or communicate with her students" via email, and if the teacher wanted she could assignments through either Google Classroom or the actual classroom itself. (A319 and A328, LaSusa Testimony at T27:9-14, T44:12-24; and A171 Maher Testimony at T30:12-18).

21.    Access to Google Classroom was password protected and available outside of the classroom via a student's network credentials that are issued by the District and for use only by the student. (A327-A328 LaSusa Testimony at T27:9-14; T43:6-44:11; A138 Chase Testimony at T64:10-21; A381 District Representative Testimony at T32:10-21).

22.    Middle school students enrolled in the School District of the Chathams are specifically instructed since 3rd grade how to utilize third party websites as sources and to determine the validity and reliability of the information developed by third parties that are posted on a teacher's online Google Classroom page. (A172 Maher Testimony at T34:19-35:20) (see also DE 62-35 Defs. Summary Judgment "Exhibit EE," Defendants' Responses to Requests for Admissions #12 and #13).

23.    In the absence of any specific instructions to do so from their teacher, C.H. was not expected to *sua sponte* view any secondary source materials that had been hyper-linked in any in class Power Point Presentations on Google Classroom. (A236 Jakowski Testimony at T29:1-14 & T39:21-T40:10) (see also DE 62-25 Defs. Summary Judgment "Exhibit U," Maher Testimony at T62:3-8).

24.    In fact, C.H., understood that, in the absence of any specific instructions from his teacher or an explicit assignment posted under the homework tab on Google Classroom, he was also not expected to complete "assignments" solely derived from words in a PowerPoint slides. (A228 Jakowksi Testimony at T46:8 -T47:7).

**Critical Thinking Making Generalizations Power Point**

25.    For the MENA Unit 4, the first Power Point presentation was entitled: Critical Thinking Lesson-Making Generalizations with Content (PowerPoint #1) (See A290; A293 Hilsenrath's Testimony at T68:10-12; T71:8-22).

26.    The general format of Power Point #1 was originally created by the Social Studies Content Coordinator, Mr. Maher, based on resources from an educational agency called "Foundation for Critical Thinking" and was designed to present students with content to make them think critically about what a generalization is, to permit the students to make generalizations from said content, and then teach them about criteria by which generalizations can be effective or not in their daily lives. (A280 & A282 expert report of Dr. Justice; and A98-99 Hilsenrath Testimony at T80:20-81:6) (See also DE 62-25, Defs. Summary Judgment "Exhibit U" Maher Testimony, at T68:24-T69:25).

27.    Power Point #1 was not assigned as homework by Ms. Jakowski and it did not expressly include an assignment to be completed at home. (A267 Unit 4 Lesson Plan for Critical Thinking Lesson Plan Unit 4.5; and A223 & A227 Jakowski Testimony at T29:1-14; T45:11-19).

28.     Power Point #1 was plainly intended to be utilized solely as a topic of discussion <u>in the classroom</u>, "if time," to promote critical thinking skills in the area of generalizations that could be made about a variety of matters including about Muslims and Islam, and which required, in part, for students to also assess the credibility of sources by identifying bias and prejudice in documents, media and computer-generated information. (A407-A416 Generalizations Presentation and A267 Unit 4 Lesson Plan, 4.5) (see also DE 62-33, Defs. Summary Judgment "Exhibit CC," Answers to Interrogatories of Christine Jakowski, #10; and DE 62-32, Defs. Summary Judgment "Exhibit BB," Answers to Interrogatories of Megan Keown #5 and #10).

29.     While one of the slides in Power Point #1 included a hyperlink to a video that is entitled "Intro to Islam" ("Video #1") that was posted on You Tube by a third party organization named GainPeace.com, and the statement "watch this video," appears above, that slide also states: "As you watch this video clip, write down words that describe Islam as presented by this video." (A416 Generalizations Presentation).

30.     Video #1 was not hyperlinked for the purpose of instructing students in its contents as though they were religious truths, nor to take any position on the religious statements contained therein, but as secondary source for an academic critical thinking exercise designed to elicit vocabulary "words that come to mind when describing Islam," and then for use in an in-class discussion about what generalizations (good or bad) may be made from the video and whether they were "valid or faulty." (A416

Generalizations Presentation; A267 Unit 4.5 Lesson Plan and A278-280, expert report of Dr. Justice).

31.     Video #1 was never played by Ms. Jakowski in class. (A225; A227-A228 Jakowski Testimony at T35:5-14; T36:4-6; T45:11-T46:7; and A308 C.H. Testimony at T34:7-19).

32.     Instead, C.H. watched Video #1 solely at home with his mother (A309 C.H. Testimony at T35:1-16).

33.     Although Video #1 was never shown in class, the critical thinking goal of the "generalizations" lesson as presented in the Power Point #1 slides was nonetheless confirmed by C.H. to have been achieved since he admitted to learning that the effect of making generalizations is that, "most of the time they are not true and that it could be used to hurt some people." (A307 C.H. Testimony at T33:1-13).

**Video #1 ("Intro to Islam")**

34.     The five-minute long "Intro to Islam" slide show video presentation on You Tube consists of approximately 50 different slides. Only five (5) of those slides contain what appears to be the creator's own interpretation in English of certain quotes in Arabic from the Quran. (A434 Intro to Islam Video Link submitted by Appellant via a flash drive).

35.     Both Ms. Hilsenrath and C.H. admittedly did not understand any of the non-English words being sung in Video #1 accompanied by background music that Ms. Hilsenrath (<u>not</u> C.H.) "confused" to be the equivalent of "prayer music." (A314 C.H. Testimony at T61:16-25).

36.    Approximately 80% of the slides in Video #1 contain images of Islamic art and architecture, photographs of children, women and men dressed in traditional Muslim garb, and written information about where Muslims live on all seven continents as well as the historical contributions made by Muslims to science, philosophy, literature, astronomy, architecture during the Dark Ages and their influence to the European Renaissance Era. (A434; see also A278, Dr. Justice's expert report).

37.    Video #1 also contains positive references to the Jews, Christians, the Bible, and Torah, by including from the Quran the phrases: "Be <u>Jews and Christians</u>, then ye will be <u>rightly guided</u>." and "He (Allah) hath revealed unto thee (Muhammad) the Scripture with the truth, confirming that which was (revealed) before it, just as He revealed the <u>Torah and the Gospel</u>." (Slide #13 at 1:15 and Slide #19 at 1:56). (A434).

38.    Video #1 also quotes Islam's Prophet Muhamad as espousing principles of equality for all races: "An Arab has no superiority over a non-Arab and a white man has no superiority over a black man, nor a black man over a white man---" (Slide #47 at 4:21). (A434)

39.    Contrary to Ms. Hilsenrath's assertions, the last slide in Video #1 does not end in a prayer but with the creator's personal gratitude to Allah, a dedication to all Muslims everywhere, and blessings to his parents and in memory of his grandparents that they may be rewarded by Allah in this life and the next. As Ms. Jakowski is not Muslim, it is thus, clear that the video is expressing the viewpoint of the creator and not of Ms. Jakowski. (Slide #50, at 4:54) (A434).

40.    A link in the comments section contained below the "Intro to Islam" video on YouTube, and which allegedly references a poem entitled "Qaseedah Burdah" does not lead to a valid website and Ms. Hilsenrath did not attempt to down the words to the song when she first viewed the video. (A109 Hilsenrath Testimony at T109:9-22) (see also DE 62-34, Defs. Summary Judgment "Exhibit DD," Ms. Hilsenrath's Admission to Request for Admission #9).

41.    Ms. Hilsenrath was not aware of the meaning of the poem "Qaseedah Burdah" when she watched the video and did not see any reference to "Christians as infidels who should be killed." (A100 Hilsenrath Testimony at T105:4-106:2).

**Introduction to Islam Power Point and Worksheet**

42.    Power Point #2 (entitled "Introduction to Islam") was made available to students on Google Classroom but did not expressly contain an "assignment" to watch any videos at home. (A386-A405 Intro to Islam Presentation; and A227-A228 Jakowski Testimony at T45:4-19, T46:2-7, and T46:25-T47:7).

43.    PowerPoint #2 was prepared by the 7th grade social studies teachers to educate the students about the manner in which religious beliefs and traditions of Islam influence the language, arts, and daily lives of Muslim people in the region, amongst presentation of other facts regarding the Middle East, and to draw similarities between the 5 Pillars of the Islamic Faith to other belief systems of the world, such as Buddhism that was to be taught in the latter half of the WCG class. (A224 Jakowski Testimony at T33:12-34:11; and A268 & A272 Foundation of Islam Belief Lesson Plan 4.6).

44.     During class, C.H. was required to fill in a worksheet in paper form to take notes regarding the information presented in Power Point #2 by Ms. Jakowksi on a SmartBoard during a single class period ("worksheet"). (A226 Jakowski Testimony at T39:21-T40:10). As C.H. only received a paper copy of the worksheet and not a digital one, it was impossible for him or Ms. Hilsenrath to follow any hyperlinks on the digital copy of the Worksheet that was later produced in discovery to Plaintiff (A226 Jakowski Testimony at T39:21-3 and T40:1-10) (see also DE 62-35, Defs. Summary Judgment "Exhibit EE," District's Response to Plaintiff's Request for Admissions, #15).

45.     In fact, C.H. filled in the worksheet solely by hand. (See DE 62-47, Defs. Summary Judgment "Exhibit QQ," Incomplete Worksheet).

46.     At the bottom of the Worksheet, are the words, "Wrap Up/Discussion," and which discussion topic was expressly stated to be "[w]hy is it important to understand the religion of Islam in our study of the MENA region?" (see DE 62-47, Defs. Summary Judgment "Exhibit QQ," Incomplete Worksheet).

47.     Power Point #2 answers this questions as follows:

(A396)

48.    C.H. was not threatened with any consequences, such as receiving a bad grade, as a result of failing to complete the worksheet, either in class or at home. (A110 C.H. Testimony at T45:11-16; and A92 and A101 Hilsenrath Testimony at T24:6-18 and 111:15-22).

49.    In fact, the note taking assignment was not completed by C.H. and was never graded, but he nonetheless advanced to the 8th grade without being penalized (A110 C.H. Testimony at T45:18-22) (see also DE Defs. Summary Judgment "Exhibit QQ," Incomplete Worksheet).

50.    In PowerPoint #2 Ms. Hilsenrath discovered a hyperlink to a video about the Five Pillars ("Video #2") that was posted on You Tube by an educational organization

located in the United Kingdom with a website address of DiscoverIslam.co.uk. (A100 & A293 Hilsenrath Testimony at T108:9-109:8; T71:20-25; and A436 Five Pillars Video).

51.    While C.H. was shown the contents of PowerPoint #2 on a Smart Board by Ms. Jakowski with his entire class, <u>Video #2 was not played in class because she ran out of time</u>; nor did Ms. Jakowski present information contained within any website allegedly hyperlinked in PowerPoint #2 during her presentation of Islam and the 5 Pillars to her WCG class. (A109 C.H. Testimony at T43:5-44:4; A225, A227-A228 Jakowski Testimony at T35:5-14; T36:4-6; T45:11-T46:14; and A282 Expert Report of Dr. Justice) (see also DE 62-33, Defs. Summary Judgment Exhibit "CC" Christine Jakowski's Answers to Interrogatories, #3, #10 and #11).

52.    The first text that is contained in Video #2 states: "THE FOLLOWING IS AN ISLAMIC EDUCATIONAL PRESENTATION FOR PRIMARY AND SECONDARY SCHOOLS." (A436; see also A291 Hilsenrath Testimony at T69:18-21).

53.    Video #2 also informed viewers that the presentation they were about to watch was created by an organization called Discover Islam --both in the beginning of the video and at the end. (A436).

54.    While the Five Pillars Video explains Islamic tenets, beliefs, and practices, it did not contain any explicit instructions as to how C.H. could convert to Islam. Rather it merely reinforced the student's basic knowledge of Islam which was later followed by

a comparative exercise to other religions. (A308 & A311 C.H. Testimony at T34:7-16 and T37:3-22; and A282, Expert Report of Dr. Justice; and A296 Hilsenrath Testimony at T93:6-10; see also A263, Handwritten note by C.H.).

**C.H.'s Review of The Videos**

55.    C.H.'s entire recollection of the two videos at issue in this case is based solely on his review of the videos on a third-party platform, YouTube, and discussion of said videos with his mother at home, and not in conjunction with any lesson presented by his social studies teachers, namely Ms. Jakowski, in the classroom. (A306, A308-A310, A312, and A314 C.H. Testimony at T34:23-T36:9; T38:7-39:5; T61:6-15).

56.    None of the children enrolled in C.H.'s 2016-2017 7th grade World Cultures and Geography Class, including C.H. were explicitly given an "assignment" to watch the "5 Pillars Video" at home, instructed about how to schedule a tour of a mosque, nor encouraged to attend prayer at an Islamic Mosque. (A223, A224-A228 Jakowski Testimony at T29:8-15; T33-23; T36:4-6; T39:6-20; T40:1-10; T45:4-47:7) (see also DE 62-35, Defs. Summary Judgment Exhibit, "Exhibit EE," District's Response to Request for Admissions, #10, and #11; and DE 62-33, Defs. Summary Judgment "Exhibit CC," Answers to Interrogatories of Christine Jakowski, #3, #9 #10).

57.    In fact, Ms. Hilsenrath could not identify a single date on which C.H. was allegedly assigned to watch the "Intro to Islam" video at home, failed to produce any evidence of a written homework assignment to watch any videos, and denied that any individual had specifically instructing C.H. to "view any videos on Chathams' Google

Classroom at home alone." (A101 Hilsenrath Testimony at T112:22-24) (see also DE 62-6 Defs. Summary Judgment "Exhibit B," Ms. Hilsenrath's Answer to Interrogatory #6, #9, #10, and #11; and DE 62-8, Defs. Summary Judgment "Exhibit D" Plaintiff's Supplemental Answer to Interrogatory #6 dated February 14, 2019).

58.    Ms. Hilsenrath also failed to provide any evidence C.H.'s failure to review the Power Point Presentations and to click on any hyperlinks to videos contained therein had actually affected his grades in any adverse manner (A92-A93 and A290 Hilsenrath Testimony at T24:6-18, T25:2-26:10, and T68:1-8).

59.    In fact, C.H. denied that he had been threatened with lower grades or failed assignments if he did not watch the videos that were hyperlinked in the two Power Point Presentations posted on Google Classroom for an End of Unit 4 assessment. (A110, A306 A310-A311, A314 C.H. Testimony at T32:15-20, T36:24-37:2, T46:10-47:1, and T61:2-5).

60.    The understanding that C.H. ultimately gained from learning about different religions in Middle School was, in his opinion, "important" so that he can have a different perspective and "take in other ideas so you are not one-sided," and "see where people are coming from." (A106-A107 C.H. Testimony at T17:3-10 and T28:7-15).

61.    C.H. admittedly was not pressured to either convert to Islam after watching Video #1, to recite the Shahada, or to join someone in prayer or to visit a Mosque after watching Video #2 at home with his mother. (A108, A109, A110, and A305, A306,

A311 and A314, C.H. Testimony at T40:12-15, T44:8-10, T47:10-23, T:24:18-23, T32:5-20, T37:20-22, and T61:2-5).

62.    C.H. did not interpret any of the videos or instruction he received in his WCG class as sending any type of religious message to conform to Islam, but stated only that *his mother* thought that his "*rights* had been violated." (See DE 63-3, Pl. Summary Judgment "Exhibit 2," C.H. Testimony at T70:25-T71:14).

### *SUMMARY OF THE ARGUMENT*

The District Court correctly granted the Board's Summary Judgment Motion on October 16, 2023 with regard to C.H.'s Establishment Clause claim seeking nominal damages only, because no evidence was submitted by Ms. Hilsenrath that satisfied her burden to establish that the curriculum and instruction in the classroom in the case *sub judice* had violated the Establishment Clause.

Here, Ms. Hilsenrath bases her appeal entirely on the fiction that, as part of his WCG class, C.H. was <u>required</u> to view videos "under threat of lower grades, that [allegedly] present religious opinions as "fact," that encourage Islamic prayer, and that include an explicit call for conversion," as homework (emphasis supplied). (Appellant's Brief, P.2. The uncontroverted evidence however demonstrates that no such requirement existed, despite C.H. now framing his Establishment Clause challenge as one based on an alleged assignment found in a single Power Point Slide posted on Google Classroom on or about January 2017. In fact, C.H. had failed to produce any evidence that either Ms. Keown or Ms. Jakowski had expressly instructed C.H. to view

the You Tube videos linked in either PowerPoint Presentation as homework. Furthermore, Ms. Hilsenrath had no knowledge that any of the material or information conveyed in the videos were tested or graded and had expressly denied that any individual threatened C.H. with lower grades or failed assignments (A92 Hilsenrath Testimony at T24:6-22). Furthermore, nothing contained within the PowerPoint slides themselves directs any student to watch the videos outside of the exercise for discussion in the classroom and for note taking purposes to ensure students understand and can think critically about the information being presented for a comparative exercise later in the semester. (see A406-416 Generalizations Presentation; and A385-405 Introduction to Islam Presentation). Instead, the record clearly demonstrates that Ms. Hilsenrath watched the videos with her son on a third-party platform You Tube of her own volition and it was she alone who thought C.H.'s rights had been violated by the inclusion of the Intro to Islam video. (A314 C.H. testimony at P.61 L.6-12; see also DE 63-3 C.H. Dep., T70:25-71:14; and A54-A55 Complaint, ¶¶49-51; ¶56).

Insofar as Appellant urges this Court to make a sweeping inference from the syllabus for C.H.'s WCG class setting forth the percentages which make up a student's final grade and an unauthenticated "study guide" so as to conclude that the videos were "required" viewing by C.H. in preparation for an Open Notes Test on the lessons taught during the MENA unit, the Syllabus itself did not inform any student that all materials presented in any form on Google Classroom website or that contents of hyperlinked secondary source materials and videos would be graded and tested. (A438).

The Syllabus only refers to "homework and classwork, unit assessment, map assessment, group assessment and individual assessment" as components of grading only. (Id).

Further, the Study Guide upon which Ms. Hilsenrath relies to support her contention that all of the materials on Ms. Keown's Google Classroom online webpage were required viewing is from another WCG teacher's class, Ms. Lukasiewicz, who would have had her own password protected Google Classroom website to which C.H. would not have had access (A423). In fact, no one, including C.H. identified it as being part of Ms. Keown's WCG class. (see A352 Dr. LaSusa Testimony at P.70 L.6-12). In fact, the name Lukasiewicz in reference to a "note packet handout" (which also was never produced in discovery by Plaintiff) appears on the study guide itself, and therefore, was ostensibly created by a second non-party WCG teacher (Ms. Lukasiewicz) for a different WCG class that C.H. did not attend. (A423 Study Guide). Accordingly, it is hearsay without an exception. Thus, no competent evidence was produced to demonstrate that C.H.'s failure to review the PowerPoint presentations and to click on any hyperlinks contained therein would have affected his grades in any negative manner and Ms. Hilsrenrath's reliance upon an unauthenticated Study Guide to argue otherwise is insufficient to support C.H.'s Establishment Clause claim. *Roberts v. Madigan*, 921 F.3d 1047, 1052 (10th Cir. 1990) ("[S]tudents cannot claim First Amendment violations . . .for actions against a teacher in whose class they were not enrolled." (internal quotation marks and citations omitted)).

Assuming *arguendo*, that there is a valid dispute as to whether the videos and worksheet at issue were assigned as required viewing for homework or for a grade, then the mere exposure to words from the Quran and to religious concepts believed by a Middle Eastern civilization that is presented as part of a secular pedagogical lesson which is necessary to understand the culture and traditions of those same people and to assess cultural biases through making generalizations about all of the religious and non-religious images, words, and music in Video #1 does not violate the Establishment clause when 1) no teacher expressed a preference for or approval of Islam or the religious beliefs expressed in the videos, nor disapproval of any other religion; 2) there was instruction and videos about other religious beliefs during the year-long WCG course; and 3) C.H. admittedly was not coerced into participating in any sort of religious exercise or practice, such as praying, professing his belief in the Shahada, or attending a mosque service. The District Court concluded as much on October 16, 2023, and this Court should do likewise. (A1, Supplemental Opinion on Remand; see also DE 82, November 12, 2020 SJ Opinion).

As it pertains to Ms. Hilsenrath's standing for an injunction and declaratory relief to issue, these claims were abandoned and therefore waived during oral argument before the Third Circuit on September 23, 2021 when counsel for Appellant denied that she had advanced a claim to personally obtain injunctive and declaratory relief against Defendants (A585, Line 11 to Line 16 Appeal Oral Argument). In any event, she has also failed to brief the standing issue on appeal and thus, the District Court's

dismissal of the claims for injunctive and declaratory relief in its initial Decision issued on November 12, 2020 should, respectfully, not be disturbed.

## LEGAL ARGUMENT

### Scope and Standard of Review

Where the First Amendment is involved, the Third Circuit will undertake exacting review of the whole record with a particularly close focus on facts that are determinative of a constitutional right. *Armour v. County of Beaver, Pa*, 271 F.3d. 417, 420 (3d. Cir. 2001). Thus, review of a district court's grant or denial of summary judgment on a First Amendment claim is *de novo*, such that, the Third Circuit may affirm on any basis supported by the record. *Gorum v. Sessoms*, 561 F.3d 179, 184 (3d Cir. 2009).

It also bears noting that unsupported allegations, subjective beliefs, or argument alone, cannot preclude a grant of summary judgment on a claim for violation of one's constitutional rights. *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 888, 110 S. Ct. 3177, 111 L.Ed.2d 695 (1990) (nonmoving party may not successfully oppose summary judgment motion by simply replacing "conclusory allegations of the complaint or answer with conclusory allegations of an affidavit."). Thus, if the nonmoving party fails "to set forth competent evidence sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial ... there can be 'no genuine issue of material fact,' since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts

immaterial." *Katz v. Aetna Cas. & Sur. Co.*, 972 F.2d 53, 55 (3d Cir. 1992) (*quoting Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986)).

## I. THE CLAIMS FOR DECLARATORY AND INJUNCTIVE RELIEF HAVE BEEN ABANDONED AND WAIVED

In her newly-filed appeal, Ms. Hilsenrath has failed to brief the issue of whether she has standing on behalf of her child C.H. to obtain declaratory and injunctive relief against the individual Defendants or the Board, as plead in the Complaint, presumably because C.H. has completed his K-12 public education with his graduation from High School in June 2022, thereby making Plaintiff's claims for declaratory and injunctive relief moot. *Donovan ex rel. Donovan v. Punxsutawney Area Sch. Bd.*, 336 F.3d 211, 216-217 (3d Cir. 2003); *see also Doremus v. Board of Ed. Of Borough of Hawthorne*, 342 U.S. 429, 433 (1952). In fact, Ms. Hilsenrath does not even contend that she is appealing from the District Court's Order dated November 12, 2020 in her Notice of Appeal and only includes the Order dated October 16, 2023 in her Appendix. Accordingly, Plaintiff has abandoned and waived her ability to argue that the November 12, 2020 dismissal of said claims for lack of standing on her part was in error. *Kars 4 Kids, Inc., v. America Can!*, ---F.4th---, 2024 WL 1647746 (3d Cir. April 17, 2024) (opining that an argument not raised in a party's opening brief are generally forfeited) (*citing Simko v. U.S. Steel Corp.*, 992 F.3d 198, 205 (3d Cir. 2021) and *United States v. Quillen*, 335 F.3d 219, 224 (3d Cir. 2003)). For these reasons, the dismissal of the claims for injunctive and declaratory relief should remain undisturbed.

## II. SUMMARY JUDGMENT WAS APPROPRIATELY GRANTED ON C.H.'S ESTABLISHMENT CLAUSE CLAIM SEEKING NOMINAL DAMAGES DUE TO THE ABSENCE OF SIGNIFICANT COERCION TOWARDS HIM TO CONFORM TO A PARTICULAR RELIGIOUS BELIEF OR PRACTICE

The First Amendment states, in relevant part, that "Congress shall make no law respecting an establishment of religion[.]" *U.S. Const., Am. 1*. Thus, to prevail and avoid dismissal of her Establishment Clause claim, C.H. was required to show that the videos and the worksheet at issue in the matter at bar had caused the School District to "establish a religion." On June 27, 2022, the United States Supreme Court's decision in *Kennedy v. Bremerton School Dist.*, 597 U.S. 507, 142 S.Ct. 2407 (2022), significantly changed the manner in which federal courts must analyze Establishment Clause violations in our public schools when it abandoned the "*Lemon*" test and its various offshoots, i.e. the endorsement test, reasonable observer test, primary effects test, predominant purpose test, to determine the line between "the permissible and the impermissible" in the public school context. *Id* at 535-536.

Federal courts must now interpret the Establishment Clause solely by "reference to historical practices and understandings," in particular that which "accord with history and faithfully reflect the understanding of the Founding Fathers." *Id. See also Town of Greece v. Galloway,* 572 U.S. 577, 582 (2014) (plurality opinion) (rejecting Establishment clause challenge to legislative prayer based upon long-standing historical practices and tradition of the United States) (*quoting School Dist. of Abington Township v. Schempp*, 374 U.S. 203, 294 (1963) (Brennan, J. concurring)); *Shurtleff v. City of Boston, Mass.*, --U.S.--,

142 S.Ct. 1583, 1607-08 (May 2, 2022) (J. Gorsuch and J. Thomas concurring in judgment) ("This Court has long ago interred Lemon and it is past time for local officials and lower courts to let it lie"); and *American Legion v. American Humanist Association*, --U.S.---, 139 S.Ct. 2067, 2082, fn 16 (2019) (abandoning Lemon because it is "particularly daunting…in cases…that involve [public monuments, symbols, mottos, displays, and ceremonies] for ceremonial, celebratory or commemorative purposes, of words or symbols with religious association). It was against this historical understanding, that the *Kennedy* Court evaluated the claim that a coach's personal praying activity during a school-sponsored event had violated the Establishment Clause and therefore justified the infringement upon his exercise of religion by the school when it fired him. *Kennedy*'s evaluation of whether the coach's praying activity on the sidelines during a football game resulted in an establishment of religion within the school had focused entirely upon whether there was evidence of coercion to join Kennedy in prayer. *Id.* at 537. The absence of any evidence that any student was directly coerced into participating in what was unquestionably a religious activity was dispositive in determining that an Establishment Clause violation did not exist. *Id* at 539-540.[1]

*Kennedy*'s extensive focus upon coercion is an approach that is faithful to "the original meaning of the word 'establishment' as the Framers understood the term." *Van*

---

[1] The decision in *Kennedy* was also rendered without regard for the age of the students and therefore, it is clear that the Supreme Court has now clearly and unequivocally rejected a presumption of susceptibility to conform by "impressionable" school children to apply in favor of an actual coercion test. *Id.* at 542.

*Orden v. Perry*, 545 U.S. 677, 692-93 (2005) (plurality op.) (Thomas, J. concurring). In Justice Thomas' concurring view, [t]he Framers understood the term establishment "necessarily [to] involve <u>actual legal coercion</u>." *Id* at 693 (emphasis added). *See also Elk Grove Unified School Dist. v. Newdow*, 542 U.S. 1, 52 (2004) (Thomas J. concurring). Further, in *Lee v. Weisman*, 505 U.S. 577 (1992), Justice Scalia clarified that the level of coercion that was "a hallmark of historical establishments of religion was coercion of religious orthodoxy and of financial support by force of law and <u>threat of penalty.</u>" *Id* at 693 (emphasis added); *Accord Am. Legion v. Am. Humanist Ass'n*, 139 S.Ct. at 2096 (Thomas, J, concurring). On the other hand, "government practices that have nothing to do with creating or maintaining…coercive state establishments" supporting religion do not violate the Establishment Clause. *Id.* Thus, unless the challenged actions were significant enough to result in "mandatory observance [of a religion's belief system] or mandatory payment of taxes supporting ministers," the Founders would not have considered it to be a violation of the prohibition against the "establishment of religion." *Id* at 694; and *Shurteleff v. City of Boston*, 142 S.Ct. at 1609 (Gorsuch, J., concurring) (listing as a guide most of the traditional hallmarks reflecting "forms of coer[cion] regarding religion or its exercise that would lead to government violating the Establishment Clause).

Unsurprisingly then, compulsory prayer, religious observance, attendance at church, or other formal religious activity when offered as part of the school day to a captive audience of school children continue to be constitutionally problematic even

26

after abandonment of the *Lemon* test. *Kennedy*, at 537. But, on the other hand, mere "exposure to religion" no longer renders an "offended observer" sufficiently injured to bring suit against the government for violating the Establishment Clause. *Id* at 541. (distinguishing *Lee v. Weisman*, *supra*, and *Santa Fe Independent School District v. Doe*, 530 U.S. 290 (2000)). Rather, the significant level of coercion that will suffice to support an Establishment Clause violation is now nothing short of direct coercion to support or conform to another's religious dogma. *Id* at 543, *and Town of Greece, supra*, 572 U.S. at 576 (rejecting Establishment clause challenge to prayer activities due to an absence of proof that its contents denigrate non-believers or religious minorities, threaten damnation, preach conversion, or constitute actual coercion).

If there was any doubt as to whether the Supreme Court requires direct coercion to support or participate in religion or its exercise, such doubt is dispelled by the Supreme Court's 2023 decision in the case of *City of Ocala, Florida v. Art Rojas*, where the only concrete and particularized injury set forth by the plaintiffs who sued the City for organizing a prayer vigil for victims of a shooting spree was that one of the plaintiff's found the prayers offered at the vigil to be "offensive" and thus, made her feel as if she was an "outsider." 143 S.Ct. 764 (2023). In denying the petition for writ of certiorari, Justice Gorsuch wrote that "[t]his court has never endorsed the notion that an 'offended observer' may being an Establishment Clause claim." *Id* at 764. He then rejected the notion that the "offended observer" has standing to sue for an Establishment Clause violation by opining, "[i]n Kennedy, this Court put to rest any question…that claims

alleging an establishment of religion must be measured against the Constitution's original and historical meaning, <u>not the sensitivities of a hypothetical reasonable observer</u>." *Id* at 764-765 (emphasis added). He then stated that "lower courts will recognize that offended observer standing has no more foundation in the law than the *Lemon* test that inspired it" and cautioned that since "most every governmental action probably offends <u>somebody</u>," "recourse for such disagreement and offense does not lie in federal litigation," but rather the political process. *Id.*

What this ultimately means for C.H.'s claim is that to the extent that a school program or activity causes "some [to] take offense to certain forms of speech or prayer they are sure to encounter in a society," there is no Establishment Clause violation. *Kennedy*, *supra*, 538-539 (*citing Town of Greece*, 572 U.S. at 589) ("offense does not equate to coercion"). To be specific, it has always been the case that, "[n]either psychological harm produced by observation of conduct with which one disagrees nor offense at the behavior of government and a desire to have public officials comply with one's view of the law constitutes a cognizable injury." *Valley Forge Christian College v. Americans United for Separation of Church and State, Inc.*, 454 U.S. 464, 485 (1982) (declining to recognize a right to any form of relief for an alleged injury resulting solely from the constitutional right to "a government that does not establish religion"). Thus, allegations amounting to nothing more than indirect and subtle psychological pressures to conform to a particular religion that C.H. may have subjectively felt are no longer sufficient to violate the Establishment Clause. *Kennedy*, at 539-540. In fact, apart from prayers, invocations,

in class instruction regarding "creation science" and other overtly religious activities in connection with school sponsored events such as graduations and sporting events, the United States Supreme Court has yet to recognize the same subtle coercive effects it has previously recognized to exist to also apply to the curricular decisions of a school. *Fleischfresser v. Dirs. Of Sch. Dist. 200*, 15 F.3d 680, 689, n.9 (7th Cir. 1994) (noting heightened concerns that arise from classroom activities in the elementary school context only, and declining to adopt generally an "impressionable child" standard since our Supreme Court has not yet done so). Therefore, unless C.H. can point to evidence that he has been coerced in a concrete and direct way to participate in a religious practice or prayer, and not merely exposed to religious sentiments and beliefs with which he disagrees, there can be no Establishment Clause violation in the matter at bar. *Kennedy,* at 542-543; and *American Legion*, 139 S.Ct. at 2102 (Gorsuch, J. concurring in judgment) (stating that "with *Lemon* now shelved…only a public school student compelled to recite a prayer will still have standing to sue.") (*citing Sch. Dist. Abington Twp. V. Schempp*, 374 U.S. at 244, n.9).

Here, there is absolutely no evidence that C.H. was compelled by any words spoken by his teacher to adopt or participate in any school sponsored or approved exercise, observance, or activity that was religious or even predominantly religious in nature, such as a prayer, invocation, petition, or lecture about creation science, much less directed to view any religious content that forced him to perform any act contrary to his religion (A559, Op., p. 25) (finding that "neither the lesson, Ms. Jakowski, nor

even the video creator invites or encourages the students to adopt [the videos] views" "as revealed religious truth."). In fact, Ms. Jakowski did not show the subject videos that had been embedded in the Power Point in-class presentations in class, and there is a lack of any competent evidence that the videos were assigned by her for viewing as homework or to study for a test. (see A225; A227-A228 Jakowski Testimony at T35:5-14; T36:4-6; T45:11-T46:14; and A109 & A308 C.H. Testimony at T34:7-19; T43:5-44:4). The only evidence C.H. submitted to demonstrate that the videos were required viewing at home was an unauthenticated "study guide" that was not created or distributed by Ms. Jakowski but by another 7th grade social studies teacher for her separate WCG class in which C.H. was not a student.[2] (A423).

There is also no evidence that Ms. Jakowski directed students to follow links in the Power Points at home or that C.H. himself followed any link to a webpage that allegedly teaches visitors how to convert to Islam from the BBC describing the Shahada. (Op., p. 4, fn 5.). Nor is there evidence that C.H. clicked any link on the YouTube page on which Video #1 could be played or that he understood what the music and singing, which was in Arabic, signified. (A314 C.H. Testimony at T61:16-25; see also DE 63-2, Hilsenrath Dep., T105:4-23). And, as it pertains to the worksheet, it is undisputed that

---

[2] On the study guide itself, in reference to a "note packet handout" the name Lukasiwiecz appears, and therefore, this study guide which Plaintiff relies upon to argue that it directs the students to review all of the power point slides for an open note test on the MENA unit was from a different WCG class that C.H. did not attend, but was created by a non-party WCG teacher (Ms. Lukasiewicz). In fact, no such graded open note test on the MENA unit was ever provided in discovery as having been given or taken by C.H.

"C.H. was not required to memorize the Shahada, to recite it [three times in front of a witness], or even to write the complete statement of faith. (A560, Op., p. 26) (finding that "the worksheet included a variety of factual information related to Islam and merely asked the students to demonstrate their understanding of the material by completing the partial sentences").

Additionally, while Power Point #1 entitled: Making Generalizations did include the statement "watch this video" on the same slide above the hyperlink to Video #1, it was plainly intended to be utilized in class, "if time," to develop <u>critical thinking skills</u> which required students to, in part, assess the credibility of sources by identifying bias and prejudice in documents, media and computer-generated information (A267 Unit 4 Lesson Plan for Critical Thinking Lesson Plan Unit 4.5). Video #1 was not included to instruct students in its contents as though they were religious truths, nor to take any position on questions of the religious statements contained therein, but selected for an academic critical thinking exercise designed to elicit vocabulary "words that come to mind when describing Islam," and which was to be used for an in-class discussion about what generalizations (good or bad) may be made from the various images, music, and statements in the video. (A416 Generalizations Presentation). This type of academic exercise requiring students to merely "read, discuss and think" about a religion does not violate the Establishment Clause because no student would understand that they were being pressured to follow Islam or to adopt the views of Islam as their own by simply

learning to think critically and "identify the views of a particular religion." *Wood v. Arnold*, 915 F.3d 308, 317 (4th Cir. 2019), *cert. denied,* 140 S.Ct. 399 (2019).

To wit, the majority opinion in *Kennedy* expressly recognized that there was a long constitutional tradition in which learning how to tolerate diverse expressive activities has always been a part of learning how to live in a pluralistic society. *Id* at 510. In so recognizing, the Supreme Court categorically rejected the notion that coercion could be found whenever a student was exposed to prayer that was not part of a formal school program and where there is no evidence anyone from the school sought to persuade or force students to participate in a formal religious exercise. *Id.* at 541, citing, *Zorach v. Clauson*, 343 U.S. 306, 311-312, -218 (1952)) (holding that secondary school students are mature enough to understand that a school does not endorse" let alone coerce them to participate in "speech that it merely permits on a nondiscriminatory basis"). Thus, mere exposure to religious sentiments and beliefs that the school permits to achieve certain educational objectives, as in the matter at bar, clearly does not cross the line from "the permissible to the impermissible." *Id. See also California Parents for the Equalization of Educational Materials v. Torlakson*, 973 F.3d 1010, 121-1022 (9th Cir. 2020) ("The Establishment Clause does not prevent California from educating students about world religions and their role in human civilizations") (Bress, J. concurring), *cert. denied*, 141 S.Ct. 2583 (2021). Moreover, the fact that C.H. was able to opt out of the classroom instruction that his mother considered offensive belies any finding of coercion. *Grove v. Mead School Dist. No. 354*, 753 F.2d 1528, 1533 (9th Cir. 1985) *cert. denied*, 474 U.S. 826

(1985) (no coercion exists where student was given permission to avoid classroom discussions of the Learning Tree which she equated to advancing the religion of secular humanism).

Furthermore, no coercion can possibly exist where it was Ms. Hilsenrath, and not the teacher, who was at all times in control of the environment and manner in which the videos were presented to C.H. at home, and as such, she was the sole adult responsible for discussing the religious information being presented in the videos. *Fleischfresser v. Dirs. Of Sch. Dist. 200, supra*, 15 F.3d at 690 (no coercion can exist where the parents are not precluded from meeting their religious obligation to instruct their children and the use of the curricular materials does not compel parents or children to do or refrain from doing anything of a religious nature). Indeed, it is beyond the stretch of the Establishment Clause's prohibition against coercing school children to conform to any single religion to suggest that parental control over a child's religious upbringing can be adversely affected by a homework assignment to passively watch a video created by a third party to achieve greater insight into a civilization's culture and daily lives in the Middle East, as opposed to what a teacher might say or do in a classroom during instructional time. *Id. See also Wiley v. Franklin*, 497 F.Supp. 390 (E.D. Tenn, Northern Div. 1980) ("the ultimate test of the constitutionality of any course of instruction founded upon the Bible must depend on classroom performance. It is that which is taught in the classroom that renders a course so founded constitutionally permissible or impermissible").

Last but not least, wholly dispositive of the issue of whether an Establishment Clause violation exists in the matter at bar under the historical framework established in *Kennedy*, is C.H.'s admission that, after being coerced into viewing and discussing the subject videos at home with his mother, he did not feel pressured to convert to Islam. (A108, A109, A110, and A305, A306, A311 and A314, C.H. Testimony at T40:12-15, T44:8-10, T47:10-23, T:24:18-23, T32:5-20, T37:20-22, and T61:2-5). In fact, C.H. flatly denied that the passively watching the videos and discussing them with his mother had the effect of coercing him to subscribe to any of the religious beliefs of Islam. (see DE 63-3; C.H. Dep. T24:24-25:1; T33:6-13; T37:20-22; and T40:2-15). C.H. also testified that he did not personally believe that any of his rights to receive an education free from religious references in the classroom were violated, but rather his mother believed as much. (see DE 63-3 Plaintiff's SJ Exhibit #2, C.H. Dep., T70:25-71:14). The failure of C.H. to concretely describe his personal reaction to the videos as conveying a religious message or to being coerced to conform his beliefs to be aligned with the Islamic beliefs expressed in Video #1 is entirely fatal to Ms. Hilsenrath's ability to obtain nominal damages on behalf of C.H. for merely being exposed to religious content with which she disagreed. *FFRF v. New Kensington Arnold Sch. Dist.*, 832 F.3d 469, 480 (3d Cir. 2013) (affirming that child lacked standing for nominal damages when she failed to describe her reaction to the religious display and it was unclear that she understood the monument as conveying that the school wanted students to subscribe to religious beliefs at the time that the Complaint was filed); and *Dougherty v. Vanguard Charter School*

*Academy*, 116 F.Supp.2d 897, 905 (W.D. Mich. 2000) (activities that do not directly affect the student cannot be said to have burdened the child's freedom of conscience or father's right to guide religious upbringing and are thus not actionable).

For all of the foregoing reasons, it is clear that summary judgment was appropriately granted in favor of Defendant on the claim for nominal damages for an alleged past constitutional harm based on the sole allegation that the school indirectly established the "religion" of Islam.

## III.  C.H. CANNOT PREVAIL ON A THEORY OF INDIRECT COERCION AS HE WAS NOT SUBJECTED TO A FORMAL RELIGIOUS PRACTICE

Assuming arguendo, without conceding same, even if the mere "offended observer" continues to have Article III standing to bring an Establishment clause claim for nominal damages, C.H. cannot establish a violation under the cases that have historically applied the indirect "coercion test" to an offended observer's compelled observation of an unquestionably religious activity that has either taken place during the school day or at a school-sponsored event. *Schempp, supra*, 374 U.S. at 225. The indirect coercion test that has previously been applied by our courts to evaluate Establishment clause challenges in the public school context was first applied in *Lee v. Weisman* after the Supreme Court found it unnecessary to apply the *Lemon* test to hold unconstitutional the practice of including invocations and benedictions in the form of "nonsectarian" prayers at public school graduation ceremonies. 505 U.S. at 599. The indirect coercion test looks to whether government is "coerc[ing] anyone to support or

participate in religion or its exercise, or otherwise act in a way which establishes a state religion or religious faith, or tends to do so." *Lee v. Weisman*, 505 U.S. at 587.

In yet another school prayer case, the Supreme Court in *Santa Fe Independent School District v. Doe, supra,* cited *Lee* to hold, in part, that "the delivery of a [student led, student initiated] pregame prayer has the improper effect of coercing those present to participate in an <u>act of religious worship</u>." *Id.* at 312 (emphasis added). Likewise, the Third Circuit agrees that the coercion test "looks at whether the government is coerc[ing] anyone to support or participate in religion or its exercise.*" Borden v. School District of the Township of East Brunswick,* 523 F.3d 153, 175, n.18 (3d Cir. 2008), *cert. den.*, 129 S.Ct. 1524 (2009); *see also C.N. v. Ridgewood Board of Ed.*, 430 F.3d 159, 187 (3d Cir. 2005) and *Malnak v. Yogi*, 592 F.2d 197, 199 (3d Cir. 1979) (per curium) (opining that the historical development and purpose of the religion clauses limits only *religious activity* and not those that are not religious in nature). The Third Circuit was careful, however to distinguish between indirect coercive effects of a religious activity which, on one hand, violates the First Amendment with exposure to ideas or beliefs that merely do not comport with a student's religious belief which, on the other hand, is permissible if presented in a secular study of education. *Id.*

In all of the aforementioned cases, the court found that the activity at issue was "the performance of a formal religious exercise." *Sante Fe, supra.* Indeed, it is only "[once it is established that the state is sanctioning a formal religious exercise" that any indirect "subtle coercive ("peer") pressure" that presumptively inures to elementary and

secondary school children has been applied to find that non-participation does not prevent those devotional exercises from being unconstitutional. *Lee*, *supra*, at 592 ("[P]rayer exercises in public schools carry a particular risk of indirect coercion."). *Wallace v. Jaffree*, 472 U.S. 38, 57 (1985) (State-sanctioned voluntary prayer in public schools violates Establishment Clause). In fact, "[no] Court has ever applied the [rationale behind the] line of school prayer decisions outside the context of state-sanctioned formal religious observances." *Newdow v. U.S. Congress*, 328 F.3d 466, 477-478 (9th Cir. 2003) (O.Scannlain, J., dissenting), *rev'd o.b., Elk Grove Unified Sch. Dist. v. Newdow*, 542 U.S. 1 (2004). *See also* e.g. *Schempp, supra*, (the practice of Bible verse reading and recitation of the Lord's prayer each morning in school was a "devotional…religious observance" that is prohibited); *Wallace*, 472 U.S. at 58 (a state statute providing for a meditative moment of silence or voluntary prayer classrooms was an activity of a "wholly religious character"); and *Engel v. Vitale*, 370 U.S. 421, 431 (1962) (practice of daily classroom invocation of God's blessings as prescribed in a non-denominational prayer was a "religious activity" that is prohibited). Indeed, *Lee* explicitly "identifies the circumstances in which indirect coercion [to an essentially captive audience] may be said to be unconstitutional: when the government directs "the performance of a formal religious exercise" in such a way as to oblige the participation of objectors. *Lee*, at 586. Thus, unless the challenged activity is found to constitute an "act of religious worship" or a "religious exercise," there can be no violation of the First Amendment's prohibition against an "establishment" of religion. *Elk Grove Unified Sch. Dist. v. Newdow*, 542 U.S. 1,

31 (2004) (Rehnquist, J. concurring). *Accord, Newdow v. Rio Linda Union School District*, 597 F.3d 1007, 1040 (9th Cir. 2010) (upholding recitation of Pledge of Allegiance in school with phrase "under God" since "government action respects an establishment of religion only if the government coerces students to engage in a religious exercise").

Here, similarly to the facts in *Zorach v. Clauson*, *supra*, as cited by the *Kennedy* majority and Appellant in her Brief, the WCG class "did not require students to attend religious instruction" and analogously, "there was no evidence that any employee, [including Ms. Jakowski,] had used their office to persuade or force student's to participate in religious activity." This is because watching videos with religious content and quotes from the Quran as part of a pedagogical lesson "to write down words that describe Islam as presented by this video" and to later take notes on the basic tenets, beliefs, and practices of Islam with the aid of a fill-in the blank worksheet is not a religious activity or an act of religious worship. *Grove v. Mead School Dist. No. 354*, *supra*, 753 F.2d at 1539-40 (Canby J., concurring) ("In short, distinctions must be drawn between those governmental actions that actually interfere with the exercise of religion, and those that merely require or result in exposure to attitudes and outlooks at odds with perspective prompted by religion").

Indeed, for decades, the Supreme Court has recognized the importance of the "study of comparative religion or the history of religion and its relationship to the advances of civilization" as being a part of a complete education of a public school student and that even "the Bible is worthy of study for its literary and historic qualities.

38

*Schempp*, 374 U.S. at 209, 225. It is thus well settled that religious texts may be used in an appropriate study of history, civilization, ethics, comparative religion, and the like, schools are given wide range to teach about religion, explain the tenets of various faiths, and discuss the role of religion in history, literature, science, and other pedagogical endeavors. *Id. see also Stone v. Graham*, 449 U.S. 39, 42 (1980) (per curiam) (holding that "the Bible may constitutionally be used in an appropriate study of history, civilization, ethics, comparative religion, and the like"). Thus, when it involves the curricular decisions of a teacher and a school district, "it takes more than the mere presence of words with religious content" to violate the Establishment Clause. *FFRF v. Hanover School Dist.*, 626 F.3d 1, 10 (1st Cir. 2010). Accordingly, the fact a school permits religious content to promote educational goals of critical thinking and preparing students to become 21st Century global citizens with knowledge of the diverse religions of the world, as in the matter at bar, could not possibly lead to the establishment of religion, much less to coercion in any particular religious practice or dogma. For these reasons, Summary Judgment as to this claim was appropriately granted by the District Court.

## IV.  THE STUDY ABOUT RELIGIONS FOR A PEDOGOGICAL GOAL HAS BEEN CONSTITUTIONALLY PERMISSIBLE THROUGHOUT 20TH CENTURY HISTORY

Not surprisingly, Ms. Hilsenrath also argues that select statements made in Video #1 do not accord faithfully with historical practices and understandings of the Founding Fathers and therefore C.H.'s exposure to said statements alone violates the Establishment Clause. (App. Br. P. 34-35 and P. 41). However, as she concedes, the

Supreme Court has expressly recognized that the "historical litmus" test is, by itself, less useful when applied in the educational context because the Establishment Clause predated public education by roughly a century, and since presumably, in large part, the first schools in the Colonial Era were originally founded by churches, mostly Protestant, to teach reading and writing for predominantly religious purposes. *Edwards v. Aguillard,* 482 U.S. 578, 583, n.4 (1987); *Wallace v. Jaffree,* 472 U.S. at 80-81 (O'Connor, J. concurring in judgment); *Schempp*, 374 U.S. at 237-239 (Brennan J., concurring); and *Everson v. Board of Education of Ewing*, 330 U.S. 1, 23-24, (1947) (Jackson, J., dissenting) (*citing Cubberley, Public Education in the United States* (1934), ch. VI; and *Knight, Education in the United States* (1941), ch. VIII). Moreover, history instructs that, in New Jersey, religion, more specifically the recitation of prayer had been injected on a daily basis into the school curriculum for at least 80 years before the New Jersey Supreme Court decided in the year 1950 to uphold the constitutionality of a 47-year old statute requiring at least five verses from the Old Testament of the Bible to be read in public schools each day and permitting repetition of the Lord's Prayer. *Doremus v. Board of Education,* 5 N.J. 435, 452-453 (1950). Thus, contrary to Appellant's arguments, there was never a complete separation of mandated recitation of prayer in public schools until the 20th Century. *See e.g., Engel v. Vitale*, 370 U.S. at 423; *Aguillard*, at 581 (equal teaching of scientific evidence supporting creation theory), *Wallace*, at 42 (moment of silence at beginning of each school day); *Schempp, at* 207-208 (Bible verse reading by individual teacher over PA system before classes begin); *Stone v. Graham*, 449 U.S. at 42 (posting

of Ten Commandments on classroom walls); and *Illinois ex. Rel. McCollum v. Board of Education*, 333 U.S. 203, 208-209 (1948) (weekly religious instruction in public school buildings during school hours by members of clergy). And it is only very recently that the Supreme Court has been particularly vigilant in monitoring compliance with the Establishment Clause so that public education is free from religious affiliation or indoctrination by striking down religious prayer and overt religious instruction and practices occurring on the premises of a school or at school-sponsored events. *Ibid* (mandated recitation of official state prayer each day in public schools).

The Supreme Court has also specifically recognized the importance of the "study of comparative religion or the history of religion and its relationship to the advances of civilization" as being part of a complete public school education. *Schempp*, *supra*, at 209. Thus, the First Amendment is not violated if the student is merely required to read and discuss religious content about Islam that is selected as part of a social studies curriculum, and where, even under threat of lower grades, he is not required to perform or refrain from performing any act forbidden or mandated by his religion. *Wood v. Arnold*, *supra*, 915 F.3d at 319 (holding that a teacher can require a student to write out the Five Pillars of Islam so long as the student is not required to "profess or accept the tenets of Islam."); and *Brown v. Woodland Joint Unified Sch. Dist.*, 27 F.3d 1373, 1380 (9th Cir. 1994). History also makes clear that a teacher may force a student to "speak or write on a particular topic without offending the constitution, even though the student may prefer a different topic," provided that the teacher "does not demand that a student

41

profess beliefs of views with which the student does not agree." *C.N. v. Ridgewood Board of Education, supra*, 430 F.3d at 187. Thus, in light of the ubiquity of the practice of requiring American students to learn about the various world religions, as shown in cases like *Wood* and *Brown*, it is clear that the WCG MENA lessons were part of a common academic social studies program and not a religious exercise that would have any coercive effects to inculcate C.H. him with Islamic beliefs or to compel him participate in its religious practices. (A563, Op., p. 29).

The lack of coercion is apparent since there is no evidence that anyone from the school directly encouraged or required any student to engage in Islamic prayer, visit a mosque, to read from the Quran itself, or to subscribe to the words, such as, "find the true faith, Islam." (A226 Jakowski Testimony at T39:15-T40:22; A108-A109, A110 C.H. Testimony at T40:8-15; T44:8-13). Nor is there any evidence that anyone disparaged C.H.'s religious practices or provided financial support for the educational organizations who created the videos (A94 & A99 Hilsenrath Testimony at T32:4-23 and T84:2-85:9). Last but not least, there is no evidence that C.H. suffered any penalty, such as a lower grade, as a result of not completing the Five Pillars of Islam in class Worksheet or after objecting to watching any videos with religious content. (A110, A306 A310-A311, A314 C.H. Testimony at T32:15-20, T36:24-37:2, T46:10-47:1, and T61:2-5). Thus, under the new, more tolerant First Amendment religion clause's framework, Chatham's inclusion of curricular materials as part of such academic lessons on making Generalizations and designed to impute knowledge about the basic tenets

of Islam to C.H. so that he is able to compare and contrast all of the major world religions, including Hinduism and Buddhism, by the time he graduated Middle School clearly does not conflict with historic educational practices and the faithful understanding of the First Amendment's prohibition against religious practices and instruction in public schools. *Kennedy, supra*, 597 U.S. at 539-40.

For these reasons, even if only the "historical litmus" test was to be applied in the matter at bar, there can be no finding of a violation of the Establishment Clause and Summary Judgment was properly granted in favor of Defendant.

## V. THE ABSENCE OF ANY EVIDENCE OF DEFENDANT DIRECTLY FAVORING ISLAM OUTSIDE OF THE CURRICULUM ITSELF IS FATAL TO C.H.'S ESTABLISHMENT CLAUSE CLAIM

Appellant also argues that her Establishment Clause claim should survive based upon *Larson v. Valente*, 456 U.S. 228, 244 (1982) "or any of the numerous Supreme Court cases recognizing the longstanding principle that …forbids government favoritism of one religion over all others." (See App. Br., p. 19). However, Plaintiff's Establishment Clause claim differs materially from the claim in *Larson v. Valente* and the other cases cited in her Appellate Brief on page 19. Here, Plaintiff's Establishment Clause claim is not premised upon any funding decisions or upon an in-class devotional activity, but is premised entirely upon select statements made by the creator of Video #1 to argue that "a public school may not, consistent with the Establishment Clause, encourage students to "find the true faith, Islam." (App. Br., p. 41) However, favoritism in a school's educational curriculum cannot be determined in isolation, but must take

43

into consideration the school's social studies curriculum as a whole, including but not limited to the pedagogical goals that such instruction was designed to achieve. *See e.g. Brown v. Woodland Joint Unified Sch. Dist.*, 27 F.3d at 1380; *Wood v. Arnold, supra* (requiring students to "read, discuss and think about a religion" is not a violation of the Establishment Clause) and *Wiley v. Franklin, supra* ("the ultimate test of constitutionality of any course of instruction founded upon the Bible must depend on classroom performance"). This is crucial because "focus[ing almost] exclusively on religious component of any activity would inevitably lead to its invalidation under the Establishment Clause. *Lynch v. Donnelly*, 465 U.S. 668, 680 (1983); *Accord Van Orden*, 545 U.S. at 690 ("Simply having a religious content or promoting a message consistent with a religious doctrine does not run afoul of the Establishment Clause").

Furthermore, it is a well-settled principle that, absent a clear constitutional violation, it is the "local school boards, not the courts [who] should determine what pedagogical interests are 'legitimate' and what rules 'reasonably relat[e] to those interests.'" *Morse v. Frederick*, 551 U.S. 393, 421 (2007) (Thomas J., concurring); *James v. Bd. of Educ. Of Central District No. 11*, 461 F.2d 566, 573 (2d Cir.), *cert. denied*, 409 U.S. 1042 (1972) (a school district's curricular decisions may properly reflect local community views and values as to educational content and methodology) and *Carey v. Bd of Educ.*, 98 F2d 535, 544 (10th Cir. 1979) (same). If it were otherwise, and "an Establishment Clause violation arose each time a student believed that a school practice either advanced or disapproved of a religion, school curricula would be reduced to the

lowest common denominator, permitting each student to become a 'curriculum review committee.'" *Brown v. Woodland Unified Sch. Dist., supra*, at 1379. Thus, federal courts should not interfere with a school district's academic freedom and discretion to determine the composition of its curriculum and teaching methods that is most suitable for students to be employed, <u>unless an exacting and precise</u> constitutional violation can be found. *Pico v. Board of Education, Island Trees Union Free School Dist.*, 457 U.S. 853, 866-867 (1982) (plurality opinion) (emphasis added).

Here, no such exacting violation occurred since nothing in the Constitution's mandate for neutrality, as first expressed in dicta in *Epperson v. State of Arkansas,* requires that the study of each religion get the exact same treatment in the curriculum or precise same minutes of instruction by a school district. 303 U.S. 97, 103-104 (1968). As Justice Breyer noted, the First Amendment "does not mandate equal "airtime for all views." *Shurtleff, supra*, 142 S.Ct. at 1587. This is because government must be able to "promote a program" or espouse a policy in order to function" when it purports to speak for itself. *Id.* In the context of C.H.'s case, this means that, where schools are charged with educating students to achieve wholly objective educational goals that involve critical thinking on the part of the student, equal time for all religions in a program of non-religious social studies instruction need not be provided in order to comport with its obligations under the Establishment Clause. *See Eklund v. Bryon Union Sch. Dist.*, 154 Fed Appx. 648 (9th Cir. 2005), *cert. denied*, 549 U.S. 942 (2006) (holding that an Islam program at an elementary school which lasted 45 days did not raise any Establishment

Clause concerns since none of the children were required to engage in "overt religious exercises" involving Islam) and *Torlakson*, *supra*, 973 F.3d at 1021 (Bress J. concurring) (parent's efforts to wring an Establishment Clause violation from subtle differences they perceive in the curricular treatment…if accepted would paralyze educators in their lawful objective of treating religion as a topic relevant to world history).

Furthermore, the Supreme Court has explained that strict neutrality toward religion is not required to pass constitutional muster where the religious choice of an individual to freely exercise one's own religion or to not exercise religion has not, in fact, been prevented by the government's actions. *Town of Greece, supra*, 572 U.S. at 585-586 (declining to find coercion due to majority of clergy invited being of one faith). And since the First Amendment requires not only accommodations for and tolerance of all religions but forbids hostility toward any, then to remain neutral in the educational context does not mean to scrub every reference to religion in schools, but simply means to refrain from discriminating against a religion. *Id.* at 588; *see also Mitchell v. Helms*, 530 U.S. 793, 795 (2000) (aid that is "allocated on basis of neutral, secular criteria that neither favor nor disfavor religion" does not create "a financial incentive to undertake religious indoctrination"). In fact, nothing in the First Amendment requires "laws that cast a pall of orthodoxy over the classroom" *Epperson*, *supra*, at 104-105, (*citing Keyishian v. Board of Regents*, 385 U.S. 589, 603 (1967)). And since "not every mention of "God" or religion by the government or at the government's direction is a violation of the First Amendment," then "it takes more than the presence of words with religious content to

violate the Establishment Clause" when it comes to the curricular decisions of a teacher and a school district. *FFRF v. Hanover School Dist.*, *supra*, (*citing Lynch v. Donnelly*, 465 U.S. at 673).

Based on the foregoing principles, Plaintiff simply cannot prevail on an argument that Islam was treated more favorably than any other religion because the basic tenets of Christianity and Judaism were not studied in any great detail during the year-long social studies class or that, in later studying Hinduism and Buddhism, videos containing statements from a historical book and other statements of belief affiliated with those religions were allegedly not viewed by the students. This is mainly because the inclusion of Islam did not detract from the stated purpose of teaching students about other religions in connection with other regions of the World sufficient to be able to compare and contrast various religions and to critically think about them. *See FFRF, Inc. v. Concord Community Schools*, 885 F.3d 1038, 1049-1050 (7th Cir. 2018) (opining that inclusion of other songs about Hanukkah and Kwanzaa, even if brief, does not detract from the stated and varied educational purposes for including Christian religious hymns and a short nativity scene in a school sponsored December Holiday Spectacular production). Additionally, it is well-established that the guarantee of neutrality is not offended when the government faithfully follows neutral criteria and even-handed policies for all of its students. *Good News Club v. Milford Central School*, 533 U.S. 98, 114 (2001). Thus, in most curriculum cases, a school's difference in treatment of the presentation of a variety of religious materials in accordance with mandatory state educational standards and goals

generally tends to demonstrate the unwavering neutral treatment of religion in the curriculum. *Torlakson*, 370 F.Supp.3d at 1081-82 (N.D. Cal. 2019), *aff'd.* 973 F.3d 1010 (9th Cir. 2020) (surveying cases)*; and Downs v. Los Angeles Unified Sch. District*, 228 F.3d 1003, 1012 (9th Cir. 2000) (recognizing that in educational context, the selection of curricular materials is not required to be neutral if reasonably related to legitimate pedagogical concerns).

Here, any subtle differences in treatment is a distinction without significance. In the matter at bar, the District maintains a neutral religion policy in instruction and in following learning standards mandated by the State of New Jersey in accordance with *N.J.S.A.* 18A:35-4.36a. There is no indication that the District was veering from these pedagogical standards or that Islam or even Video #1 was specifically selected for its religious and allegedly proselytizing content. Rather, the undisputed evidence demonstrates that Islam was treated by the teacher, who was not Muslim, similarly to Hinduism and Buddhism, as evidenced by the comparative exercise the entire class had later engaged to compare Islam to Buddhism and understand both religions' similarities and differences (A264 C.H. handwritten notes).

Last but not least, in the absence of any evidence that, in viewing the quotes from the Quran or other devotional statements in the videos created by third parties had actually coerced C.H. to subscribe to any of the religious beliefs or practices of Islam, then clearly the school had no corresponding duty to delete the third-party videos and the worksheet containing words from the Shahada for the students to fill in and make

a complete sentence from the 7th grade social studies curriculum in order to avoid being held liable for violating the Establishment Clause. *Florey v. Soux Falls School District 49-5*, 619 F.2d 1211 (8th Cir. 1980) (school authorities are not required to delete from the curriculum all materials that may offend any religious sensibility). In fact, there is an argument to be made that had the Chatham Superintendent made such a conscious choice and removed such information in the absence of any threats of violence toward the school, but solely upon a "heckler's veto," then in light of the Supreme Court's recent decisions, the District would have most certainly have run afoul of the Establishment Clause by effectively discriminating against Islam for impermissible religious reasons. *Bd. of Educ. v. Pico*, 457 U.S. at 871 ("Our Constitution does not permit the official suppression of ideas") (Brennan, J.). *See also Grove v. Mead School Dist. No. 354*, 753 F.2d at 1543 (Canby J., concurring) ("if we were to…remove the Learning Tree from the curriculum because of plaintiff's hostility to its ideas, our action would itself threaten first amendment values").

For the foregoing reasons, the District Court's Summary Judgment decision should be affirmed.

49

## *CONCLUSION*

For all of the foregoing reasons, the Appellee/Board respectfully requests that

the Third Circuit affirm the judgment of the District Court denying summary judgment

to the Appellant and granting summary judgment in favor of the Defendants.

 Respectfully submitted,

CLEARY GIACOBBE ALFIERI JACOBS, LLC
169 Ramapo Valley Road, UL 105
Oakland, New Jersey 07436
(973) 845-6700
Attorneys for Defendant-Appellee, Board of
Education for the School District of the Chathams

By:    *s/ Ruby Kumar-Thompson*
RUBY KUMAR-THOMPSON  (044951999)


Dated: April 24, 2024

***CERTIFICATION OF BAR MEMBERSHIP PURSUANT TO LAR 28.3(d)***

I, Ruby Kumar-Thompson, Eq., am a member in good standing of the bar of the United States Court of Appeals for the Third Circuit. I certify under penalty of perjury that the foregoing is true and correct, pursuant to 28 U.S.C. §1746.

> CLEARY GIACOBBE ALFIERI JACOBS, LLC
> Attorneys for Defendant-Appellee, Board of Education for the School District of the Chathams

> By:    *s/ Ruby Kumar-Thompson*
>        RUBY KUMAR-THOMPSON

Dated: April 24, 2024

### *CERTIFICATION OF COMPLIANCE*

1. This document complies with the word volume limit of <u>Fed. R. App. P.</u> 32(a)(7)(B) because, excluding parts of the document exempted by <u>Fed. R. App. P.</u> 32(f), this document contains 12,765 words.

2. This document complies with the typeface requirements of <u>Fed. R. App. P.</u> 32(a)(5) and the type style requirements of <u>Fed. R. App. P.</u> 32(a)(6) because this document has been prepared in proportional typeface using the 2016 version of Microsoft Word in 14 point Garamond font.

3. I further certify pursuant to L.A.R. 31.1(c) that the text of the Defendant-Appellee, Board of Education of the School District of the Chathams' electronic responding brief is identical to the text of the paper copies.

I declare under penalty of perjury the foregoing is true.

CLEARY GIACOBBE ALFIERI JACOBS, LLC
Attorneys for Defendant-Appellee, Board of Education for the School District of the Chathams

By:     *s/ Ruby Kumar-Thompson*

Dated: April 24, 2024                    RUBY KUMAR-THOMPSON

### *CERTIFICATIONS PURSUANT TO LAR 31.1(c)*

A virus detection program was run on the PDF version of Appellees' Brief for electronic filing by Jason Jeski, a paralegal of the firm of Cleary Giacobbe Alfieri Jacobs, LLC, and no viruses were detected. The virus detection used was Malwarebytes version 1.2.0.1096 and Symantec Endpoint Protection version 14.3.10148.8000. I declare under penalty of perjury the foregoing is true.

CLEARY GIACOBBE ALFIERI JACOBS, LLC
Attorneys for Defendant-Appellee, Board of Education for the School District of the Chathams

By:    *s/ Ruby Kumar-Thompson*
RUBY KUMAR-THOMPSON

Dated: April 24, 2024

53

***CERTIFICATE OF FILING AND SERVICE PURSUANT TO LAR 31.1***

On April 24, 2024, I caused Defendant-Appellee, Board of Education for the School District of the Chathams's responding brief to be electronically filed through CM/ECF system and served upon all counsel of record, through the CM/ECF system.

I declare under penalty of perjury the foregoing is true.

CLEARY GIACOBBE ALFIERI JACOBS, LLC
Attorneys for Defendant-Appellee, Board of Education for the School District of the Chathams

By: _____
Christina Sarras, Paralegal
On behalf of the Firm

Dated: April 24, 2024