No. 23-3030

# IN THE UNITED STATES COURT OF APPEALS FOR THE THIRD CIRCUIT

LIBBY HILSENRATH, on behalf of her minor child, C.H.,

*Plaintiff-Appellant*,

*v.*

SCHOOL DISTRICT OF THE CHATHAMS, et al.,

*Defendants-Appellees*,

On appeal from the United States District Court for the
District of New Jersey, No. 2-18-cv-00966
Hon. Kevin McNulty, District Judge

## BRIEF *AMICUS CURIAE* OF THE JEWISH COALITION FOR RELIGIOUS LIBERTY SUPPORTING APPELLEES AND AFFIRMANCE

Eric C. Rassbach
THE HUGH AND HAZEL
DARLING FOUNDATION
RELIGIOUS LIBERTY CLINIC
Pepperdine University
Caruso School of Law
24255 Pacific Coast Hwy.
Malibu, CA 90263
(310) 506-4611
eric.rassbach@pepperdine.edu

Noel J. Francisco
*Counsel of Record*
Christopher Pagliarella
JONES DAY
51 Louisiana Ave., NW
Washington, DC 20001
(202) 879-3939
njfrancisco@jonesday.com

*Counsel for* Amicus Curiae
*Jewish Coalition for Religious Liberty*

## FRAP 26.1 CORPORATE DISCLOSURE STATEMENT

Pursuant to Rule 26.1 of the Federal Rules of Appellate Procedure, the Jewish Coalition for Religious Liberty states that it has no parent corporation and that no publicly held corporation owns any part of it.

# TABLE OF CONTENTS

**Page(s)**

FRAP 26.1 CORPORATE DISCLOSURE STATEMENT ........................i

TABLE OF AUTHORITIES....................................................................iv

INTEREST OF THE *AMICUS* .............................................................1

INTRODUCTION AND SUMMARY OF ARGUMENT ..........................3

ARGUMENT ..........................................................................................6

I.    CONSTRUING *KENNEDY'S* HISTORICAL TEST TO
      LIMIT PLURALISTIC EDUCATION WOULD BE
      HARMFUL TO JEWISH CITIZENS. ...........................................6

      A. Antisemitism, and Anti-Semitic Attacks, Are on the Rise ..........6

      B. Ignorance of Minority Faiths Contributes to Hatred...................8

      C. Fact-Based, Tolerance-Focused Education *About* Religion Is
         Key to Combating Ignorance-Fueled Violence ...........................11

II.   *KENNEDY* SETS FORTH A HISTORICAL-HALLMARK
      TEST IN PLACE OF *LEMON* .....................................................13

      A. *Kennedy* Recognized That the *Lemon* Test Wrongly Pitted
         the Religion Clauses Against Each Other...................................13

      B. To Support a Complementary Understanding of the
         Religion Clauses, *Kennedy* Defined the Establishment
         Clause by Well-Known Hallmarks of Religious
         Establishment ...........................................................................15

      C. The Contrary Approach of Appellant and AU Would Revive
         *Lemon* .........................................................................................19

III.  UNDER THE HISTORICAL-HALLMARK TEST, THE
       DISTRICT DID NOT VIOLATE THE ESTABLISHMENT
       CLAUSE ...................................................................................24

    A. The District Did Not Compel Church Attendance ......................24

    B. The School District Did Not Provide Exclusive Financial
       Support to the Established Church ............................................26

    C. No Other Historical Hallmark Applies ......................................28

    CONCLUSION ........................................................................................33

# TABLE OF AUTHORITIES

**Page(s)**

C<small>ASES</small>

*Agudath Isr. of Am. v. Cuomo,*
No. 20A90 (U.S. Nov. 17, 2020) ............................................................. 7

*Am. Legion v. Am. Humanist Ass'n,*
588 U.S. 29 (2019) .................................................................................. 14

*Busch v. Marple Newtown Sch. Dist.,*
567 F.3d 89 (3d Cir. 2009) ..................................................................... 20

*Carson v. Makin,*
596 U.S. 767 (2022) ............................................................................ 23, 27

*Capitol Square Rev. & Advisory Bd. v. Pinette,*
515 U.S. 753 (1995) ................................................................................ 14

*Cnty. of Allegheny v. Am. Civil Liberties Union Greater
Pittsburgh Chapter,*
492 U.S. 573 (1989) ................................................................................ 12

*Erie v. Hunter,*
675 F. Supp. 3d 647 (M.D. La. 2023) .................................................... 18

*Espinoza v. Mont. Dep't of Revenue,*
591 U.S. 464 (2020) ................................................................................ 27

*Everson v. Bd. of Educ. of Ewing Twp.,*
330 U.S. 1 (1947) ............................................................................... 25, 27

*Firewalker-Fields v. Lee,*
58 F.4th 104 (4th Cir. 2023) .................................................................. 19

*Freedom From Religion Found., Inc. v. Cnty. of Lehigh,*
  933 F.3d 275 (3d Cir. 2019) .................................................................. 1

*Fulton v. City of Phila.,*
  593 U.S. 522 (2021) .......................................................................... 32

*Groff v. DeJoy,*
  600 U.S. 447 (2023) .......................................................................... 13

*Hosanna-Tabor Evangelical Lutheran Church & Sch. v.*
  *E.E.O.C.,*
  565 U.S. 171 (2012) ..................................................................... 22, 24

*Kedroff v. St. Nicholas Cathedral of Russian Orthodox*
  *Church in N. Am.,*
  344 U.S. 94 (1952) ............................................................................ 30

*Kennedy v. Bremerton Sch. Dist.,*
  597 U.S. 507 (2022) ................................................................... *passim*

*Larkin v. Grendel's Den, Inc.,*
  459 U.S. 116 (1982) .......................................................................... 32

*Lee v. Weisman,*
  505 U.S. 577 (1992) .......................................................................... 16

*Lemon v. Kurtzman,*
  403 U.S. 602 (1971) ................................................................... *passim*

*Lozano v. Collier,*
  No. 22-40116, 2024 WL 1562765 (5th Cir. Apr. 11, 2024) ................ 18

*Lynch v. Donnelly,*
  465 U.S. 668 (1984) .......................................................................... 26

*Maddonna v. U.S. Dep't of Health & Human Servs.,*
   No. 6:19-CV-3551-JD, 2023 WL 7395911
   (D.S.C. Sept. 29, 2023) ................................................................ 18

*Marsh v. Chambers,*
   463 U.S. 783 (1983) ..................................................................... 14

*Our Lady of Guadalupe Sch. v. Morrissey-Berru,*
   140 S. Ct. 2049 (2020) .................................................................. 30

*Rogers v. McMaster,*
   No. 6:19-CV-01567-JD, 2023 WL 7396203
   (D.S.C. Sept. 29, 2023) ................................................................ 18

*Salazar v. Buono,*
   559 U.S. 700 (2010) ....................................................................... 6

*Shurtleff v. City of Bos.,*
   596 U.S. 243 (2022) ............................................................. *passim*

*Torcaso v. Watkins,*
   367 U.S. 488 (1961) ..................................................................... 31

*Town of Greece v. Galloway,*
   572 U.S. 565 (2014) ......................................................... 14, 16, 21

*Trinity Lutheran Church of Columbia, Inc. v. Comer,*
   582 U.S. 449 (2017) ................................................................ 23, 27

*Young Isr. of Tampa, Inc. v. Hillsborough Area Reg'l Transit
   Auth.,*
   89 F.4th 1337 (11th Cir. 2024) ....................................................... 1

*Zorach v. Clauson,*
   343 U.S. 306 (1952) ..................................................................... 24

OTHER AUTHORITIES

Grethel Aguila, *A Jewish Man Was Attacked Near a Synagogue in Broward. Police Say It Was a Hate Crime.*, Miami Herald (Feb. 18, 2024).................................................................8

Anti-Defamation League, *ADL Reports Unprecedented Rise in Antisemitic Incidents Post-Oct. 7* (Dec. 11, 2023) ...........................8

Anti-Defamation League, *Antisemitic Attitudes in America: Conspiracy Theories, Holocaust Education and Other Predictors of Antisemitic Belief* (Mar. 17, 2023)..................................9

Thomas Berg, *Religious Freedom, Church-State Separation, and the Ministerial Exception*, 106 NW. U. L. REV. COLLOQUY 175 (2011)..........................................................................29

1 William Blackstone, *Commentaries on the Laws of England*...........................................................................................29

Rob Boston, *The National Day of Prayer Is a Christian Nationalist Relic From the 1950s. Here's How You Can Push Back.* Americans United (May 4, 2023) ...................................21

Nathan S. Chapman & Michael W. McConnell, *Agreeing to Disagree: How the Establishment Clause Protects Religious Diversity and Freedom of Conscience* (2023).....................31

Daniel L. Chen, Kennedy v. Bremerton School District*: The Final Demise of* Lemon *and the Future of the Establishment Clause*, 21 HARV. J.L. & PUB. POLICY PER CURIAM 1 (Summer 2022) ..................................................................19

Mira Fox, *A Guide to the Talmud for All the Haters*, Forward (Jan. 11, 2024)......................................................................10

*From George Washington to the Hebrew Congregation in Newport, Rhode Island*, 18 August 1790, Founders Online, National Archives (last visited April 4, 2024) .........................7

Masha Gessen, *Why the Tree of Life Shooter Was Fixated on the Hebrew Immigrant Aid Society*, The New Yorker (Oct. 27, 2018) ...............................................................................9

Kennedy v. Bremerton School District, Americans United (last modified Oct. 25, 2022) ................................................5

Andrew Lapin, *Man Arrested After Fort Lauderdale Chabad Center Is Damaged in Apparent Arson Attack*, Jewish Telegraphic Agency (Mar. 18, 2024) ......................................8

Talia Lavin, *The San Diego Shooter's Manifesto Is a Modern Form of an Old Lie About Jews*, Wash. Post (Apr. 29, 2019) ...............................................................................9

Janet Maslin, *The Exodus from Paducah, 1862*, N.Y. Times, (Apr. 4, 2012) ......................................................7

Michael W. McConnell, *Establishment and Disestablishment at the Founding, Part I: Establishment of Religion*, 44 WM. & MARY L. REV. 2105 (2003) .....................................17

*New Survey by Claims Conference Finds Significant Lack of Holocaust Knowledge in the United* States, Claims Conference (last accessed Apr. 16, 2024) ...............................10

Office of Juvenile Justice & Delinquency Protection, Hate Crimes and Youth, U.S. Dep't of Justice (Feb. 2022) ........................11

Press Release, U.S. Attorney, D.N.J., Middlesex County Man Admits Communicating Threats to Attack Synagogue (Jul. 12, 2023) ...............................................................10

Dan Rosenzweig-Ziff, *'People Are Afraid': Antisemitic Fliers Found In Atlanta Suburbs*, Wash. Post (Feb. 5, 2023) ..................................................................... 10

Mark Storslee, *Church Taxes and the Original Understanding of the Establishment Clause*, 169 U. PA. L. REV. 111 (2020) .................................................... 28

The White House, *U.S. National Strategy to Counter Anti-Semitism* (May 2023) ............................................. 9, 10, 12

*UC Berkeley Police Release Photos of Suspects in Violent Protest at Jewish Student Event*, CBS News (Mar. 26, 2024) ........................................................................... 8, 11

Dir. Christopher Wray, "Director Wray Addresses ADL at Never Is Now Summit," FBI.gov (November 10, 2022) ....................... 8

# INTEREST OF THE *AMICUS*[1]

*Amicus* Jewish Coalition for Religious Liberty (JCRL) is a nonprofit organization comprised of rabbis, lawyers, and professionals who practice Judaism and are committed to religious liberty. JCRL aims to ensure that all Americans can freely practice their faith while fostering cooperation between Jews and other faith communities. Its founders have litigated religious liberty issues, published op-eds in prominent news outlets, and established an extensive volunteer network encouraging Jewish communal leadership to make public statements and act on religious liberty issues. JCRL has acted as party counsel and *amicus*, including in this Circuit, advocating for a historically-grounded understanding of the Establishment Clause that allows religious diversity to flourish. *See Kennedy v. Bremerton Sch. Dist.*, 597 U.S. 507 (2022) (*amicus* supporting prevailing petitioner); *Freedom From Religion Found., Inc. v. Cnty. of Lehigh*, 933 F.3d 275, 277 (3d Cir. 2019) (*amicus* supporting prevailing appellee); *Young Isr. of Tampa, Inc. v.*

---

[1] All parties have consented to the filing of this brief. *Amicus* states that no counsel for a party authored this brief in whole or in part, and no person other than *amicus* and its counsel made any monetary contribution intended to fund the preparation or submission of this brief. See Fed. R. App. P. 29(a)(4)(E).

*Hillsborough Area Reg'l Transit Auth.*, 89 F.4th 1337, 1339 (11th Cir. 2024) (counsel to prevailing plaintiff-appellee in First Amendment challenge to prohibition on religious advertisements on public property).

JCRL submits this brief to offer its expertise and to assist this Court in properly interpreting and applying the "historical practices and understandings" that guide courts' application of the Establishment Clause post-*Kennedy*.  597 U.S. at 535 (citation omitted).  JCRL also provides its unique perspective on this historical test's benefits for minority faith communities that faced exclusion from the public square under now-"abandoned" Establishment Clause doctrines untethered from the historical "hallmarks of religious establishments."  *Id.* at 534, 537; *see* Brief of JCRL et al., *Kennedy*, No. 21-418, 2022 WL 685804 (U.S. Mar. 2, 2022).  Factual education on the beliefs of unfamiliar faiths is a key tool against the spread of falsehoods and conspiracy theories about religious minorities, especially at a time when the Jewish community faces increased violence motivated by such misinformation.  Under *Kennedy,* the Establishment Clause is no barrier to such education.

## INTRODUCTION AND SUMMARY OF ARGUMENT

Encountering different religious views "is 'part of learning how to live in a pluralistic society,' a trait of character essential to 'a tolerant citizenry.'" *Kennedy v. Bremerton Sch. District*, 597 U.S. 507, 538 (2022) (citation omitted).  Thus, when schools teach their students basic facts about different religions, they are also teaching young citizens of a diverse nation "mutual respect and tolerance" in line with "the best of our traditions." *Id.* at 514.  For the Jewish community to which *amicus* belongs, the growth of antisemitic rhetoric and violence—much inspired by misinformation and conspiracy theories about Judaism—has heightened the urgency and importance of such education.

*Kennedy* made clear that the Establishment Clause poses no stumbling block to that pursuit.  Under prior Establishment Clause case law, efforts at religious inclusion in "'the public sphere'"—including public schools—were subject to challenge wherever "an objective observer could reasonably infer" that the effort "endorses or 'partakes of the religious.'" *Id.* at 535 (citations omitted).  No longer.  Rather, government action is tested against "'historical practices and understandings'"—*i.e.*, by reference to the "hallmarks of religious establishments the framers

sought to prohibit when they adopted the First Amendment." *Id.* at 535, 537 & n.5.

The district court correctly noted (as have numerous post-*Kennedy* decisions) that Justice Gorsuch's opinion in *Kennedy* provided "guidance" as to the relevant hallmarks by incorporating his prior concurrence in *Shurtleff v. City of Boston*, 596 U.S. 243 (2022). App. 13; *see Kennedy*, 597 U.S. at 537 & n.5. Those hallmarks are (1) "government ... control over the doctrine and personnel of the established church"; (2) "government mandated attendance in the established church and punish[ing] people for failing to participate"; (3) "punish[ment for] dissenting churches and individuals for their religious exercise"; (4) "restricted political participation by dissenters"; (5) "financial support for the established church"; and (6) "government us[e of] the established church to carry out certain civil functions." *Shurtleff*, 596 U.S. at 286 (Gorsuch, J., concurring in the judgment). These six "traditional hallmarks help explain many of [the Supreme] Court's Establishment Clause cases," which often focus on avoiding "government control over religion." *Id.* at 286–87. And they prevent "a misconstruction of the Establishment Clause" that would make the Free Exercise and

Establishment Clauses "at odds" rather than "complementary." *Kennedy*, 597 U.S. at 533, 543. Accordingly, the Court chose "these hallmarks as the guiding principles for Establishment Clause jurisprudence" going forward. App. 14 n.14.

Both Appellant and *amicus* Americans United for Separation of Church and State ("AU") seek to blur *Kennedy*'s concrete historical test with a free-floating analysis of whether government has been "involved in any way with religion" (Opening Br. 36), "endorsed religion," (Opening Br. 27), or "advance[d] religious views" (AU Br. 22 (citation omitted)). But asking whether an action advances or endorses religion is simply to apply the standard of *Lemon v. Kurtzman*, 403 U.S. 602 (1971), "and its endorsement test offshoot"—the precise tests *Kennedy* rejected, 597 U.S. at 534 (citation omitted). Simply put, *Kennedy*'s clear guidance forecloses the conclusion that "not much has changed" in the law, AU Br. 2—as AU has acknowledged elsewhere.[2]

---

[2] *See* Kennedy v. Bremerton School District, Americans United (last modified Oct. 25, 2022) https://perma.cc/3AQQ-BJ8F (stating that *Kennedy* "undid fifty years of foundational First Amendment law" in favor of requiring courts to "consider what the Founding Fathers would have thought to be an Establishment Clause violation").

In any event, confirming the historical-hallmark understanding of *Kennedy* suffices to resolve this case—and to protect education promoting religious tolerance.  Here, as the district court found, the social-studies lesson on Islam did not even "resemble" the relevant hallmarks of historical establishment.  App. 21.  This Court may reserve for another day how closely government conduct need parallel a hallmark, or whether a free exercise or other constitutional claim might be a more appropriate vehicle to address particular instances of alleged coercion.  For today, it is enough to say that the Establishment Clause does not bar education *about* religion that teaches students the "[r]espect for religious expressions"—familiar and unfamiliar—that "is indispensable to life in a free and diverse Republic."  *Kennedy*, 597 U.S. at 543.

## ARGUMENT

I. **CONSTRUING *KENNEDY*'S HISTORICAL TEST TO LIMIT PLURALISTIC EDUCATION WOULD BE HARMFUL TO JEWISH CITIZENS.**

A. **Antisemitism, and Anti-Semitic Attacks, Are on the Rise.**

At its best, the United States has thrived as a nation of "unparalleled pluralism and religious tolerance."  *Salazar v. Buono*, 559 U.S. 700, 723 (2010) (Alito, J., concurring in the judgment).  "[T]he

6

Constitution and the best of our traditions counsel mutual respect and tolerance, not censorship and suppression" for diverse religious views. *Kennedy*, 597 U.S. at 514. From the Founding, that tradition of mutual respect has included American Jews. In a 1790 letter to the Hebrew Congregation of Newport, Rhode Island, George Washington wrote: "May the Children of the Stock of Abraham, who dwell in this land, continue to merit and enjoy the good will of the other Inhabitants; while every one shall sit in safety under his own vine and figtree, and there shall be none to make him afraid."[3]

Unfortunately, America has sometimes fallen short of these ideals. Jews, for example, were targeted for expulsion from Tennessee during the Civil War, and faced selective prosecution under New Deal health laws.[4] While such official discrimination is less common today, another form of intolerance has become more prevalent. As the Anti-Defamation League has catalogued, Jewish Americans have faced a "terrifying

---

[3] *From George Washington to the Hebrew Congregation in Newport, Rhode Island*, 18 August 1790, Founders Online, National Archives, https://perma.cc/H5WR-BQ3W (last visited April 4, 2024).

[4] *See* Janet Maslin, *The Exodus from Paducah, 1862*, N.Y. Times, (Apr. 4, 2012) https://perma.cc/W3UT-7EQW; Brief of Muslim Public Affairs Council et al. at 5–6, *Agudath Isr. of Am. v. Cuomo*, No. 20A90, (U.S. Nov. 17, 2020) (collecting sources).

pattern of antisemitic attacks" and harassment—including physical assault—in the wake of the Hamas-led massacre in Israel on October 7, 2023.[5]  This violence against Jewish persons and gathering places has continued through the first half of 2024.[6]  And even before the October 7 massacre, the FBI estimated that 63% of all religiously motivated hate crimes in the United States targeted Jews—even though Jews comprise less than 3% of the population.[7]

## B.    Ignorance of Minority Faiths Contributes to Hatred.

Hatred and ignorance about minority faiths often travel together. Many of the most prominent terrorist attacks on Jewish Americans were committed by persons who professed belief in one or more conspiracy

---

[5] Anti-Defamation League *ADL Reports Unprecedented Rise in Antisemitic Incidents Post-Oct. 7* (Dec. 11, 2023), https://perma.cc/Z23J-9A64 (discussing a "337-percent increase" in "antisemitic incidents" compared to the same two-month period a year before).

[6] *See, e.g.*, Grethel Aguila, *A Jewish Man Was Attacked Near a Synagogue in Broward. Police Say It Was a Hate Crime.*, Miami Herald (Feb. 18, 2024), https://perma.cc/XPY8-PRQM; Andrew Lapin, *Man Arrested After Fort Lauderdale Chabad Center Is Damaged in Apparent Arson Attack*, Jewish Telegraphic Agency (Mar. 18, 2024), https://perma.cc/T85G-296P; *UC Berkeley Police Release Photos of Suspects in Violent Protest at Jewish Student Event*, CBS News (Mar. 26, 2024), https://perma.cc/D6RG-R7SK.

[7] Dir. Christopher Wray, "Director Wray Addresses ADL at Never Is Now Summit," FBI.gov (November 10, 2022), https://perma.cc/K269-A5AT.

theories about the Jewish people.  The perpetrator of the Tree of Life synagogue attack in Pittsburgh, for example, wrote extensively online about his belief that Jews were working to import violent invaders into the United States.[8]  Shortly before his attack, the gunman who attacked the Chabad of Poway completed a manifesto asserting a more extensive version of the same conspiracy.[9]

While such extremism remains rare, dangerous ignorance is not.  A recent University of Chicago study found that negative feelings toward Judaism and Jewish persons are closely correlated not only with belief in "a range of conspiracy theories," but also with knowing "significantly less about Jews, Judaism, and Jewish history."[10]  Such ignorance is particularly prevalent among young persons.  In a 2020 survey cited in the White House's *National Strategy to Counter Anti-Semitism*, 63% of

---

[8] Masha Gessen, *Why the Tree of Life Shooter Was Fixated on the Hebrew Immigrant Aid Society*, The New Yorker (Oct. 27, 2018), https://perma.cc/W2TF-W2MP.

[9] Talia Lavin, *The San Diego Shooter's Manifesto Is a Modern Form of an Old Lie About Jews*, Wash. Post (Apr. 29, 2019), https://perma.cc/AAH6-RBSP.

[10] Anti-Defamation League, *Antisemitic Attitudes in America: Conspiracy Theories, Holocaust Education and Other Predictors of Antisemitic Belief* (Mar. 17, 2023), https://perma.cc/9TCB-2A2S (summarizing survey conducted with the National Opinion Research Center of the University of Chicago).

millennials did not know how many Jews were murdered in the Holocaust, while over 10% believed that Jews *caused* the Holocaust.[11] Young persons may also have more exposure to the increased online spread of false claims about Jewish religious texts and practices, particularly lies about the contents of the Talmud.[12]

This sort of extreme ignorance and misinformation can lead to danger. For example, in 2022, an 18-year-old from Sayreville, New Jersey (a half-hour away from the school district here) prompted a state-wide alert when he circulated a manifesto associating Jews with historical crimes and threatening to attack a synagogue.[13] Such threats from an 18-year-old are not wild outliers; in fact, FBI hate crime statistics

---

[11] The White House, *U.S. National Strategy to Counter Anti-Semitism* 13 (May 2023), https://perma.cc/W3EE-64FG; *see New Survey by Claims Conference Finds Significant Lack of Holocaust Knowledge in the United States*, Claims Conference, https://perma.cc/CZZ9-CB5G (last accessed Apr. 16, 2024).

[12] *See, e.g.*, Mira Fox, *A Guide to the Talmud for All the Haters*, Forward (Jan. 11, 2024) https://perma.cc/M76S-LYH2 (summarizing false claims about Talmud content); Dan Rosenzweig-Ziff, *'People Are Afraid': Antisemitic Fliers Found In Atlanta Suburbs*, Wash. Post (Feb. 5, 2023), https://perma.cc/9K4K-9W2T (discussing fliers attacking the Talmud and directing the reader to an anti-Semitic website).

[13] Press Release, U.S. Attorney, D.N.J., Middlesex County Man Admits Communicating Threats to Attack Synagogue (Jul. 12, 2023), https://perma.cc/APM4-HQJK.

from 2020 showed that one out of every ten reported hate crimes was committed by juveniles.[14] And more recent reports of violence associated with anti-Israel rallies on college campuses suggest little has changed.[15]

### C. Fact-Based, Tolerance-Focused Education *About* Religion Is Key to Combating Ignorance-Fueled Violence.

It is a near-certainty that young people will continue to be exposed to misinformation about Judaism and other minority faiths online.[16] As such, secondary schools—including public schools—play a key role in teaching "how to tolerate [faith] of all kinds," *Kennedy*, 597 U.S. at 538, and in combating misinformation, *see* App. 19 ("*Kennedy* itself only reinforces the view . . . that *exposure* to a variety of viewpoints, including religious ones, is a proper goal. That goal is not undermined, and indeed may be enhanced, by non-coercive exposure to opposing beliefs.").

---

[14] Office of Juvenile Justice & Delinquency Protection, Hate Crimes and Youth, U.S. Dep't of Justice (Feb. 2022), https://perma.cc/9RAK-PATY ("Data Trends").

[15] *E.g.*, Complaint, *Kestenbaum v. President and Fellows of Harvard College*, No. 1:24-cv-10092 (D. Mass. Jan. 10, 2024), ECF 1 (alleging assault and physical harassment following verbal calls for death to Jews and Israel); *UC Berkeley*, *supra* note 6 (noting attack connected with university rally).

[16] Hate Crimes and Youth, *supra* note 14 (noting that roughly half of young people are exposed to hate speech online, and discussing specific hate-group recruitment tactics aimed at youth).

Accordingly, the White House's *National Strategy to Combat Anti-Semitism* places heavy emphasis on public education playing a larger role in "help[ing] to inoculate young people against antisemitic stereotypes, tropes, and conspiracy theories," including by highlighting the "positive contributions" of Jews to the nation and by teaching accurate Jewish history. *National Strategy* at 14.

While education about minority faiths need not (and should not) direct students to take those faiths as true, tolerance-focused education necessarily portrays a religion, and the contributions its adherents have made to American and world culture, in a positive light. *See id.* Yet so long as "*Lemon* and its endorsement test offshoot" governed, *Kennedy*, 597 U.S. at 534, such positivity—even if well short of proselytizing—ran the risk of being perceived as "advanc[ing]," "endors[ing]," or "promot[ing]" religion, *Lemon*, 403 U.S. at 613; *Cnty. of Allegheny v. Am. Civil Liberties Union Greater Pittsburgh Chapter*, 492 U.S. 573, 593 (1989). Such tests functionally forced religion from the "public sphere," *Kennedy*, 597 U.S. at 535, and if revived, could chill the important work of pluralistic, tolerant education.

By contrast, *Kennedy*'s focus on historical hallmarks avoids all of this.  *See infra* Parts II–III.  Where a public school lesson serves merely to "educate students about world religions and the importance of avoiding group generalizations,*"* App. 17, no religion has been "established" in any sense recognizable to the Founders.

## II.    *KENNEDY* SETS FORTH A HISTORICAL-HALLMARK TEST IN PLACE OF *LEMON*.

### A.    *Kennedy* Recognized That the *Lemon* Test Wrongly Pitted the Religion Clauses Against Each Other.

The U.S. Supreme Court has "abrogated" the *Lemon* test, which considered (among other things) whether a government action's "principal or primary effect was to advance religion." *Groff* v. *DeJoy*, 600 U.S. 447, 460 (2023) (quotation marks omitted) (citing *Lemon*, 403 U.S. at 612).  Though the *Lemon* test sought to prevent the "evils against which the Establishment Clause was intended to afford protection," 403 U.S. at 612, the test in practice incentivized a "modified heckler's veto" against visible religion in public life. *Kennedy*, 597 U.S. at 534.  "[W]henever a 'reasonable observer' could conclude that the government has 'endorse[d]' religion," an Establishment Clause violation was found. *Id.* at 533 (citation omitted).  This rule "created a 'minefield' for legislators" seeking to follow *Lemon* without suppressing or abridging

protected religious expression or speech. *Kennedy*, 597 U.S. at 534 (citing *Capitol Square Rev. & Advisory Bd. v. Pinette*, 515 U.S. 753, 768–69 & n.3 (1995) (plurality opinion)).

In contrast, *Kennedy* emphasized that the Establishment Clause does not "compel the government to purge from the public sphere anything an objective observer could reasonably infer endorses or partakes of the religious." 597 U.S. at 535 (citation and quotation marks omitted). Instead, it works with the Free Speech and Free Exercise Clauses to "protect[] religious speech … [as] a natural outgrowth of the framers' distrust of government attempts to regulate religion and suppress dissent." *See id.* at 523–24. Whereas previously these Clauses could be seen "as separate units," *Kennedy* confirmed that they "have 'complementary,'" not "warring," purposes. *Id.* at 533 (citation omitted). In adopting this approach, *Kennedy* followed (and further developed) a line of precedent that looked to history and tradition—rather than *Lemon*—to interpret and apply the Establishment Clause. *E.g.*, *Am. Legion v. Am. Humanist Ass'n*, 588 U.S. 29, 48–52, 60 (2019) (plurality opinion); *id.* at 73–74 (Thomas, J., concurring in the judgment); *Town of Greece v. Galloway*, 572 U.S. 565, 577 (2014); *Marsh v. Chambers*, 463

U.S. 783 (1983).    By doing so, *Kennedy* conclusively rooted all Establishment Clause interpretation in "historical practices and understandings." 597 U.S. at 535–36 (citation omitted).

**B.   To Support a Complementary Understanding of the Religion Clauses, *Kennedy* Defined the Establishment Clause by Well-Known Hallmarks of Religious Establishment.**

Had *Kennedy* only referred to "historical practices and understanding" without elaboration, the contours of the Establishment Clause might remain uncertain.  But the Court went further, instructing reviewing courts to look to those "hallmarks of religious establishments the framers sought to prohibit." *Id.* at 537.  To identify those hallmarks, the Court first gave some examples, including "coercion along the[] lines" of requiring "anyone to attend church," "mak[ing] a religious observance compulsory," or "forc[ing] citizens to engage in 'a formal religious exercise.'" *Id.*  It went on to incorporate prior judicial writings and scholarship that provide a detailed roadmap for subsequent courts tasked with applying this standard.  *Id.* at 537 n.5.  Indeed, this roadmap is the "sole guide[] that *Kennedy* has furnished the lower courts for the

assessment of 'coercion' for purposes of an Establishment Clause challenge in the context of public education." App. 21.[17]

The roadmap itself is located in footnote 5 of *Kennedy*. It first introduces the hallmark analysis through Justice Scalia's dissent in *Lee v. Weisman*, 505 U.S. 577 (1992). In the cross-referenced section, Justice Scalia concluded that "[t]he coercion that was a hallmark of historical establishments of religion was coercion of religious orthodoxy and of financial support *by force of law and threat of penalty*." *Id.* at 640 (Scalia, J., dissenting). The footnote then offers an extended citation to a recent concurrence by Justice Gorsuch (the author of the *Kennedy* majority) that, drawing on the scholarship of Professor Michael McConnell, catalogued "certain other historical hallmarks of an established religion." 597 U.S. at 537 n.5 (citing *Shurtleff*, 596 U.S. at 286 (Gorsuch, J., concurring in the judgment)). Those six hallmarks include government

---

[17] The district court quoted scholarship on *Kennedy* to refer to the roadmap (favorably) as a "cipher" for interpreting the decision. App. 13. To be clear, no de-coding is required; Justice Gorsuch's majority opinion simply cross-references and incorporates reasoning from elsewhere, including his prior writing on the subject. That approach is often used to indicate that the Court is adopting reasoning from prior separate writings. *E.g.*, *Town of Greece*, 572 U.S. at 577 (incorporating reasoning of prior partial dissent by Justice Kennedy in *County of Allegheny*).

"control over the doctrine and personnel of the established church," "government[-]mandated attendance in the established church," punishment of "dissenting churches and individuals for their religious exercise," "restrict[ions on] political participation by dissenters," "financial support for the established church," and use of "the established church to carry out certain civil functions." *Shurtleff*, 596 U.S. at 286 (Gorsuch, J., concurring in the judgment) (citing Michael W. McConnell, *Establishment and Disestablishment at the Founding, Part I: Establishment of Religion*, 44 WM. & MARY L. REV. 2105, 2131–81 (2003)). The roadmap footnote "also cites directly to Professor McConnell's scholarship," particularly its explication of the "hallmark" directly at issue in *Kennedy* (mandated attendance at state church services). App. 14 n.14; *see* 597 U.S. at 537 n.5 (citing McConnell, *supra*, at 2144–46).

Armed with this guidance, the district court correctly determined that "footnote 5" adopts "these hallmarks" from *Shurtleff* as the "guiding principles for Establishment Clause jurisprudence" going forward. App. 14 n.14.  On this point, the district court is in good company. Though few courts have needed to apply *Kennedy*, many that have

understand it to require Establishment Clause coercion claims to be decided with reference to the "hallmarks" outlined in *Shurtleff*. For example, in *Maddonna v. U.S. Department of Health & Human Services*, a district court found that the plaintiff's coercion "claim of subtle and indirect pressure" by a foster care agency's religious practice did not parallel the *Shurtleff* hallmark of a "monopoly" over a civil function, and was not otherwise "a historically disfavored establishmentarian practice." No. 6:19-CV-3551-JD, 2023 WL 7395911, at *9–10 (D.S.C. Sept. 29, 2023) (citation omitted); *see Rogers v. McMaster*, No. 6:19-CV-01567-JD, 2023 WL 7396203, at *11–12 (D.S.C. Sept. 29, 2023) (parallel case) ("Plaintiffs fail to meet their burden to show that the[] 'hallmarks' [identified in *Shurtleff*] exist here."). And in a recent precedential decision, the Fifth Circuit relied on allegations concerning a "hallmark[] of religious establishment[]" to revive an Establishment Clause claim. *Lozano v. Collier*, No. 22-40116, 2024 WL 1562765, at *9 (5th Cir. Apr. 11, 2024); *see Erie v. Hunter*, 675 F. Supp. 3d 647, 657 (M.D. La. 2023) (forced attendance at worship service under threat of penalty fell within a hallmark of establishment identified in *Kennedy*). Even courts that have not yet had occasion to apply *Kennedy* recognize that it requires a

plaintiff to "prov[e] that [factual findings] align with a historically disfavored establishmentarian practice." *Firewalker-Fields v. Lee*, 58 F.4th 104, 122 & n.7 (4th Cir. 2023).  In short, the roadmap footnote "make[s] clear that government conduct violates the Establishment Clause only when that conduct exhibits these historical characteristics of a religious establishment."  Daniel L. Chen, Kennedy v. Bremerton School District*: The Final Demise of* Lemon *and the Future of the Establishment Clause*, 21 HARV. J.L. & PUB. POLICY PER CURIAM 1, 9 (Summer 2022); *see* App. 13 (citing same).

## C.    The Contrary Approach of Appellant and AU Would Revive *Lemon.*

Appellant and AU take a different approach, insisting that the "discussion of hallmarks of religious establishment" in *Shurtleff* and *Kennedy* do not limit the scope of available Establishment Clause claims. AU Br. 6; *see* Opening Br. 32.  Instead, they offer a variety of general, undefined categories of Establishment Clause violations, asking this Court to consider whether, for example, the government has "endorsed religion," (Opening Br. 27), or otherwise "advance[d] religious views" (AU Br. 22 (citation omitted)).

The problem with this approach is not only that it would effectively reinstitute the "*Lemon* [standard] and its endorsement test offshoot" that *Kennedy* rejected, 597 U.S. at 534, but that it fails to account for the driving force behind *Kennedy*'s historical approach. As *Kennedy* explained, a focus on advancement or endorsement of religion, untethered to historical hallmarks of establishment, inevitably results— and did result—in pressure to "'censor' private religious speech" and a "purge from the public sphere [of] anything an objective observer could reasonably infer endorses or 'partakes of the religious.'" *Id.* at 534–35 (citations omitted); *see, e.g.*, *Busch v. Marple Newtown Sch. Dist.*, 567 F.3d 89, 108 n.16 (3d Cir. 2009) (Hardiman, J., dissenting in part) (rejecting the conclusion that prohibiting the sharing of scripture by a parent for her student in a show-and-tell "was necessary to avoid an Establishment Clause violation" under *Lemon*). Where a test would functionally pit the Establishment Clause against the Free Exercise Clause, it is a sign that "the project falters badly." 597 U.S. at 542–43.

To be sure, the Establishment Clause bars many forms of "coercion," "indoctrination," or "religious preference." AU Br. 6. *Kennedy* itself recognized that many of the historical hallmarks it references or

incorporates involve "coercion." 597 U.S. at 537. But the reason *Kennedy* carefully compared the facts of its case to "coercion *along the*[] *lines*" of traditional hallmarks of religious establishment, *id.* (emphasis added), was to *avoid* a "broad" interpretation of these terms, AU Br. 10, that would generate the sort of "phantom constitutional violations" used by the school district in *Kennedy* to restrict an employee's personal prayer. 597 U.S. at 543.

The "standards" proposed by Appellant and AU present similar risks. For example, AU's conception of coercion relies on Thomas Jefferson's private letters to conclude that "'recommendation' of prayer, even without the backing of legal force" by a public official constitutes "coercion" in the form of "subtle pressure to conform." AU Br. 10–11. Such a rule would turn the presidential proclamation of the National Day of Prayer into a constitutional violation—a conclusion AU advocates,[18] but which works the exact "purge from the public sphere" of religion that *Kennedy* corrected. 597 U.S. at 535; *see also id.* at 538–39 (noting *Town*

---

[18] Rob Boston, *The National Day of Prayer Is a Christian Nationalist Relic From the 1950s. Here's How You Can Push Back.* Americans United (May 4, 2023), https://perma.cc/AHX2-BLWE.

*of Greece* rejects that "offense" or having to encounter "speech or prayer of all kinds" might "equate to coercion").

At base, both Appellant and AU appeal to the intuition that government coercion of or preference for religious practice can be unconstitutional even absent precise alignment with one of the historical hallmarks of establishment identified in *Kennedy*. But that intuition is entirely consistent with the Court's guidance, for two reasons.

*First*, Appellant is correct both that "an exact match to history is not required," and that (for example) someone claiming compelled participation in a religious exercise need not show "such extreme coercion as existed in the colonies." Opening Br. 33, 36. Courts may properly review for modern analogues to the historical hallmarks identified by *Kennedy*. That, in fact, is what the district court did here in assessing whether the "curriculum and materials … bear or resemble the 'hallmarks of religious establishments the framers sought to prohibit.'" App. 21. The Supreme Court has likewise reasoned by analogy in finding modern Establishment Clause violations, such as its prohibition on applying employment law "to contradict a church's determination of who can act as its ministers." *Hosanna-Tabor Evangelical Lutheran Church*

*& Sch. v. E.E.O.C.*, 565 U.S. 171, 182, 185 (2012) (looking back to Church of England limits on ministry service).

*Second*, and as AU agrees, concluding that not every form of coercion or pressure can support an *Establishment Clause* claim does not mean such coercion or pressure could not support *other* First Amendment claims. *See* AU Br. 20 (noting that "the Free Exercise Clause also bars religious coercion"). For example, the Supreme Court has (properly) vindicated free exercise challenges to the "indirect coercion" wrought by the exclusion of religious entities from government benefits. *E.g.*, *Carson v. Makin*, 596 U.S. 767, 778 (2022); *Trinity Lutheran Church of Columbia, Inc. v. Comer*, 582 U.S. 449, 463 (2017). Such claims are not bounded by historical analogues. But here, Appellant does not present a free exercise or other constitutional claim. *See* App. 16 (noting no Free Exercise claim was brought); *cf.* Tr. of Oral Arg. 10–11 (disclaiming a freestanding parental rights claim).[19]

---

[19] AU frets that limiting the Establishment Clause to "bar only coercion" would render it "duplicative of the Free Exercise Clause." AU Br. 20. But not all of the hallmarks *Kennedy* identifies necessarily involve the coercion of individual religious practice. *Supra* Part II.B. In any event, finding that the Clauses point in the same direction aligns with both *Kennedy*'s conclusion that the Religion Clauses (and the Free

## III. UNDER THE HISTORICAL-HALLMARK TEST, THE DISTRICT DID NOT VIOLATE THE ESTABLISHMENT CLAUSE.

The application of *Kennedy*'s historical-hallmark test here yields a straightforward result: the District did not violate the Establishment Clause by teaching about the tenets of Islam as part of its social-studies unit on Middle Eastern cultures. Appellant offers two of the six hallmarks incorporated by *Kennedy* as analogues—"mandat[ing] attendance in the established church" and "financial support for the established church." Opening Br. 33–34 (quoting *Shurtleff*, 596 U.S. at 286 (Gorsuch, J., concurring in the judgment)). On the facts found by the district court, neither these hallmarks, nor the others incorporated in *Kennedy,* provide plausible support for Appellant's claim.

### A.   The District Did Not Compel Church Attendance.

A clear historical hallmark of established religion is "mandat[ing] attendance in the established church," *Shurtleff*, 596 U.S. at 286 (Gorsuch, J.), or "coerc[ing] anyone to attend church" on threat of penalty, *Kennedy*, 597 U.S. at 537 (quoting *Zorach v. Clauson*, 343 U.S. 306, 314

---

Speech Clause) are "complementary," 597 U.S. at 533, and the insight of other cases that these provisions can work in tandem to bar certain government actions, *see Hosanna-Tabor*, 565 U.S. at 188–89.

(1952)); *see* McConnell, *supra*, at 2144 (describing fines, corporal punishment, and other criminal penalties enacted by colonial governments for nonattendance). This hallmark is recognized in longstanding precedent holding that the government "[n]either can force nor influence a person to go to or to remain away from church against his will." *Everson v. Bd. of Educ. of Ewing Twp.*, 330 U.S. 1, 15 (1947).

Here, the classroom instruction and homework at issue bore no resemblance to "worship services." McConnell, *supra*, at 2145. As the district court explained, while the curriculum "expos[ed] students to the tenets of religious faiths in various regions of the world," it "did not require or coerce students 'to *support* or *participate* in' the religious faith covered by that unit." App. 18. The challenged material was "used to introduce students to the tenets of Islam" and to "assess the[ir] understanding" of those tenets, not to "proselytiz[e]" or "to inveigle them into praying." *Id.* at 18–19. This remains true even if this same material could be considered devotional "*in the mouths of adherents.*" *Id.* To "teach and study *about* such statements is not to espouse them," much less to encourage others to do so—a fact the student here appears to have recognized. *Id.* at 17–19 (finding that C.H. "perceived the purpose and

effect of the lessons as being to educate students about world religions and the importance of avoiding group generalizations").

For comparison, consider the regular occurrence of a public school teacher taking students on a field trip to the National Gallery of Art. There, students would be exposed to any number of "masterpieces with religious messages" from the Christian faith, "notably the Last Supper, and paintings depicting the Birth of Christ, the Crucifixion, and the Resurrection." *Lynch v. Donnelly*, 465 U.S. 668, 676-77 (1984). But few would contend that a teacher quizzing students on the scenes and messages depicted in this historically significant artwork constitutes a devotional exercise, even though the artwork expresses a religious view and could be used devotionally in another context (*e.g.*, on display in a church sanctuary). The same principle governs exposure to the tenets of minority faiths, including Islam and Judaism.

## B.   The School District Did Not Provide Exclusive Financial Support to the Established Church.

Appellant also suggests that by permitting tax money to indirectly support a school lesson on Islam, the District stumbled into a hallmark of establishment. *See* Opening Br. 34. But the scholarship incorporated

in *Kennedy* shows that there is no analogy here to the type of financial support that characterized a historical establishment.

At the Founding, financial support of "established churches" across the Colonies took a few forms—compulsory religious taxes raised solely for the support of churches and ministers (so-called "tithes"), direct grants from the public treasury, dedicated taxes on products like liquor, and land grants. McConnell, *supra,* at 2147–48, 2152. Such support was direct, institutional, and preferential; it directly subsidized preferred ministers and institutions of worship, while leaving disfavored churches to "the voluntary support of their members." *Id.* at 2154 (discussing South Carolina).

This context is key, because history and precedent make clear that financial support to religious entities for activity that happens to serve government interests is not (and has never been) an establishment per se. Indeed, in free exercise cases, the Supreme Court has *required* funding for religious organizations that qualify for government support. *See Trinity Lutheran*, 582 U.S. 449; *Carson*, 596 U.S. 767; *Espinoza v. Mont. Dep't of Revenue*, 591 U.S. 464, 488–89 (2020); *see also Everson*, 330 U.S. at 17 (school district's funding of transportation to the parochial

schools did not violate the Establishment Clause). This aligns with historical understanding, as "[b]oth before and after the ratification of the First Amendment, the federal government and virtually every state that ended church taxes also funded religious activity." Mark Storslee, *Church Taxes and the Original Understanding of the Establishment Clause*, 169 U. PA. L. REV. 111, 117 (2020).

Here, Appellant does not allege anything like direct, preferential funding to an established denomination. At most, Appellant contends that general funding for a nonreligious entity (a public school) *indirectly enabled* the dissemination of religious speech (*e.g.*, by linking YouTube videos). *See* Opening Br. 34. That is a far cry from exclusive financial support to one religious body, particularly where the lessons on Islam were "part of a larger survey of world . . . religions" that "include[d] similar units on, for example, Hinduism and Buddhism." App. 20.

## C.    No Other Historical Hallmark Applies.

While Appellant does not invoke the remaining hallmarks incorporated in *Kennedy*, a brief discussion of each illustrates how *Kennedy*'s hallmark analysis both (1) accounts for the Court's other

recent Establishment Clause decisions and (2) serves to increase, not decrease, breathing room for free religious expression.

***Governmental Control over Church Doctrine or Personnel.*** In colonial America, it was not uncommon for formal legislation to address articles of faith.  McConnell, *supra,* at 2131, 2136.  For example, in Anglican colonies like Virginia, Parliament determined the articles of faith for the Church of England and approved the text of the Book of Common Prayer; it also stipulated that the King be Supreme Governor of the Church and required all ministers to accept the Church of England's doctrines.  *See* 1 William Blackstone, *Commentaries on the Laws of England* 364–83; *see also* Thomas Berg, *Religious Freedom, Church-State Separation, and the Ministerial Exception*, 106 Nw. U. L. Rev. Colloquy 175, 180 (2011).  Colonies also exercised governmental control over ministers; in South Carolina, for example, the colonial government selected twenty laymen to discipline the church and remove ministers.  McConnell, *supra*, at 2142.

The Supreme Court has referenced such hallmarks of establishment when applying "the general principle of church autonomy" to preclude state interference in the selection of ministers or questions of

religious doctrine. *Our Lady of Guadalupe Sch. v. Morrissey-Berru*, 140 S. Ct. 2049, 2061 (2020). It has concluded that "the 'background' against which 'the First Amendment was adopted'" requires preserving religious entities' "authority to select, supervise, and if necessary, remove a minister without interference by secular authorities." *Id.* at 2060-61 (citation omitted). And it has pointed to that same background to foreclose "state interference" in religious entities' decisions on matters "of faith and doctrine." *Kedroff v. St. Nicholas Cathedral of Russian Orthodox Church in N. Am.*, 344 U.S. 94, 114, 116 (1952).

Plainly, this hallmark has no application here, as the lesson about Islam neither interfered with the operation of any Muslim congregation nor prescribed any particular version of Islam. Rather, it served merely to educate students about what Muslims have historically believed.

***Punishment of Dissenting Worship.*** Various colonies approved imprisonment, corporal punishment, and even capital punishment against dissenting adherents or religious persons showing disfavored "evangelical enthusiasm." McConnell, *supra*, at 2118, 2160–62, 2166. The Supreme Court has described such "abuses" when outlining the protections of the church autonomy doctrine. *Our Lady*, 140 S. Ct. at

2061. Again, there is no analogue to the conduct challenged here, as Appellant did not allege that her minor son was put to the choice of following his own faith or suffering a negative consequence.

*Restrictions on Political Participation.* Before the Founding, English law allowed only Anglicans to hold public office and vote. McConnell, *supra*, at 2177. Similar restrictions on officeholding and voting continued in colonial America, including by denying the franchise to members of disfavored denominations, or extending the franchise only to members of favored denominations. Nathan S. Chapman & Michael W. McConnell, *Agreeing to Disagree: How the Establishment Clause Protects Religious Diversity and Freedom of Conscience* 26–27 (2023). The Supreme Court has applied this hallmark to strike down a Maryland constitutional rule requiring professed belief in God to hold a state commission. *See Torcaso v. Watkins*, 367 U.S. 488, 496 (1961). Of course, no political restriction is at issue here; to the contrary, the disputed lessons were designed to *improve* civic tolerance by discouraging "group generalizations." App. 17.

*Monopoly over Government Functions.* At the Founding, states delegated government duties to religious officials and entities in such

areas as social welfare, elementary education, marriages, public records, and the prosecution of certain moral offenses. McConnell, *supra*, at 2169–77. The Supreme Court has invoked this hallmark in striking down a statute giving churches the power to veto liquor licenses. *See Larkin v. Grendel's Den, Inc.*, 459 U.S. 116, 127 n.10 (1982) (discussing historical practice). But the Court has also distinguished, and protected, religious organizations' ability to perform important civil functions (and receive funds to do so) alongside secular agencies. *See, e.g.*, *Fulton v. City of Phila.*, 593 U.S. 522, 542 (2021) (foster care). In any event, there can be no analogue to this hallmark here, as the District did not give control of the curriculum to a religious body, but itself selected Islamic resources it found useful for a social studies lesson. Tr. of Oral Arg. 28 (describing Board of Education authority over the curriculum).

*  *  *

In sum, the historical-hallmark test reveals that Appellant has identified a "phantom constitutional violation[]," that, if credited, would unnecessarily pit the "complementary" purposes of the Religion Clauses against each other. *Kennedy*, 597 U.S. at 543. Presenting unfamiliar religious faiths in a context of "mutual respect and tolerance" so as to

combat misunderstanding and hatred serves the "best of our traditions."

*Id.* at 514.  The Establishment Clause poses no obstacle to doing so.

## CONCLUSION

The Court should affirm the decision below, and it should do so on the basis that the challenged conduct fails to bear or resemble a hallmark of a religious establishment under *Kennedy*.


May 1, 2024                         Respectfully submitted,
                                    /s/ *Noel J. Francisco*
                                    Noel J. Francisco
                                    Christopher Pagliarella
                                    JONES DAY
                                    51 Louisiana Ave., NW
                                    Washington, DC 20001
                                    (202) 879-3939
                                    njfrancisco@jonesday.com

                                    Eric C. Rassbach
                                    THE HUGH AND HAZEL
                                    DARLING FOUNDATION
                                    RELIGIOUS LIBERTY CLINIC
                                    Pepperdine University
                                    Caruso School Of Law
                                    24255 Pacific Coast Hwy.
                                    Malibu, CA 90263
                                    (310) 506-4611
                                    eric.rassbach@pepperdine.edu

                                    *Counsel for* Amicus Curiae

## COMBINED CERTIFICATIONS

I hereby certify the following:

1. I am a member of the Bar of the United States Court of Appeals for the Third Circuit.

2. This *amicus* brief complies with the type-volume limitation of Fed. R. App. P. 29(a)(5) because it contains 6,401 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f).

3. This *amicus* brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a 14-point proportionally spaced typeface (Century Schoolbook) using Microsoft Word 2019.

4. That the text of the electronic and paper versions of the foregoing brief are identical.

5. That a virus check was performed on this brief using a commercial virus detection program, Microsoft Safety Scanner—version 1.409, and no virus was indicated.

6. That on May 1, 2024, I caused the foregoing to be filed with the Clerk of Court using the CM/ECF System, and all counsel of record in this case is a Filing User who will receive notice of such filing.

Dated: May 1, 2024                    /s/ *Noel J. Francisco*

Noel J. Francisco
*Counsel for* Amicus Curiae